**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEPHAN COWANS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No: 05-11574 (RGS) |
| | ) |
| CITY OF BOSTON; BOSTON POLICE | ) |
| DEPARTMENT; DONALD L. DEVINE, Deputy | ) |
| Superintendent of the Bureau of Investigative | ) |
| Services of the Boston Police Department, in his | ) |
| individual capacity; ROBERT FOILB, Supervisor | ) |
| of the Boston Police Department Identification | ) |
| Unit, in his individual capacity; GREGORY D. | ) |
| GALLAGHER, in his individual capacity; DENNIS | ) |
| LEBLANC, in his individual capacity; JOHN H. | ) |
| MCCARTHY, in his individual capacity; PAUL T. | ) |
| MCDONOUGH, in his individual capacity; | ) |
| ROSEMARY MCLAUGHLIN, in her individual | ) |
| capacity; HERBERT L. SPELLMAN, in his | ) |
| individual capacity; and DOES 1–10; | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S OPPOSITION TO CITY OF BOSTON'S MOTION
FOR A PROTECTIVE ORDER**

Plaintiff hereby opposes Defendant City of Boston's ("City's") Motion for a

Protective Order.  The City seeks to protect documents related to the training,

supervision, verification, assignment, skills and discipline of the officers assigned to the

Latent Print and Identification Units of the Boston Police Department ("BPD") from

1985 to 2004.  Mr. Cowans has sought these documents in support of his claim under 42

U.S.C. § 1983 and under *Monell v. Dept. of Soc. Serv. Of City of N.Y.*, 436 U.S. 658

(1978), as they are directly relevant to establishing the City's custom or policy of failing

to train and supervise its officers assigned to those units leading up to and during the time

that Mr. Cowans was wrongfully convicted.  The City has not shown any sufficient

reason why these documents should not be produced and Mr. Cowans is entitled to these documents as part of discovery. Plaintiff's discovery requests are reasonably calculated to lead to the discovery of admissible evidence and are not overly broad. Therefore, the City of Boston should be compelled to produce all documents requested and provide answers to Plaintiff's Second Set of Interrogatories.

## BACKGROUND

Mr. Cowans sued the City and Officer LeBlanc, among others, for his wrongful conviction based on a fraudulent fingerprint identification. In 1998, Mr. Cowans was wrongfully convicted of shooting BPD Sergeant Gregory Gallagher. The primary evidence against Mr. Cowans was a fingerprint allegedly left behind at the scene of the crime by the perpetrator. This fingerprint was identified by Officer LeBlanc and verified by Officer McLaughlin as belonging to Mr. Cowans. In 2004, when Mr. Cowans was exonerated based on his actual innocence, which was determined by DNA testing, the BPD reviewed the fingerprint evidence. Based on this review, the BPD conclusively determined that the fingerprint found at the scene did not match that of Mr. Cowans. Independent fingerprint experts hired by the City of Boston audited the Latent Print Unit of the BPD and the fingerprint identification that resulted in Mr. Cowans' conviction. As a result of this audit those experts concluded that no competent fingerprint examiner could have matched Mr. Cowans' fingerprints with those found at the scene, that one of the Fingerprint Unit officers discovered the mistake prior to trial and may have deliberately concealed the mistake, and that the officers in the Unit were untrained and unsupervised.

Furthermore, during the independent expert's evaluation of the BPD Latent Print Unit, the experts concluded that:

> Generally speaking, it appears that over the last several years the Latent Print Unit has developed into a unit that has been satisfied with survival instead of success. The absence of involvement and administrative supervision from upper management, coupled with the lack of on site technical leadership have contributed to an environment in which excellence is not expected, therefore not achieved. Maintaining the status quo became Job #1, regardless of what the rest of the forensic identification world was doing. This situation was further complicated by a never ending stream of analytical work that exceeded the perceived abilities of the examiners. Survival became acceptable and new employees assigned to the unit quickly became accustomed to this philosophy.

See Expert Report dated September 5, 2004 at 34, attached hereto as Exhibit A; see also Expert Report dated June 22, 2005, attached hereto as Exhibit B (detailing systematic failures of the BPD Latent Print Unit).

Moreover, subsequent investigations revealed (in the words of the Massachusetts Attorney General) that Mr. Cowans' ordeal was the result of "systemic failures of the fingerprinting lab," and (according to investigative reports) that, prior to its closure in the wake of Mr. Cowans' exoneration, the Latent Fingerprint Unit was, "for decades … a 'dumping ground' for troubled cops who were responsible for handling critical evidence used to put suspected rapists and killers behind bars." (See News Articles Attached hereto as Exhibit C).

As a result of the expert report, the Latent Fingerprint Unit was closed in 2004 and was not reopened until January of this year under civilian control. Additionally, an internal affairs investigation was conducted and a grand jury was convened to assess the wrongdoing that had occurred.

Furthermore, Mr. Cowans' preliminary investigation into this matter has revealed that additional failures by the BPD may have occurred in the Homicide Unit in terms of Mr. Cowans' name being provided as a suspect, the line-ups and picture arrays, and the overall failure of the Homicide Unit to follow up on other possible suspects.

## FACTS

Plaintiff served its Second Set of Interrogatories and Third Set of Requests for Documents and Things on the City on April 27, 2006. In those requests, among other things, Mr. Cowans requested documents related to the training, supervision, verification, assignment, skills and discipline of the officers assigned to the Latent Print and Identification Units of the BPD from 1985 to 2004. Mr. Cowans sought these documents in support of his claim under § 1983 and *Monell* as they are directly relevant to establishing a the City's custom or policy of failing to train and supervise its officers assigned to those units leading up to and during the time that Mr. Cowans was wrongfully convicted.

The City provided its Responses on June 1, 2006. (Attached hereto as Exhibits D and E). On June 15, 2006, Plaintiff sent a letter to the City detailing the deficiencies in its answers for objecting to these interrogatories and document requests, among other deficiencies. (See Letter attached as Exhibit F). Counsel for the City responded on June 21, 2006, but did not agree to respond to the requests. (See Response attached as Exhibit G). On June 23, 2006, counsel for Mr. Cowans filed a motion to compel production of these documents and responses to Plaintiff's interrogatory requests. (See Motion to Compel, attached as Exhibit H).

The City's motion for a protective order is merely an attempt by the City to avoid producing documents directly relevant to Mr. Cowans' case and to further delay this litigation.

## ARGUMENT

Plaintiff does not dispute the legal standard set forward by the City. Mr. Cowans is entitled to discovery "regarding any matter, not privileged, that is relevant to" his

claims. Fed. R. Civ. P. 26(b)(1). Even if the evidence may not be admissible at trial, discovery must be had as long as it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id*. However, "[r]elevancy is to be <u>broadly construed</u> at the discovery stage of litigation and a request for discovery should be considered relevant if there is <u>any possibility</u> that the information sought may be relevant to the subject matter of the action." *Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 10 (D. Mass. 1990) (emphasis added). Because written responses to interrogatories and document requests as well as documents responsive to the above-requests are relevant to Mr. Cowans' § 1983 claims against the defendants and because there is no valid basis upon which these documents can be withheld, this Court should deny the City's motion for a protective order and compel the defendants to respond to written discovery and produce all responsive documents immediately.

The City, however, attempts to assert that it should be protected from producing documents relevant to Mr. Cowans' requests and responding to interrogatories because those requests and interrogatories are oppressive, unduly burdensome and expensive. However, the City ignores its own statement of the law that discovery shall only be limited "if the burden or expense of the proposed discovery outweighs its likely benefit." Defendant's Motion for Protective Order ("Defendant's Motion") at 3.

In the case at hand, Mr. Cowans claims, based on statements of the City's experts and police and public reports, that the City of Boston had a policy or custom of failing to train and supervise the officers assigned to the Latent Print Unit of the Boston Police Department. As a result, the training and supervision provided to members of the unit as a whole—not just those individuals named as defendants—is directly relevant to the current lawsuit. *Bordanaro v. Mcleod*, 871 F.2d 1151, 1156 (1st Cir. 1989). To limit

discovery on issues related to training, supervision, and discipline to those officers named

as defendants would ignore the fact that Mr. Cowans has made a claim against the City

with respect to an alleged custom or policy of failing to train and supervise members of

the Unit. While the City attempts to contend that information related to officers assigned

to the Identification Unit over the period of time when the defendants were assigned there

is not relevant, this is completely untenable.

Furthermore, Mr. Cowans has sound reason to believe that the information

relating to individuals assigned to the Identification and Latent Print Units over the 19

year time span articulated would lead to admissible evidence based on the testimony of

both Commissioner O'Toole and Sgt. Silva. Commissioner O'Toole testified that she

was informed that the Latent Print and Identification Units (the Units to which the

officers who are alleged to have violated Mr. Cowans' constitutional rights by

misidentifying a fingerprint as belonging to Mr. Cowans were assigned) were used as

"dumping ground" for less than desirable employees of the BPD. (Deposition of

Kathleen O'Toole ("O'Toole Dep."), attached hereto as Exhibit I, at 124-25; 127-28).

Furthermore, Commissioner O'Toole adopted wholesale the findings of Ron Smith and

Associates, the experts who audited the BPD Latent Print Unit, which indicated a custom

or policy of failing to train and supervise members of the BPD Latent Print Unit which

had evolved over a period of years. (*Id.* at 128-29; June 22, 2005 Report at 2, attached

hereto as Exhibit B).

Furthermore, Sgt. Silva, a member of the Latent Print Unit since 1984, testified

similarly and named at least six (6) individual officers assigned to the Identification and

Latent Print Units who were dumped in the unit because they needed to be taken off the

streets and then were not trained or supervised. (Deposition of Robert Silva ("Silva

Dep."), attached hereto as Exhibit J, at 98-108). Sgt. Silva testified that for years leading up to and while the defendants in this action were assigned to this unit, less than desirable employees were assigned to the unit. Furthermore, he stated that the Unit was understaffed, no supervisors were present and sufficient training was not provided to members of the unit. (Silva Dep. at 120; 14-16; 91-92).

Thus, the documents requested by Plaintiff are directly related to his claims and Mr. Cowans has good reason to believe that records and information relating to the training, supervision, assignment and disciplinary records related to all individuals assigned to the Identification Units and Latent Print Units will reveal admissible evidence for his *Monell* claim against the City.

The fact that these requests pre-date the arrest of Mr. Cowans and relate to individuals other than the defendants are precisely the reason why they are relevant to Mr. Cowans' claims of widespread failure to train and supervise. *See Briddell v. Saint Gobain Abrasives, Inc.* 233 F.R.D. 57, 59 (D. Mass. 2005) (holding that "[p]laintiff[s] should be permitted to show that defendants' past practices manifest a pattern…") (quoting *Jackson v. Harvard*, 111 F.R.D. 472, 475 (D. Mass. 1986) (further holding that a time frame which brackets only the action in question "would foreclose plaintiff from elucidating past practices or identifying a pattern."). The likely benefit to Mr. Cowans from receiving these documents is great in terms of evidence in support of his *Monell* claim. The City's claims that it cannot see the relevance of these documents is completely disingenuous.

Simply because the amount of documents that would need to be reviewed by the City is voluminous does not mean that the requests are overbroad and unduly burdensome. Furthermore, the fact that a large amount of documents may be involved

certainly does not mean that the burden outweighs the benefit to Mr. Cowans.  As demonstrated, the likely benefit of these documents to Mr. Cowans' *Monell* claim is substantial, the City must demonstrate the burden on them is so great as to outweigh this benefit.  The City has not done so.  The fact that the City would have to review 5,000 personnel files is not so burdensome as to outweigh the benefit to Mr. Cowans of receiving these relevant documents.

Finally, the City argues that it has adequately responded to Plaintiff's requests.  However, the City failed to cooperate in discovery for nearly six months of this case.  Original requests for documents and interrogatories were served in October 2005.  The City failed to produce a single document until January 2006 and did not produce any written discovery responses until April 2006.  Furthermore, Mr. Cowans has had to send numerous letters in an attempt to elicit documents from the City.  The City was still producing responsive documents as of the last week in June – eight months after discovery requests were served.  The City's request for a protective order is merely another attempt to delay this litigation.

Therefore, because the documents requested are relevant and there has been no showing sufficient to outweigh the substantial benefit to Mr. Cowans of this discovery, the City's motion for a protective order should be denied and the City should be compelled to produce the documents requested and written responses to discovery immediately.

RESPECTFULLY SUBMITTED,

STEPHAN COWANS

By his attorneys,


  /s/ R. David Hosp
Joseph Savage (BBO# 443030)
R. David Hosp (BBO# 634091)
Sheryl A. Koval (BBO# 657795)
Goodwin | Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100

Dated: July 13, 2006

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 13, 2006.

/s/ R. David Hosp
R. David Hosp

LIBA/1713239.1

# EXHIBIT A



# Ron Smith & Associates, Inc.

P.O. Box 4436 · Meridian· Mississippi · 39304·
Toll Free: 1-866-TEAM RSA (832-6772) · Office (601) 485-7606 · Fax (601) 485-7622 ·
www.ronsmithandassociates.com

September 5, 2004

Captain Thomas Dowd, Supervisor
Identification Division
Boston Police Department
1 Schroeder Plaza
Boston, Massachusetts   02120

Reference:  Latent Print Unit Evaluation

Captain Dowd,

Pursuant to our previous contractual agreement, several senior staff members of Ron Smith & Associates, Inc. conducted interviews, administered written tests, and practical exercises to several members of the Boston Police Department Latent Print Unit. The members of the RS & A, Inc. unit/examiner evaluation team were as follows:

Team Leader:      Ron Smith, President of RS & A, Inc.      Meridian, MS
Team Member:      Charles Richardson, Senior Consultant      Hughesville, MD
Team Member:      Bob Garrett, Senior Consultant      Metuchen, NJ

The general purpose of the on site testing and evaluation was to answer, if possible, the following questions:

1.      What is the individual general knowledge level of each examiner in the field of latent print examination?

2.      How does their level of knowledge compare to the expected level of knowledge commensurate with the requirements of experts in the field today, particularly as it relates to the level of knowledge required for certification by the International Association for Identification?

3.      What appears to be the level of "collective knowledge" within the Latent Print Unit?

1

4.  Is their level of knowledge displayed consistent with the level of training they have been provided from internal and external sources throughout their career within the Latent Print Unit?

5.  What is the individual skill level of each latent print examiner as it pertains to "analysis of latent prints" to determine sufficiency for further review? (This exercise was designed to determine what level of expertise each examiner displayed in determining if partial latent prints were of value for comparison purposes.)

6.  What is the individual skill level of each latent print examiner as it pertains to "comparison and evaluation" of latent prints with known inked prints of possible suspects? (These practical exercises were designed to provide the evaluation team with sufficient information to determine the probability of each examiner successfully completing the comparison portion of the I.A.I. Latent Print Examiner Certification test.)

7.  How do the results of these individual and collective evaluations compare to the initial unit assessment previously reported under the sections "III. Training Deficiencies of Existing Personnel: Latent Print Unit" and "VI. Absence of Continuing Education Program of members of the Latent Print Unit."? (These two items can be found in the previous report entitled "Request for Proposal: Latent Print Services" which was dated, June 22, 2004.

## The Evaluation Process:

Every attempt was made to fairly and honestly determine the knowledge, skills and abilities of each staff member of the B.P.D. Latent Print Unit. Although these assessments were certainly not exhaustive, they were designed to elicit sufficient information to answer the questions noted above. It is the opinion of the assessment team that this was accomplished. It should be noted at the outset that these individuals did not know what was going to be expected of them prior to the actual on site assessment; therefore they had no time to conduct any special preparations for the evaluations. All they had been instructed to do was to have a current resume prepared for inspection during the interview portion of the assessment. The results and comments are a compilation of the findings of the on site evaluation team and a thorough review of the assessment results.

It should be noted that the following members of the B.P.D. Latent Print Unit participated in the evaluation process, as noted below:

| Name | Participated in: |
|---|---|
| ██████████ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I (Was not requested to participate in Latent Print Comparison Exercise Level II due to assistance he had to provide to members of the RS & A, Inc. assessment team. He therefore, did not have time to complete this Level II exercise) |
| ██████████ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ████████ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ██████████ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ██████████ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ████████ | Was not present and did not participate. |

## Results:

The individual results will be reported for each element of the on site assessment. The results will be reported in three different manners to assist in the complete comprehension of the information. First, the raw data for each assessment or exercise will be noted for each individual participating in the assessment. This will be referred to in this report as RESULTS: RAW DATA.

Second, the data will be reviewed and discussed in a fuller context to discuss any individual patterns which might have been recognized by the assessment team and displayed in the exercises. The data will also be discussed in comparison to what the expected level of performance would be on these exercises for subject matter experts in other functional latent print units. This section will be referred to as INDIVIDUAL RESULTS: OBSERVATIONS.

Third, the data will be reviewed and discussed in combination with the training and experience level of each examiner, which was determined through the interviews, to fully evaluate the data in the proper context. This will be referred to as INDIVIDUAL RESULTS: FINAL ASSESSMENT.

Once all of the individual results have been addressed, the final review of the results will be discussed from a collective knowledge, skills and abilities perspective to determine what capabilities, and/or limitations within the Boston Police Department Latent Print Unit currently exist. This is a vital part of the evaluative process because it is this collective knowledge, skill and ability that represents the absolute best the B.P.D. Latent Print Unit currently has to offer. This will indicate the highest level of expertise currently available within the section **when all the resources are combined together and will not be indicative of the collective abilities of each working shift.** This section will be referred to as the LATENT PRINT UNIT COLLECTIVE ASSESSMENT.

## RESULTS: RAW DATA

I.    Written Knowledge Assessment:

Note:  This written assessment consisted of a two hundred (200) question latent print general knowledge examination. The examination was designed to determine the working knowledge level of the Boston Police Department employees who currently represent the department as subject matter experts in the field of latent print examination. The primary topic areas which were included in this written assessment included the following:

A.    History of the science of friction ridge comparison and identification.

B.    The fundamentals of fingerprint classification methods and systems.

C.    Biological aspects of the friction ridge science.

D.    Finger, palm and foot latent print orientation principles.

E.    The principles of the latent print comparison & identification process.

F.    Chemical & non-chemical latent processing techniques.

The cumulative individual results on the Written Assessment were as follows:

| Name | Percentage of Correct Answers (Entire Test) |
|---|---|
|  | 65% |
| | 54% |



50%

62%

47%

The breakdown of correct/incorrect answers for each participant as it is related to each primary topic area is as follows: (Note: The numbers under each name reflect the total number of correct answers each participant received followed by a slash mark and the number of incorrect answers for each topic. The total number of questions for each topic is noted in parentheses next to the topic name.)

| Name: | ▇▇▇ | ▇▇▇ | ▇▇▇ | ▇▇▇ | ▇▇▇ |
|---|---|---|---|---|---|
| (Correct/Incorrect) | C / I | C / I | C / I | C / I | C / I |
| **Topics** | | | | | |
| History (45) | 26 / 19 | 12 / 33 | 16 / 29 | 21 / 24 | 11 / 34 |
| Classification (36) | 29 / 7 | 29 / 7 | 27 / 9 | 28 / 8 | 29 / 7 |
| Biology (23) | 15 / 8 | 16 / 7 | 13 / 10 | 18 / 5 | 15 / 8 |
| Position Orientation (14) | 9 / 5 | 12 / 2 | 10 / 4 | 12 / 2 | 8 / 6 |
| Principles of Comparison (27) | 26 / 1 | 22 / 5 | 12 / 15 | 21 / 6 | 20 / 7 |
| Processing Techniques (55) | 25 / 30 | 16 / 39 | 22 / 33 | 25 / 30 | 11 / 44 |
| Totals (200) | 130 / 70 | 107 / 93 | 100 / 100 | 125 / 75 | 94 / 106 |

II.     Friction Ridge Evaluation and Orientation Exercise

Note:   This practical exercise was composed of fifty (50) latent impressions. The latent impressions were originally developed with black latent fingerprint powder, lifted with clear lifting tape, and mounted on white latent lift cards. The impressions were digitally scanned as TIFF images using a resolution of 1000 dpi and printed on high quality photographic paper. The impressions within this exercise consisted of impressions from fingers, tips of fingers, second and third joints of fingers, palms, feet, non-friction ridge human skin and lightly textured non-human surfaces. Of the fifty (50) impressions, a total of twelve (12) of them have been deemed to be of no value for comparison purposes by I.A.I. Certified Latent Print Examiner senior team members of RS & A, Incorporated.

The purpose of this exercise is to determine the skill of each participant in making the initial determination of "value versus no value" on their latent prints. This is a very critical part of the ACE-V process. (Analysis, Comparison, Evaluation – Verification). Examiners who continually deem latent prints to be of value, which do not possess sufficient friction ridge area information to be used for comparison purposes, reduce the unit efficiency over a period of time by a significant margin. Likewise, examiners who do not retain difficult latent prints which are indeed identifiable, eliminate entirely the possibility of that latent print being identified.

This exercise is also designed to determine the knowledge of the participant in recognizing the friction ridge origin area of the latent prints. This knowledge is a very critical element of the comparison process and one that has a major impact on the overall efficiency of the examiner during the comparison phase of the examination process.

The results were as follows:

| <u>Name</u> | <u>Correct/Incorrect Answers</u> |
|---|---|
|  | 1.  Correctly located all twelve (12) of the latent impressions which were not of value for comparison purposes. |
| | 2.  Incorrectly marked two (2) latent impressions as being of no value when they were of value for comparison purposes. |
| | 3.  Of the remaining thirty-six (36) latent impressions he deemed to be of value, he accurately determined the correct friction ridge origin area of twenty-nine (29) of the latent impressions. |

1.    Correctly located ten (10) of the twelve (12) latent impressions which were not of value for comparison purposes.

2.    Incorrectly marked five (5) latent impressions as being of no value when they were of value for comparison purposes.

3.    Of the remaining thirty-five (35) latent impressions he deemed of value, he accurately determined the correct friction ridge origin area of twenty-nine (29) of the latent impressions.

1.    Correctly located all twelve (12) of the latent impressions which were not of value for comparison purposes.

2.    Incorrectly marked eight (8) latent impressions as being of no value when they were of value for comparison purposes.

3.    Of the remaining thirty (30) latent impressions she deemed of value, she accurately determined the correct friction ridge origin area of twenty (20) of the latent impressions.

1.    Correctly located six (6) of the twelve (12) latent impressions which were of no value for comparison purposes.

2.    Incorrectly marked one (1) latent impression as being of no value when it was of value for comparison purposes.

3.    Of the remaining forty-three (43) latent impressions he deemed of value, he accurately determined the correct friction ridge origin area of thirty-two (32) of the latent impressions.

1.    Correctly located all twelve (12) of the latent impressions which were of no value for comparison purposes.

7

2.    Incorrectly marked four (4) latent impressions as being of no value when they were of value for comparison purposes.

3.    Of the remaining thirty-four (34) latent impressions he deemed of value, he accurately determined the correct friction ridge area of origin of twenty-four (24) of the latent impressions.

## III.    Latent Print Comparison Exercise Level I:

Note:  This exercise was composed of fifteen (15) latent prints of medium levels of difficulty. All fifteen (15) of these latent impressions were made by one of the individuals whose known inked prints are contained in the exercise and all fifteen (15) contain sufficient legible friction ridge detail information to be identified. The corresponding "match area" of the known inked prints is of sufficient clarity to be used to correctly locate and identify all fifteen of the latent impressions in this exercise.  All latent impressions were developed on items with cyanoacrylate ester fuming and further developed with black latent fingerprint powder.  Each latent impression was lifted with clear lifting tape and mounted on white latent lift cards. The latent impressions were then digitally scanned as TIFF images at a resolution of 1000 dpi.  The five (5) sets of known inked fingerprints and palm prints, A through E, were recorded with black printer's ink and scanned as TIFF images at a resolution of 1000 dpi.  Both the latent impressions and the known inked prints were printed on high quality photographic paper on a Kodak color printer set at an output resolution of 1000 dpi.

| Name | Correct/Incorrect Answers |
|------|---------------------------|
| ███████ | 1.    Correctly identified eight (8) of the fifteen (15) latent prints in this comparison exercise. |
| | 2.    Did not identify the seven (7) remaining latent prints in this comparison exercise. |
| | 3.    Incorrectly marked one (1) of the latent impressions as being of no value when it was of value for comparison purposes and sufficient for identification with one (1) of the suspect known prints provided. |
| ███████ | 1.    Correctly identified nine (9) of the fifteen (15) latent prints in this comparison exercise. |

2.   Did not identify the six (6) remaining latent prints in this comparison exercise.

3.   Incorrectly marked two (2) of the latent impressions as being of no value when they were of value for comparison purposes, and sufficient for identification with the suspect known prints provided.

1.   Correctly identified nine (9) of the fifteen (15) latent prints in this comparison exercise.

2.   <u>Incorrectly identified one (1) latent impression.</u> (This could have been an administrative error since the correct finger was the finger next to the one she marked. She said that one of the latent prints (Latent # 11) matched the left middle finger of suspect E when it actually matched the left ring finger of that same subject.)

3.   Did not identify the five (5) remaining latent prints in this comparison exercise.

4.   Incorrectly marked three (3) of the latent impressions as being of no value when they were of value for comparison purposes, and sufficient for identification with the suspect known prints provided.

1.   Correctly identified three (3) of the fifteen (15) latent prints in this comparison exercise.

2.   Did not identify the remaining twelve (12) latent prints in this comparison exercise.

3.   Incorrectly marked five (5) of the latent impressions as being of no value for comparison purposes when they were of value for comparison purposes, and sufficient for identification with the suspect known prints provided.

1.   Correctly identified nine (9) of the fifteen (15) latent prints in this comparison exercise.

2.   Did not identify the remaining six (6) latent prints in this comparison exercise.

IV.    Latent Print Comparison Exercise Level II:

Note:  This exercise was composed of fifteen (15) latent prints of more advanced levels of difficulty.  Fourteen (14) of the fifteen (15) of these latent impressions were made by the individuals whose known inked prints are contained in the exercise and all fifteen (15) contained sufficient legible friction ridge detail information to be identified or excluded. The corresponding "match area" of the known inked prints is of sufficient clarity to be used to correctly locate and identify all of the matching latent impressions in this exercise. All latent impressions were developed on items with cyanoacrylate ester fuming and further developed with black latent fingerprint powder.  Each latent impression was lifted with clear lifting tape and mounted on white latent lift cards.  The latent impressions were then digitally scanned as TIFF images at a resolution of 1000 dpi. The five (5) sets of known inked fingerprints and palm prints, A through E, were recorded with black printer's ink and scanned as TIFF images at a resolution of 1000 dpi. Both the latent impressions and the known inked prints were printed on high quality photographic paper on a Kodak color printer set at an output resolution of 1000 dpi.

| Name | Correct/Incorrect Answers |
|------|---------------------------|
|  | 1.    Did not participate in the Level II Comparison Exercise. |
| | 1.    Correctly identified one (1) of the latent prints in this comparison exercise. |
| | 2.    Incorrectly identified one (1) latent impression. Erroneous identification of wrong individual. |
| | 3.    Did not identify or exclude any of the remaining thirteen (13) latent prints in this comparison exercise. |
| | 1.    Correctly identified five (5) of the latent prints in this comparison exercise. |
| | 2.    Incorrectly identified one (1) latent impression. Erroneous identification of wrong individual.  (This latent impression did not match any of the known inked-fingerprints provided.) |
| | 3.    Did not identify the remaining nine (9) latent prints in this comparison exercise. |

10



1. Did not identify any of the fifteen (15) latent prints in this comparison exercise.

2. Incorrectly marked thirteen (13) of the latent impressions as being insufficient for "verification", when they were all sufficient for comparison and identification or exclusion with the known inked prints provided.

1. Correctly identified five (5) of the latent prints in this comparison exercise.

2. Did not identify the remaining ten (10) latent prints in this comparison exercise.

3. Incorrectly marked four (4) of the latent impressions as being insufficient for comparison purposes, when they were sufficient for comparison and identification with the known inked prints provided.

## INDIVIDUAL RESULTS: OBSERVATIONS

**Note: It is very important to understand that any comments made in this section of the report entitled "Individual Results: Observations" are based upon what would be the expected level of knowledge and performance for any examiner who is being offered to the court system as a subject matter expert in the field of latent print examination and are not based upon their individual background, training and experience.**

| Name | Written Assessment |
|---|---|

1. In the Written Assessment it became clear that ▮▮▮▮▮▮ general knowledge of the science of friction ridge identification is significantly greater than his subordinate employees but is significantly less than what it could be, or should be, considering his current assignment as a supervisor of the latent print unit.

11

2.  His primary strengths appear to be in the critically important area of "Principles of Latent Print Comparison and Identification Process" and "Fingerprint Classification".

3.  He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

4.  He demonstrates average knowledge in the area of "Finger, Palm and Foot Latent Print Orientation Principles".

## Friction Ridge Skin Evaluation and Orientation Exercise

1.  ██████████ appears to have developed a high level of discernment related to making the value/no value decision in latent print examinations. Appears to be very experienced and skilled in making this initial analytical decision.

2.  Demonstrates average ability in his knowledge of position clues related to finger and palm print areas of origin.

3.  Demonstrated no significant knowledge of position clues related to footprint impressions.

## Latent Print Comparison Exercise Level I

1.  ██████████ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints. He seems to be slightly less proficient in comparing latent palm prints than fingerprints.

2.  He seems to be very careful in making his identification decisions, which is a very desirable analytical trait.

## Latent Print Comparison Exercise Level II

██████████ did not participate in this Level II exercise due to lack of time.

| Name | Written Assessment |
|------|--------------------|

█████████

1. In the Written Assessment it became clear that █████████ general knowledge of the science of friction ridge identification is slightly above the average of the non-supervisory employees within the B.P.D. Latent Print Unit, but is significantly less than what it could be, or should be, considering his current assignment as a testifying latent print subject matter expert.

2. His primary strengths appear to be in the areas of "Principles of Latent Print Comparison and Identification Process", "Finger and Palm Print Orientation Principles", and "Fingerprint Classification".

3. He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

## Friction Ridge Skin Evaluation and Orientation Exercise

1. █████████ appears to have a slightly below expected average level of discernment related to making the value/no value decision in latent print examinations. Appears to be less skilled and lacks training in making this initial decision.

2. Demonstrates expected average ability in his knowledge of position clues related to finger and palm print areas of origin.

3. Demonstrated no significant knowledge of position clues related to footprint impressions.

## Latent Print Comparison Exercise Level I

1. █████████ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints.

2..     In this exercise, he seemed to be very careful in making his identification decisions, which is a very desirable analytical trait.

## Latent Print Comparison Exercise Level II

1.     █████████ did not exhibit any significant skill level in comparing difficult latent prints. He identified one latent impression in this exercise correctly and erroneously identified a second latent fingerprint. A thorough review of this major error was conducted and the review team cannot understand how this particular error could have occurred. The reported matching fingerprint in no way resembles the latent fingerprint.

| Name | Written Assessment |
|------|--------------------|
| ████ | |

1.     In the Written Assessment it became clear that █████ general knowledge of the science of friction ridge identification is well below the average of the non-supervisory employees within the B.P.D. Latent Print Unit and is significantly less than what it could be, or should be, considering her current assignment as a testifying latent print subject matter expert.

2.     Her primary knowledge strengths appear to be in the areas of "Finger and Palm Print Orientation Principles", and "Fingerprint Classification".

3.     She shows very significant weaknesses in her knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

4.     Worthy of special notice is her significant weakness in her knowledge of the very critical area of "Principles of Latent Print Comparison and the Identification Process". Her number of incorrect answers in this topic area was in excess of double of any of the other B.P.D. examiners evaluated.

## Friction Ridge Skin Evaluation and Orientation Exercise

1.  ▮▮▮▮▮ appears to have a significantly below expected average level of discernment related to making the value/no value decision in latent print examinations. Appears to be less skilled, or for some other reason, very hesitant to retain latent prints which might be difficult to compare with suspect known prints.

2.  Demonstrates less than expected average ability in her knowledge of position clues related to finger and palm print areas of origin.

3.  Demonstrated no significant knowledge of position clues related to footprint impressions.

## Latent Print Comparison Exercise Level I

1.  Based upon the correct identifications only, ▮▮▮▮▮ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints.

2.  In this exercise, she identified ten (10) of the latent impressions, which was at least one (1) more than any other participant. However, when recording her identifications on the examination results worksheet, she appears to have inadvertently recorded the wrong matching finger of the correct known prints. This is normally referred to as a "clerical erroneous identification", if indeed this is what actually occurred. It is the opinion of the review team that this was indeed a serious clerical error, but not one of a technical nature.

## Latent Print Comparison Exercise Level II

1.  ▮▮▮▮▮ appears to possess an average expected ability to compare difficult latent prints and was able to identify five (5) of these more difficult latent prints correctly. This was based upon the identifications reported correctly and not the erroneous identification.

2.  She did, however, incorrectly identify one (1) latent impression. After a thorough review of the latent print and the known inked prints, it is the opinion of the review team that this "identification" qualifies as a

"technical erroneous identification", which is the most serious of all technical errors. The latent impression was of the same pattern type as the known inked fingerprint but was not made by this person.

Name

## Written Assessment

1.   In the Written Assessment it became clear that ▮▮▮▮▮ ▮▮▮▮▮▮ general knowledge of the science of friction ridge identification is above the average of the non-supervisory employees within the B.P.D. Latent Print Unit but is significantly less than what it could be, or should be, considering his current assignment as a testifying latent print subject matter expert.

2.   His primary knowledge strengths appear to be in the areas of "Principles of Latent Print Comparison and Identification Process", "Finger and Palm Print Orientation Principles", "Biological Aspects of the Friction Ridge Science" and "Fingerprint Classification".

3.   He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", and the "History of the Science of Friction Ridge Identification".

## Friction Ridge Skin Evaluation and Orientation Exercise

1.   ▮▮▮▮▮▮▮ appears to have a slightly below expected average level of discernment related to making the value/no value decision in latent print examinations. Appears to be less skilled and lacks training in making this initial decision. He lacks the willingness to eliminate the "no value" impressions when they occur.

2.   Demonstrates below expected average ability in his knowledge of position clues related to finger and palm print areas of origin.

3.   Demonstrated no significant knowledge of position clues related to footprint impressions.

16

## Latent Print Comparison Exercise Level I

1.      ████████ appears to possess significantly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints. He seemed to be hesitant to "make the call" on his own, even in this non-case testing environment.

2.   In this exercise, he identified less than half as many latent prints as the other B.P.D. participants.

## Latent Print Comparison Exercise Level II

1.      ████████ did not exhibit any significant skill level in comparing difficult latent prints. He did not identify any of the latent prints in this exercise. His worksheet notes indicated that he had probably found the most likely candidate for some of the latent prints but he was not willing to make a commitment as to the identification.

<u>Name</u>

████████

## Written Assessment

1.   In the Written Assessment it became clear that ████ ████████ general knowledge of the science of friction ridge identification is significantly below the average of the non-supervisory employees within the B.P.D. Latent Print Unit and is significantly less than what it could be, or should be, considering his current assignment as a testifying latent print subject matter expert.

2.   His primary strengths appear to be in the areas of "Principles of Latent Print Comparison and Identification Process", "Finger and Palm Print Orientation Principles", and "Fingerprint Classification".

3.   He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

17

### Friction Ridge Skin Evaluation and Orientation Exercise

1. ████████████ appears to have a slightly below expected average level of discernment related to making the value/no value decision in latent print examinations. Appears to be less skilled and lacks advanced training in making this initial decision.

2. Demonstrates less than expected average ability in his knowledge of position clues related to finger and palm print areas of origin.

3. Demonstrated no significant knowledge of position clues related to footprint impressions.

### Latent Print Comparison Exercise Level I

1. ████████████ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints.

2. In this exercise, he seemed to be very careful in making his identification decisions, which is a very desirable analytical trait.

3. Seems to display a lack of confidence in searching for latent palm prints.

### Latent Print Comparison Exercise Level II

1. ████████████ appears to possess an average expected ability to compare difficult latent prints and was able to identify five (5) of these more difficult latent prints correctly.

2. Appears to be a very cautious examiner.

## INDIVIDUAL RESULTS: FINAL ASSESSMENT

Note: It should be fully understood that the comments made in this section entitled "Individual Results: Final Assessment" are based upon not only the results of their written and practical exercises but also upon a thorough interview with each of the participants and a careful review of their individual resume and training history.

18

Name

## Final Assessment

███████ is a dedicated career B.P.D. employee who has been
employed as either a civilian or sworn officer with the department
since 1968. He has been assigned to the Identification Unit since
1985 and was assigned to the Latent Print Unit for a period of five
(5) years between 1990 and 1995. His primary function for the last
several years, since 1995, has been as a supervisor in the
Identification Unit with direct daily supervision of the 10 Print
operation and very limited supervision of the Latent Print Unit. He
has not been functioning as a latent print examiner on a regular
basis since 1995.

Based upon a review of his resume which he provided, and a
thorough interview, it appears that his original technical training
was not formal and was very restricted in scope. It appeared to
have been primarily internship type training with very little
organized material or other instructional methods being employed
internally. Much of what he now knows he learned on his own
through other sources throughout his career. He was provided the
opportunity to participate in limited external training, primarily
when it was made available to the department without tuition or at
a reduced cost. Based upon his written assessment, he seems very
proficient in discussing the latent print science, from the
perspective of how it was being practiced by the Boston Police
Department during his assignment to the Latent Print Unit.

Surprisingly, and in spite of the fact that he has not been an active
latent print examiner since 1995, his overall knowledge level of the
friction ridge science was higher than any of the latent print
examiners currently assigned to the Latent Print Unit and he scored
the highest in four (4) of the six (6) topic areas. Although, this
certainly can be considered a positive when examining the
credentials of ███████, it most assuredly should be considered as
a negative when examining the expected level of knowledge
displayed by the current latent print staff members who are
representing the department in court as their subject matter experts.

It is the opinion of the RS & A, Inc. assessment team that even
though his lack of knowledge of current technology and scientific
methodology could certainly be used against him in a court of law
by an informed defense attorney, his vast years of experience in the
field will probably keep that from happening. It is doubtful that
the counselor would be versed enough themselves in the science to

be able to convince the judge to disallow his testimony. Even though he would probably be able to qualify as an expert witness in the Boston courts, his lack of knowledge could greatly affect his level of credibility in the eyes of the jury members as the cross examination proceeds. If he will continue to be offered as an expert witness, his training deficiencies would need to be addressed as soon as reasonably possible.

His technical ability to properly evaluate latent prints for sufficiency and determine the friction ridge origin area and proper orientation should be considered as acceptable, considering his absence from active latent print casework for approximately nine (9) years. Based upon the expected level of proficiency, in this required area, for a supervisor of a fully functional Latent Print Unit, his current technical ability is significantly below the desired level.

████████ technical ability to compare and correctly identify latent prints should also be considered acceptable, considering his absence from active latent print casework for approximately nine (9) years. Based upon this very critical responsibility area of a Latent Print Unit supervisor, his technical ability would currently be below the desired level.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the RS & A, Inc. assessment team that ████████ is a very cautious and conscientious employee and is fully capable of arriving at the correct ident/non-ident conclusion on the vast majority of latent prints he encounters.

It is also the opinion of the assessment team that on some difficult "ident" latent prints he currently does not possess the skills and experience necessary to arrive at the "ident" conclusion and would choose to arrive at an "inconclusive" decision rather than take a chance and make an erroneous identification. This is a very commendable trait and one that all examiners should possess; but for a Latent Print Unit to effectively function, the senior technical supervisor(s), who serve as the final word on difficult examinations, must be able to make the correct decision on the difficult latent print comparisons. As a result, a significant number of suspect latent prints will not be identified, thereby reducing the effectiveness of the entire Latent Print Unit.

It is the opinion of RS & A, Inc. that ████████s current level of knowledge, skill and ability as a latent print examiner is indeed

consistent with his level of internal and external training and experience. There appears to be a direct correlation between his lack of technical training and his lack of scientific knowledge in the field.

███████ has not had the opportunity during his career to receive sufficient training in numerous areas of importance to a current day functioning Latent Print Unit. Some of these deficient areas would include Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, Expert Witness Testimony Techniques in a Post-Daubert Environment and Latent Print Section Management. Although B.P.D. supervisory personnel may not be required to perform all of these additional duties on a daily basis, for them to maintain a proper Quality Assurance / Quality Control program for the Latent Print Unit, they need to fully understand the procedures and underlying scientific principles of each of these functions.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ███████ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ███████ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ███████ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

███████ certainly appears to be capable of improving himself in his technical areas of deficiency, if he has the desire to do so at this point in his career. He is certainly trainable and should be able to excel in a formal training environment. He has continually displayed a very positive attitude throughout the assessment process. It is the opinion of RS & A, Inc. that ███████ could be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination.

21

██████ has been an employee of the Boston Police Department since 1986. He was assigned to the Identification Unit in July of 2000 and was officially assigned to the Latent Print Unit in January of 2004 although he was physically moved to the Latent Print Unit in September of 2003.

While being assigned to the Identification Unit he received external training in fingerprint classification, law enforcement photography, latent print recovery techniques and crime scene investigation. Since being appointed to the Latent Print Unit he has attended a twenty-four (24) hour palm print identification seminar.

Upon entering the Identification Unit he did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print functions. Upon his assignment to the Latent Print Unit he was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of his training in latent prints has come from spending time with the previously employed latent print examiners ██████ and ██████ and the current examiners ██████ and ██████. No documentation of his internal training in latent prints seems to exist.

Based upon his written assessment, ██████ has a general understanding of the very basic principles of friction ridge area identification as it applies to latent print examinations but is very limited in his knowledge of several advanced topics of importance. To his credit, much of what he does know was learned from his own reading and his own individual efforts, which is very commendable. His has a very significant lack of technical knowledge regarding the subjects of Biological Uniqueness, Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, and Expert Witness Testimony Techniques in a Post-Daubert Environment.

It is consensus opinion of the RS & A, Inc. assessment team that he will not be able to succeed as an subject matter expert witness if he is challenged to any significant degree by a defense attorney who has prepared their cross examination utilizing any form of Daubert style issues. Since he cannot testify to having completed any formal latent print examiner training program and he does not possess any significant amount of actual experience, it would not

be surprising to see him disallowed to testify due to his lack of
expert credentials. This is particularly true in light of the public
exposure gained from recent events within the Boston Police
Department Latent Print Unit. He may not get challenged in court,
but if he does, then there is a likelihood that his testimonial career
would be damaged. If the court does not allow him to qualify as
an expert witness, then he will forever have to admit that a court in
his past disallowed him to testify as an expert in the science of
friction ridge identification. This bit of history will hang around
his neck like an albatross forever and can, and probably would, be
used by defense attorney's to attack the credentials of the entire
Latent Print Unit.

▇▇▇▇▇▇▇▇▇▇▇ technical ability to properly evaluate latent
prints for sufficiency and to determine the friction ridge origin area
and proper orientation should be considered as more than
acceptable considering the very limited amount of practical
experience he has gained in the short time he has been
assigned to the Latent Print Unit.

To be authorized to conduct independent case work without having
completed a formal latent print examiner training program is far
from acceptable in itself, but he did not know this was improper
and simply did the best he could with the situation he was
presented. During the sufficiency and origin determination
exercises he performed at a level higher that would be expected for
someone with his limited training and experience, which indicates
to the assessment team that he possesses some natural talents
that lend themselves well to this type of examination.

▇▇▇▇▇▇▇▇▇ technical ability to compare and correctly
identify most medium difficulty latent prints should also be
considered acceptable considering his lack of training, if indeed his
reported identifications were based upon his application of
fundamental scientific principles of the identification process.
Considering the fact that he has not undergone a formal training
program, his ability to locate and identify medium difficulty latent
prints was quite impressive. However, his lack of formal training
became very obvious when he was faced with difficult latent
impressions resulting in a far less than acceptable performance.
This exercise included one (1) erroneous identification, which by
itself is sufficient to ruin an entire career if it were to happen on an
actual case and became public knowledge.

Based upon his technical performance during all phases of the
assessment process in which he participated, it is the opinion of the

RS & A, Inc. assessment team that █████████ is capable of arriving at the correct ident/non-ident conclusion on the vast majority of medium difficulty latent prints he encounters.

It is also the opinion of the assessment team that on the majority of the more difficult "ident and non-ident" latent prints, he currently does not possess the skills and experience necessary to arrive at the correct conclusion and is certainly capable of making an erroneous identification due to his lack of formal training in this area.

It is the opinion of RS & A, Inc. that █████████ current level of knowledge, skill and ability as a latent print examiner is indeed consistent with his level of internal and external training and experience. There appears to be a direct correlation between his lack of technical training and his lack of scientific knowledge in the field.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ███████ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ███████ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ███████ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

█████████ certainly appears to be capable of improving himself in his technical areas of deficiency, if he has the desire to do so. He is trainable and should be able to excel in a formal training environment. He displayed a reasonably positive attitude throughout the assessment process, once he became familiar with the assessment process and the members of the assessment team. It is the opinion of RS & A, Inc. that ███████ could be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination. Although an accurate time line for this training process cannot be established with the available information, it would be reasonable to assume that it could be accomplished

24

within a period of two years, if training became his primary responsibility.

███████ has been employed as a Police Officer with the Boston Police Department since 1979 and has been assigned to the Identification Unit since 1998.

While being assigned to the Identification Unit, first in the tenprint operation and later in the Latent Print Unit she received external training in fingerprint classification, law enforcement photography, latent print recovery techniques, crime scene investigation, advanced latent print procedures, palm print identification and courtroom testimony techniques.

Upon entering the Identification Unit she did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print agency functions. Upon her assignment to the Latent Print Unit she was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of her training in latent prints has come from spending time with the previously employed latent print examiners. No documentation of her internal training in latent prints seems to exist.

Based upon a review of her resume which she provided and a thorough interview, it appears that her original technical training was not formal and was very restricted in scope. It appeared to have been primarily internship type training with very little organized material or other instructional methods being employed internally. She was provided the opportunity to participate in a significant amount of external training. Based upon her written assessment, she seems proficient in discussing the latent print science, strictly from the perspective of how it has been practiced by the Boston Police Department during her assignment to the Latent Print Unit.

Surprisingly, and in spite of the fact that she has had the opportunity to participate in a fairly significant amount of external training during her career, her ability to demonstrate that knowledge was certainly not displayed in the written assessment. Of the five individuals evaluated, she scored near the bottom of the list when all topic areas were considered.

She has a very significant lack of technical knowledge regarding the subjects of Biological Uniqueness, Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print

Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, and Expert Witness Testimony Techniques in a Post-Daubert Environment. There appears to be a possible correlation between her lack of performance in the written assessment, particularly in the area of Latent Print Comparison Principles, and her performance in the Latent Print Comparison Exercises.

It is the opinion of the RS & A, Inc. assessment team that her lack of knowledge of current technology and scientific methodology could certainly be used against her in a court of law by an informed defense attorney. It may be doubtful that an attorney could convince a judge to disallow her testimony since she has already qualified as an expert witness in the Boston courts on several previous occasions, but her lack of knowledge could greatly affect her level of credibility in the eyes of the jury members as the cross examination proceeds. If she continues to be offered as an expert witness, her training deficiencies would need to be addressed as soon as reasonably possible.

Her technical ability to properly evaluate latent prints for sufficiency and to determine the correct friction ridge origin area and proper orientation cannot be considered acceptable, in light of her years of experience. Although she correctly located the twelve (12) latent impressions which were not of value for comparison purposes, she eliminated an additional eight (8) latent impressions which were indeed identifiable. The result of this in casework is that cases with very difficult latent impressions would not likely be kept and be compared with possible suspects. This would then result in potential identifications not being made which should have been made. It is felt that this could primarily be as a result of her lack of formal training in this aspect of her duties.

█████████ technical ability to compare and correctly identify latent prints is still in question. Although she was able to correctly locate and identify an acceptable number of medium and difficult level latent impressions in Latent Print Comparison Exercises I and II, she made what is believed to be a "clerical erroneous identification" in Comparison Exercise I and a "technical erroneous identification" in Comparison Exercise II. Technical erroneous identifications are the most serious of all errors in the field of latent print examination and it is not unusual at all for agencies to immediately remove an employee from this job responsibility when this type of error is committed in an actual case. This type of error cannot be allowed in a professional, fully efficient and effective Latent Print Unit. As experienced by the

Boston Police Department already in recent months, an incorrect analysis can create havoc within the department and the entire criminal justice community.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ▇▇▇▇▇ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ▇▇▇▇▇ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ▇▇▇▇▇ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

▇▇▇▇▇ certainly should be capable of improving herself in her technical areas of deficiency, if she has the desire to do so at this stage of her career. She could be re-trained but it will require significant effort to go back and start over in her formal training to eliminate the obvious problems which exist based upon her written and practical exercise assessments. Typically it takes longer to correct ingrained bad habits than it takes to start from scratch with a new examiner trainee. She displayed a reasonably positive attitude throughout the assessment process, once she became familiar with the assessment process and the members of the assessment team. It is the opinion of RS & A, Inc. that ▇▇▇▇▇ could possibly be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination. It would take a tremendous effort on her part along with her instructors. An accurate time line for this training process cannot be established with the available information and the success of this re-training program would depend primarily on her attitude toward the process.

▇▇▇▇▇ has been an employee of the Boston Police Department since 1982. He was assigned to the Identification Unit in August of 1998 and was transferred to the Latent Print Unit in January of 2001.

While being assigned to the Identification Unit he received external training in fingerprint classification, law enforcement

27

photography, latent print recovery techniques and crime scene investigation. Since being appointed to the Latent Print Unit he has attended a twenty-four (24) hour palm print identification seminar.

Upon entering the Identification Unit he did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print functions. Upon his assignment to the Latent Print Unit he was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of his training in latent prints has come from spending time with the previously employed latent print examiners. No documentation of his internal training in latent prints seems to exist.

Based upon his written assessment, ███████████ has a general understanding of the very basic principles of friction ridge area identification as it applies to latent print examinations, but is very limited in his knowledge of several advanced topics of importance. To his credit, much of what he does know was learned from his own reading and his own individual efforts, which is very commendable. He did score higher in the written assessment than all of the other non-supervisory latent print examiners although it was certainly less than it should have been for someone with his level of experience. He has a significant lack of technical knowledge regarding the "new technology" subjects, including Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, and Expert Witness Testimony Techniques in a Post-Daubert Environment.

███████████ is very articulate and presented himself in a very professional manner during the interview portion of the assessment. He is capable of explaining the concepts with which he is familiar. It is the opinion of the RS & A, Inc. assessment team that he would be able to withstand the rigors of cross examination on the Daubert style issue questions, if he were to learn the material. His advanced level of formal education appears to have benefited him greatly in the area of oral communication. His ability to effectively communicate will be of great value if he is able to correct his considerable knowledge deficiencies. This certainly seems to be his "strong suit".

███████████ did not fair nearly as well in the practical exercise portions of the assessment. His technical ability to properly

evaluate latent prints for sufficiency and to determine the friction ridge area of origin fell far short of what would be expected for someone who has worked in latent prints since 2001. It is quite obvious that he has never received any significant training in how to determine sufficiency and how to determine origin areas of latent impressions. This lack of training clearly manifests itself in all aspects of his practical exercises.

His technical ability to compare and correctly identify most medium difficulty latent prints should also be considered far less than acceptable under any circumstances. He only identified three (3) of the medium difficulty latent prints in Comparison Exercise Level I, which represented less than one half of the identifications reported by each of the other examiners evaluated. His failure to produce at a level even near to that of the other examiners indicates a serious issue regarding his training and ability to perform this vitally important aspect of his duties. Considering the fact that he has not undergone a formal training program, his ability to locate and identify medium difficulty latent prints was somewhat understandable. This is also quite troublesome since these results could represent his current level of performance in Boston P.D. casework, and without having had a QA/QC program in place, there is no way to know what this impact might have been on the effectiveness of the Latent Print Unit.

█████████ was not able to identify even one of the more difficult latent impressions in the Latent Print Comparison Exercise Level II. This inability to locate, identify and commit on difficult latent impressions will certainly decrease his effectiveness and that of the entire unit when he is faced in casework with latent impressions of this quality.

Of course, RS & A, Inc. encourages and appreciates appropriate caution in all latent print comparison and identification work but a quality Latent Print Unit must be capable of identifying the difficult latent impressions when they possess sufficient legible friction ridge information to arrive at a conclusion of identification. Several of the latent impressions contained in the Level II exercise are of a similar quality level as that of the I.A.I. Latent Print Certification examination.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the RS & A, Inc. assessment team that █████████ is capable of arriving at the correct ident/non-ident conclusion on a minority of the medium difficulty latent prints he encounters.

29

It is also the opinion of the assessment team that on the majority of difficult "ident and non-ident" latent prints he currently does not possess the skills and experience necessary to arrive at the correct conclusion.

It is the opinion of RS & A, Inc. that ███████████ current level of knowledge, skill and ability as a latent print examiner is indeed consistent with his level of internal and external training and experience. There appears to be a direct correlation between his lack of technical training and his inability to perform the required technical tasks.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ███████████ does **not** currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ███████████ does **not** currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ███████████ **does** currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

███████████ appears to be capable of improving himself in his technical areas of knowledge deficiency, if he has the desire to do so at this stage of his career. He is intelligent and trainable and should be able to succeed in a formal training environment. He displayed a hesitant, but reasonably positive, attitude throughout the assessment process, once he became familiar with the assessment process and the members of the assessment team.

Regarding his inability to perform at an acceptable level in the practical exercises, it is much too soon to offer any opinion as to his ability to be retrained in this topic area. He needs to have his vision checked, as do all of the examiners, and he needs further evaluation on his visual acuity. Physical impairments need to be eliminated as a possible contributing factor prior to any additional evaluations being conducted.

███████████ has been an employee of the Boston Police
Department since 1983. He was assigned to the Identification Unit
from 1992 through 1994, returned to street assignments from 1994
through 1997 and returned to the Identification Unit in 1997. He
was assigned to the Latent Print Unit in 1999.

While being assigned to the Identification Unit he received
external training in fingerprint classification, law enforcement
videography, latent print recovery techniques, crime scene
investigation, advanced photography and digital imaging, palm
print identification and advanced latent fingerprint procedures.

Upon entering the Identification Unit he did receive some
individual internal training in the fundamentals of fingerprint
identification as they apply to the ten print functions. Upon his
assignment to the Latent Print Unit he was not placed in any
formal latent print examiner training program because none existed
in the department. It appears that the vast majority of his training
in latent prints has come from spending time with the previously
employed latent print examiners. No documentation of his internal
training in latent prints seems to exist.

Based upon his written assessment, ███████████ has a general
understanding of the very basic principles of friction ridge area
identification as it applies to latent print examinations, but is very
limited in his knowledge of several advanced topics of importance.
Although he has had the opportunity to participate in as much, if
not more, external training opportunities over his career in the
Identification Unit than anyone else assigned to the unit, he scored
the lowest of all the personnel on the written evaluation. During
his interview he made the comment that he did not do well on
written tests in the past, although we did not discuss his
performance on the written test and had not even graded them at
the time of the interview. He seems to have a significant deficiency
in his knowledge of the friction ridge science and it seems to be
concentrated on the more technical topics such as processing
techniques. It seems as if he has never received any formal
training in chemical development methods past what they
commonly used in the Latent Print Unit and he scored significantly
lower on this topic area than any other personnel in the unit. His
interview also revealed that he has a significant lack of technical
knowledge regarding Alternate Light Source Techniques,
Advanced Latent Print Photography, ACE-V Methodology,
AFIS/IAFIS Technology, Digital Imaging and Expert Witness
Testimony Techniques in a Post-Daubert Environment.

31

It is the opinion of the RS & A, Inc. assessment team that his lack of knowledge of current technology and scientific methodology could certainly be used against him in a court of law by an informed defense attorney. It may be doubtful that an attorney could convince a judge to disallow his testimony since he has already qualified as an expert witness in the Boston courts on several previous occasions, but his lack of knowledge could greatly affect his level of credibility in the eyes of the jury members as the cross examination proceeds. If he will continue to be offered as an expert witness, his training deficiencies would need to be addressed as soon as reasonably possible.

█████████ technical ability to properly evaluate latent prints for sufficiency and to determine the friction ridge origin area and proper orientation should be considered as acceptable considering the amount of time he has been assigned to the Latent Print Unit. He did quite well on the Friction Ridge Evaluation and Orientation Exercise and was a close second behind ███████ in this exercise. He performed significantly better than the other non-supervisory employees on this practical exercise.

█████████ technical ability to compare and correctly identify most medium difficulty latent prints and some of the more difficult latent prints should also be considered acceptable considering his lack of formal training in this subject area. It appears that he is indeed very cautious in his decisions and possesses some significant ability in this area. He did not commit any major errors in his practical exercises and identified as many latent prints as anyone in the unit.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the RS & A, Inc. assessment team that ███████ is capable of arriving at the correct ident/non-ident conclusion on the vast majority of medium difficulty latent prints he encounters.

It is the opinion of RS & A, Inc. that ███████ current level of knowledge, skill and ability as a latent print examiner is not completely consistent with his level of internal and external training and experience. His level of knowledge displayed in the written assessment should have been higher, based upon his exposure to external training opportunities.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ███████ does not currently possess the necessary knowledge to successfully complete the

written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ▮▮▮▮▮ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I. Although he did display considerable talent in this phase of the assessment, it does not appear that he performed at a level necessary for the successful completion the I.A.I. latent comparison test.

It is the opinion of RS & A, Inc. that ▮▮▮▮▮ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

▮▮▮▮▮ appears to be capable of improving himself in his technical areas of deficiency, if he has the desire to do so at this stage in his career. Although initially quite hesitant, he displayed a fairly positive attitude throughout the assessment process, once he became familiar with the assessment process and the members of the assessment team. It is the opinion of RS & A, Inc. that Fred Fontaine could be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination. His comparison skills need to be improved with detailed exercises and he would need to undergo extensive training to increase his general knowledge of the science of friction ridge examination and identification. Although an accurate time line for this training process cannot be established with the available information, it would be reasonable to assume that it could be accomplished within a period of one year, if training became his primary responsibility.

## LATENT PRINT UNIT: COLLECTIVE ASSESSMENT

As can be seen from the data collected through the written and practical assessments, along with the personal interviews, the Latent Print Unit of the Boston Police Department contains members with a wide variety of knowledge and expertise levels. Collectively, the level of knowledge and expertise found within the unit appears to be relatively consistent in most respects with the level of training received by its members over the last few years. Considering the size of the agency, the current level of experience found within the non-supervisory latent print examiners is quite low, although this experience level has significantly been reduced by the recent departure of two of the most experienced employees.

33

Generally speaking, it appears that over the last several years the Latent Print Unit has developed into a unit that has been satisfied with survival instead of success. The absence of involvement and administrative supervision from upper management, coupled with the lack of on site technical leadership have contributed to an environment in which excellence is not expected, therefore not achieved. Maintaining the status quo became Job #1, regardless of what the rest of the forensic identification world was doing.

This situation was further complicated by a never ending stream of analytical work that exceeded the perceived abilities of the examiners. Survival became acceptable and new employees assigned to the unit quickly became accustomed to this philosophy.

Although these comments appear to all be negative, there were certainly some positives discovered during the assessment process. We received the impression that the majority of the Latent Print Unit employees enjoyed their work as latent print examiners, which is very important indeed. Collectively, they possess a significant amount of knowledge in several topic areas that certainly are of importance to the daily function of a Latent Print Unit. Eagerness to learn new techniques was noted and it is believed that the majority of the examiners within the unit are certainly capable of learning new skills, if they so desire at this stage of their careers. Although varying levels of oral communication skills were displayed, it is the opinion of the RS & A, Inc. assessment team that all current Boston Police Department Latent Print Unit staff members possess the necessary communication skills to testify successfully as an expert witness if they are able to increase their knowledge levels and receive specialized expert witness training.

Regarding the very critical area of "latent print sufficiency" determination, it is our opinion that there currently exists a very significant difference between the volume of latent impressions which are currently being deemed to be "of value" and the actual number being submitted. Although it always best to err on the side of caution, it is strongly felt that currently "many" suspect identifications are not being made which could, and should, be made because the identifiable latent impressions are being deemed of "no value" by members of the unit during the initial assessment. This is certainly compounded by the existing unwritten policy that only identifications are to be reviewed by additional examiners. In other words, the decision to deem a latent impression as being of "no value" is not currently subject to review.

Regarding the very critical area of "latent print position orientation", it is our opinion that collectively there currently exists a significant difference between the number of latent prints which are currently being identified and the actual number of latent prints which should be identified due to a lack of expertise in correctly positioning the latent print prior to the search be conducted. It is said in this profession that "you cannot identify what you cannot find" and "you cannot find what you cannot position (orient)". This is certainly true in that if you cannot properly determine what area of friction ridge skin made the latent impression along with the correct up and down position, then you will not conduct the minutia search in the correct area and the search will not result in an identification.

Regarding the very critical area of latent print comparison and identification, it is our opinion that currently the most widely accepted scientific methodology, ACE-V, is not being followed by the Boston P.D. Latent Print Unit. ACE-V stands for Analysis, Comparison, Evaluation and Verification and it is a methodology that, when followed, results in a much higher quality of examination being produced. It is a methodology that has become an industry-standard and one that the Boston Police Department needs desperately to institute as soon as reasonably possible. Although not full proof, it is an accepted methodology which will enable a latent print unit to significantly increase their effectiveness over time. It would require some significant re-training for the existing staff but would certainly be worth every hour of training required. Coupled with an aggressive QA/QC program, it would enable the Latent Print Unit to become the efficient and effective forensic operation that is needed in the Boston Police Department. As demonstrated throughout the practical exercises, the level of comparison and identification expertise within the Latent Print Unit is woefully inadequate. Although it is our opinion that the current policy of having three examiners within the unit agree on all identifications made by the unit will for all practical purposes eliminate the possibility of an erroneous identification, it is the consensus opinion of our team of RS & A, Inc. experts that numerous identifications are being overlooked or not agreed upon due to the difficulty of the comparison. The results of the comparison exercises would clearly substantiate and validate this opinion.

Finally, one of the purposes of this assessment was to determine if the results correlate with the initial assessments entitled "III. Training Deficiencies of Existing Personnel: Latent Print Unit" and "VI. Absence of Continuing Education Program for members of the Latent Print Unit", which was reported on June 22, 2004 as a segment of the "Request for Proposal: Latent Print Services". It is clear to the entire team that the results of this assessment are certainly closely aligned with statements in that previous document. The problems noted in that initial evaluation were clearly defined throughout this assessment process and remain unchanged at this time.

This completes our assessment report. All the assessment documents are available for inspection if you so desire. As agreed upon in our original discussion, the comments regarding individual personnel are designed for your information purposes only and not intended for distribution to anyone other than management personnel. If you have any questions regarding any aspect of this report feel free to contact me for clarification.

We thank you for the opportunity to serve you in this very important endeavor and sincerely appreciate the hospitality your department showed us while we were on site during the assessment process.

Sincerely,

Ron Smith, President
Ron Smith & Associates, Inc.



35

# EXHIBIT B

**Ron Smith & Associates, Inc.**
P.O. Box 4436
Meridian, Mississippi   39304
Office:  601-485-7606
Fax:  601-485-7622
Email: ron@ronsmithandassociates.com



June 22, 2004

William Casey, Superintendent
Bureau of Administration and Technology
Boston Police Department
1 Schroeder Plaza
Boston, Massachusetts   02120

Reference:    Request for Proposal: Latent Print Services

Superintendent Casey,

Pursuant to our conversation on May 20, 2004, I have prepared this formal proposal for your consideration. This proposal has been specifically designed for the Boston Police Department, (hereinafter referred to as BPD) and addresses the Existing Status: Primary Problem Areas of both the Identification Unit (Tenprint) and Latent Print Unit. This proposal will also address Recommended Solutions to these problems.

<u>Existing Status: Primary Problem Areas</u>

I.       Backlog of un-worked 2003 and 2004 cases. (Latent Print Unit)

      A.    According to the figures provided by your staff at the May 20th meeting, the current backlog of un-worked cases within the Latent Print Unit has more than tripled in the last two months and continues to rise at an alarming rate.  At the current rate of incoming cases, it is anticipated that, unchecked, the backlog will easily surpass 1000 felony cases prior to the end of the 2004 calendar year, and continue to increase at a similar rate in 2005.

      B.    This increase in backlog can be attributed largely due to the lack of trained and experienced personnel. This situation is magnified due to the administrative suspension of two of the latent print examiners assigned to the Latent Print Unit. This suspension comes as a result of alleged infractions on a case which is currently being investigated by the Massachusetts Attorney General's Office.  These two examiners represent

3248

approximately 40% of the pre-suspension case production within the Latent Print Unit and their production cannot be replaced by realignment of existing personnel within the BPD. These developments have contributed to a "crisis" situation for the BPD which can not be dealt with internally. These latent print cases require examinations conducted by fully trained and experienced latent print examiners.

II.     In-efficient use of technology, data and supervisory skills within the Identification Unit

    A.     Based upon our personal observation of activities within the Identification Unit, and preliminary discussions with the non-supervisory and supervisory personnel, it appears that some significant changes must be considered to maximize the technical efficiency of the operation. As part of the long term project to be addressed at a later point in this proposal, this operation needs to be studied in much greater detail, particularly in the area of general technological capabilities such as AFIS or task specific software.

    B.     The supervisory structure does not appear to be conducive to efficient Quality Assurance or Quality Control within the Identification Unit.

    C.     Based upon information acquired during the "Cowans" case review, it appears that the current supervisory responsibilities of senior examiners for both the Identification Unit and the Latent Print Unit contributed, in part, to the problem which developed within that case. This condition needs to be further evaluated in much greater detail as part of the long term project and will be addressed at a later point in this proposal. It also appears from the preliminary evaluation, that there may be several operational changes necessary within the Latent Print Unit. These operational changes could significantly impact the efficiency of the Latent Print Unit.

III.    Training Deficiencies of Existing Personnel: Identification Unit & Latent Print Unit

    A.     The investigation of the case resulting in the suspension of two officers, uncovered numerous technical and training related deficiencies within the Identification Unit (Tenprint) and Latent Print Unit of the BPD, which have apparently developed over a period of many years.

    B.     Several of the newly assigned officers within the Identification Unit (Tenprint) need basic fingerprint science training, because there appears to be no formal modular training program for new officers assigned to this unit. The remaining officers assigned to the unit need additional standardized training which can be used to meet part of the formal

2

3249

training requirements needed for the "Tenprint Examiner Certification" program soon to be offered by the International Association for Identification. This certification program, which heretofore has not existed, needs to become an agency standard for personnel working within the Identification Unit. (Note: The first two week phase of this training is being implemented in June of 2004 under an agreement approved May 28th, 2004 and funded through the existing budget of the BPD.)

C.     Based upon earlier on-site observations and discussions with BPD Latent Print Unit personnel and supervisory staff, there appears to be a significant void in formal and consistent technical training in the science of latent print examination and identification. This was further confirmed by a review of the written training documentation provided during the initial inspection. Formal training in the past appears to have been disorganized and based primarily upon what was available for a minimal cost, instead of being based upon the ongoing needs of the officers assigned to the Latent Print Unit. A formal modular "Latent Print Examiner Training Program" for newly assigned officers to the Latent Print Unit does not exist within the BPD. (Note: The remaining staff members of the Latent Print Unit will be fully evaluated during the second week of the training period to be conducted under an agreement approved May 28th and funded through the existing budget of the BPD. This evaluation will include written testing of the scientific principles and methodologies of the science of friction ridge identification. It will also include a series of visual analytical tests specifically designed to determine the skill and ability of each officer currently assigned to the Latent Print Unit as it relates to the "Analysis, Comparison & Evaluation" elements the examination process. These evaluations will result in a formal recommendation regarding the future training needs of the existing personnel and newly assigned personnel to the Unit.)

IV.     Lack of Written Operational Polices and Procedures

A.     Subsequent to a review of more than 1,500 latent print cases as part of the "Cowans" case review, it became readily apparent that the BPD Latent Print Unit did not operate under any specific formal written guidelines relating to case examination during that time period.

B.     Further inquiries and interviews revealed that such formal written guidelines did not exist during that time frame for most functions of the Latent Print Unit and still do not exist today.

C.     Although not yet fully determined, it is suspected that a lack of written polices and procedures exist within the Identification Unit as well.

3

D.   This lack of written policies and procedures perpetuates a lack of individual accountability regarding functional areas of both the Identification Unit and the Latent Print Unit. This is particularly evident in the examiner's responsibilities in the Latent Print Unit and in the supervisor's responsibilities, as it relates to functions of the latent print examiners.

V.   Absence of Quality Assurance / Quality Control Program (Latent Print Unit)

A.   There is no written existing QA/QC program in place within the Latent Print Unit.

B.   Employees do not participate in external proficiency testing.

C.   There appears to be no internal proficiency testing program within the Latent Print Unit.

D.   The BPD has not required or encouraged their examiners within the Latent Print Unit to undergo testing for "Latent Print Examiner Certification" through the International Association for Identification.

VI.   Absence of Continuing Education Program for members of the Identification Unit or the Latent Print Unit.

A.   The BPD has not sufficiently, nor consistently, encouraged or supported their employees to participate in regional, national and international forensic organizations which provide training opportunities through seminars, conferences and periodical publications.

B.   The BPD has not consistently pursued specialized training opportunities for members of the Latent Print Unit from third party providers.

C.   No individual, long term, "Continuing Education Plan" exists for the employees of the Latent Print Unit. These individuals are expected to stay current on recent developments within the latent print field in order to perform their examinations properly and defend their actions, as an expert witness, in a court of law.

D.   There appears to be no designated method of disseminating technical information throughout the Identification Unit and the Latent Print Unit utilizing periodical subscriptions to forensic journals.

VII.   Absence of any "Skills Based" Formal Selection Process for entering into the Identification Unit or Latent Print Unit.

4

3251

A.  The Identification Unit staff is comprised of sworn police officers; however, the selection process is not currently based upon educational credentials related to the forensic sciences, or professional knowledge, skills or abilities applicable to the work being performed.

B.  It appears that entry into the Latent Print Unit comes as a transfer from the Identification Unit, and is not based upon a particular educational background, knowledge, skill or ability level related to the work being performed.

Synopsis of Existing Status of Identification Unit and Latent Print Unit:

Although several very significant problem areas exist and need to be addressed, there are several positive attributes present in the BPD which will have a major impact on the long term project. First, and foremost, the executive management staff fully understands the critical nature of the situation, and exhibits a very positive attitude toward solving these problems.  Second, the line supervisors and their staff members seem to be quite supportive of the department's attempt to address the unit's deficiencies and their individual professional needs.

In addition, the BPD seems to possess the facility and the majority of the equipment necessary for the Identification Unit and Latent Print Unit to become fully functional at a more than acceptable level.

These positives will prove to be vital given the many critical situations which need to be addressed in order for the BPD to provide the level of forensic friction ridge identification services commensurate with an agency of the same size of the BPD.

As seen from the previously noted comments, there exist major voids between where the BPD is and where they should be, given the size of the agency. It appears from our preliminary observations, that these voids have developed slowly over the last twenty to thirty years, and were not purposefully created, but instead were a result of non-attention or non-concern from the upper management staff.  This seems to have been aggravated by the assignment, in some instances, of less than desirable employees from other sworn divisions to the Identification Unit.  Although certainly unwarranted, this is not uncommon in police departments in which Identification Units and Latent Print Units have been staffed over the years with sworn police officers instead of specially chosen civilian employees.  Many of the very best latent print examiners in the United States are indeed sworn police officers, so it is not necessarily an issue of sworn versus non-sworn, but instead an issue of who has the best individual knowledge, skill and ability to perform the elements of the particular job of latent print examiner.  Candidates for civilian or sworn latent print examiner positions can be screened for their skills and knowledge in the field prior to being selected for employment.

5

3252

<u>Recommended Solutions:</u>

Obviously, there is no quick fix for the situation which exists within both the
Identification and Latent Print Units of the BPD.  Our recommendations will address
each of the Primary Problem Areas individually.  The implementation of each
recommendation would require significant coordination between the staff members of
Ron Smith & Associates, Incorporated, (hereafter referred to as RSA) and the staff
members of the Identification Unit and Latent Print Unit.  It would also require the full
and continued support of the upper management of the BPD throughout the entire
process.

I.      Backlog of un-worked 2003 and 2004 cases (Latent Print Unit) and ongoing
        analytical support within the Latent Print Unit due to employee shortages
        and reduction in production due to anticipated training program being
        implemented.

        Proposal:

        RSA proposes to provide the full time analytical support services of two (2) I.A.I.
        Certified Latent Print Examiners on-site on a rotating, weekly or bi-weekly basis
        for a period not to exceed two years, unless further requested. Exceptions to this
        schedule would be on an "as required" basis.  These RSA examiners would work
        in tandem with the Latent Print Examiners of the BPD.

        RSA proposes to provide a part-time on-site project manager on a rotating weekly
        or bi-weekly basis.  This person would serve as the primary on-site contact person
        for RSA and would work under the direct administrative supervision of the
        management staff of the BPD and RSA.  This person would meet regularly with
        the police department management staff and provide periodic casework backlog
        reduction reports.

        Note: The logistics of providing on-site analytical casework from an outside
        contractor are significant.  Mission goals can, however, be accomplished, if RSA
        and their analytical staff along with the BPD analytical staff can set clearly
        defined goals and establish mutually agreed upon guidelines for the casework
        project.  Under this proposal the casework responsibilities of RSA would be
        conducted under the following guidelines:

        A.      Casework conducted by members of the RSA analytical staff would
                normally be performed during day shift hours.  This would be necessary in
                the event that if procedural or administrative issues develop, supervisory
                staff of the police department would be available for consultation.
                Exceptions will be considered on an individual basis.

        B.      Technical staff of RSA would remain under the technical supervision of
                the RSA management and would not perform any analytical procedures

6

not authorized by the management of RSA, but would, while on-site, report to the designated supervisory staff of the BPD for administrative questions or issues.

C.    Casework related duties performed by members of the RSA analytical staff would include:

- Processing of evidence for the presence of latent prints utilizing the most appropriate methodology available.

- Preparation of chemical reagents necessary for the processing of items of evidence for the presence of latent prints.

- Comparison of latent prints with the known prints of named suspects and/or elimination prints submitted, using ACE-V methodology. (Verifications of all latent print identifications effected by members of the RSA staff would be conducted by a second RSA staff member <u>and</u> a member of the BPD Latent Print Unit.)

- Photographic or electronic documentation of all latent prints deemed to be of value for comparison purposes.

- Preparation and submission of all latent fingerprints suitable for AFIS/IAFIS search, as well as, the evaluation of automated search results.

- Documentation of all evidence received, analytical procedures performed, and results obtained sufficient to support official reports issued by staff members of the BPD Latent Print Unit. This documentation would be on any official document appropriate for this purpose and provided by the BPD. If none exists, an appropriate form can be designed by RSA and approved by the BPD for that specific purpose.

- Provide a second, independent examination, if requested, on any latent print identifications effected by staff members of the BPD Latent Print Unit.

- Provide additional technical assistance specifically related to Tenprint or latent print functions, as needed, to the staff members of the BPD upon request.

- Note: If a difference of opinion regarding the identification of a latent print arises between RSA and any staff member of the BPD Latent Print Unit, this situation should immediately be brought to

7

the attention of both the supervisory staff members of the BPD and the management staff of RSA. No official opinion, written or oral, should be issued by anyone prior to this difference of opinion being completely resolved.

II.    Inefficient use of Technology, Data, and Supervisory Skills within the Identification Unit and the Latent Print Unit.

Proposal (Identification Unit):

Based upon our preliminary observations of activities within the Identification Unit and our initial interviews with both unit personnel and supervisory personnel with the Identification Unit and Latent Print Unit, it appears that significant changes should be considered to maximize the technical efficiency of the overall operation. This 24 hour a day operation needs to be studied extensively and specific necessary tasks should be identified, evaluated and prioritized based upon both the current and projected level of need, as well as, the current and projected availability of resources.

Under this proposal RSA would do a complete analysis of the Identification Unit operation to determine what specific services have been required of this unit and how they have provided those services in the past. Each task within the section would be identified and examined to determine the following:

A.    What level of priority should be assigned to each task?

B.    What level of skill, knowledge and ability is necessary, for staff members to accomplish each task?

C.    How frequently will each task be performed and should it be performed on each shift?

D.    What level of on-site supervision should be present when each task is being completed?

E.    What technology is available to maximize efficiency while each task is being accomplished?

F.    Are there ways to utilize additional technology, to reduce human intervention, in any of the tasks being performed?

G.    Is each task needed as an integral part of the mission of the Identification Unit or is it just part of "how we have always done it."

H.    What will be the immediate and long term ramifications of an error being committed for each task?

8

Boston Police Department                                    June 22, 2004

I.      Are there individuals within the Identification Unit who possess the necessary skills and desire to be trained as Latent Print Examiners, if that option were to become available?

J.      Are there individuals within the Identification Unit who can be trained to assist with the daily functions of the Latent Print Unit?

For this particular phase of the project, RSA intends to utilize the skills of team members who have supervised large scale Identification Units in similar sized police departments or state agencies. These team members would be brought in specifically to assess the functions of the Identification Unit, analyze the data collected and attempt to answer the questions noted above. More than likely, this analysis will generate many more questions which will need to be answered during this process. It would then be the task of RSA to prepare recommendations in written form and present them to the management and unit staff of the BPD for consideration. The project would include the development of a new and more efficient work flow through the unit, which would maximize the efficiency of the section. Together, RSA and the BPD would then be able to develop a cohesive plan of action to bring the Identification Unit to a level of service that can handle the demands of the present and the future. Subsequent to approval, implementation of the plan of action would require the cooperative efforts of both RSA and BPD through each step of the process.

Proposal (Latent Print Unit —"On-site Functions"):

Under this proposal RSA would conduct a similar audit of the Latent Print Unit operation to determine the essential functions and individual tasks of the section. Once these tasks have been determined, each task would be examined to determine the following:

A.      What level of priority should be assigned to each task?

B.      What level of skill, knowledge and ability is necessary, for staff members to accomplish each task?

C.      Based upon the technical evaluations performed under the short term contract, which current employees are most proficient and least proficient in each primary task?

D.      How frequently will each task be performed and should it be performed on each shift?

E.      What level of on-site supervision should be present when each task is being completed?

9

3256

Boston Police Department                                         June 22, 2004

F.    What technology is available to maximize efficiency and accuracy while each task is being accomplished?

G.    Are there ways to utilize additional technology, to reduce human intervention, in any of the tasks being performed?

H.    Is each task needed as an integral part of the mission of the Latent Print Unit or is it just part of "how we have always done it."

I.    Does each task arrive at the most complete and accurate result, and if so, is this result reproducible?

J.    What will be the immediate and long term ramifications of an error being committed for each task?

K.    Are there task(s) within the Latent Print Unit which could be performed successfully by staff members not trained as Latent Print Examiners?

L.    What level of supervision exists currently within the Latent Print Unit?

M.    What level of supervision should be available for each shift and where should that supervisor be physically located to perform these supervisory duties?

For this phase of the project RSA plans to utilize the advanced technical and administrative skills of several members of the RSA team. Each of these team members will be IAI Certified Latent Print Examiners with considerable latent print unit management experience. These team members will be brought in specifically to assess the functions of the Latent Print Unit, analyze the data collected and attempt to answer the questions noted above. It is our expectation that this process will generate many more questions than those noted above. Upon completion of this evaluative process, it would be the task of RSA to prepare recommendations in written form and to present them to the management and unit staff of the BPD for consideration. The project would include the development of a new and more efficient work flow process through the unit which would maximize the efficiency of the section. Together, RSA and the Boston Police Department would then be able to develop a cohesive plan of action to bring the Latent Print Unit to a new level of excellence. The Latent Print Unit should be expected to conduct latent print examinations in a manner consistent with the quantity and quality levels that can handle the demands of both the present and the future. This RSA proposal would be designed to accomplish the long term desired result. Implementation of the plan of action would require the cooperative efforts of both the RSA and BPD staff members and management through each step of the process.

10

3257

Boston Police Department                                    June 22, 2004

III.    Training Deficiencies of Existing Personnel (Identification Unit and Latent
        Print Unit):

        Proposal (Identification Unit):

        RSA proposes that a formal, long term "Identification Unit Training Plan" be
        developed and maintained within the Identification Unit. This modular training
        plan would be designed around the specific needs and particular tasks associated
        with the BPD operation. Its design would also coincide with the training
        requirements of the International Association for Identification Tenprint
        Certification Program, which has recently been established. Upon completion of
        the "Identification Unit Training Plan"; individuals within the section would have
        completed all of the training requirements of the certification program. These
        individuals would still be required to meet the experience and/or educational
        requirements of the I.A.I. Tenprint Certification Program prior to being accepted
        for certification testing.

        RSA proposes to develop a long term training plan for BPD utilizing RSA staff
        members who have experience in the supervision of Identification Units and who
        have a proven record of establishing various elements of training programs within
        their own agency. This program would be designed in such a manner that it could
        be maintained long term, by trained staff members of the BPD, after RSA has
        completed our contractual agreements. The program would also provide
        continuing education requirements needed to maintain the high level of excellence
        desired of an Identification Unit.

        The long term modular training plan would include on-site training provided by
        members of the BPD staff, along with selected third party training providers. The
        plan would be designed to document the initial and long term training status and
        training record of each member of the Identification Unit throughout their career
        within the section. This formal documentation will be compiled in such a manner
        that it can be used for training budget preparation and promotional considerations
        by BPD if desired.

        Proposal (Latent Print Unit):

        As noted earlier, on-site observations, discussions with BPD personnel, and a
        review of a significant number of BPD Latent Print Case Files, strongly indicates
        that there is a substantial void between the current knowledge level of the BPD
        Latent Print Examiners and the expected knowledge level of latent print
        examiners in the field. Regardless of the reasons this has happened, it is the
        intention of RSA to remedy this situation as soon as reasonably possible. It will
        require significant effort on the part of the existing Latent Print Examiners, and
        the total support of the BPD management staff. When training is in session it
        involves a full time commitment of both the instructor and the student, and the
        BPD management staff must be able to continue providing the off-site (crime

                                        11

3258

June 22, 2004

scene) services of the Latent Print Unit without interrupting the formal training sessions while they are in session. This will require a major effort in time management and employee assignments, but is vital to the success of any training program implemented.

RSA proposes that this training situation be approached from four separate, but equally important, directions. First, the training and expertise void which exist within the BPD Latent Print Unit must be identified on an individual examiner basis. Each examiner must be thoroughly tested, interviewed, and evaluated while performing multiple tasks within the section. It is anticipated that the majority of this evaluation will be completed under the contractual agreement already approved, which will be conducted on June 27th through July 1st, 2004.

Second, these individual evaluations will be examined from the perspective of what the collective knowledge level is of the total group of examiners and supervisors within the Latent Print Unit, and how that knowledge is distributed among the two shifts.

Third, once the evaluations are fully completed, a specific training plan needs to be designed for each individual within the Latent Print Unit. In many instances the training will be the same for multiple individuals, but particular strengths and weaknesses need to be accounted for in the training process. RSA would design each individual training plan around the knowledge, skills, and abilities expected of any examiner who could successfully complete the Latent Print Examiner Certification Test administered by the International Association for Identification. Each training plan would also be configured to include all aspects of the "Training to Competency" plan developed by the Federal Bureau of Investigation's Scientific Working Group on Friction Ridge Analysis, Study, and Technology.

Finally, RSA proposes that a formal "Latent Print Unit Training Plan" be developed and maintained long term within the Latent Print Unit. This plan would be designed for implementation any time a new person is assigned to the Latent Print Unit. This modular training plan would be designed around the specific needs and particular tasks of the BPD operation. Its design would also coincide with the training requirements of the International Association for Identification Latent Print Examiner Certification Program, which has been in existence for over twenty-five years. They would still be required to meet the experience and/or educational requirements of the I.A.I. Latent Print Examiner Certification Program prior to being accepted for certification testing.

RSA proposes to develop a long term training plan for BPD utilizing those RSA staff members who have experience in the supervision of Latent Print Units. These individuals have a proven record of establishing various elements of

12

3259

Boston Police Department                                        June 22, 2004

training programs within their own agencies. This program would be designed in such a manner that it could be carried on long term by trained staff members of the BPD after RSA has completed our contractual agreements. This program would also provide for the development of a continuing education plan to maintain professional certification and the high level of excellence desired of a Latent Print Unit.

The long term modular training plan would include on-site training provided by members of the BPD staff and RSA staff, along with selected third party training providers. It would also be designed to document the initial and long term training status and training record of each member of the Latent Print Unit throughout their career within the section. This formal documentation will be compiled in such a manner that it can be used for long term training budget preparation.

IV.    Lack of Written Operational Policies and Procedures.

Based upon multiple case reviews, inquiries, and interviews conducted as part of this initial process, it became readily apparent that the lack of formal written operational guidelines within the Latent Print Unit has had a significant impact on the quality of latent print examinations conducted in the past and the present. The lack of formal written policies and procedures have contributed to a lack of personal accountability within the Latent Print Unit, including the supervisory staff. The lack of agency and unit policies and procedures directing the examination of latent print evidence became a major contributing factor in the "Stephan Cowans" case. It is impossible for a Latent Print Unit or Identification Unit to function in a professional manner, in today's environment, without formal guidelines which are clearly understood and followed by members of the analytical staff. This lack of formal directives is painfully obvious at BPD, as is the importance of correcting this situation.

RSA proposes to utilize the information gained in other aspects of this project to begin the development of a "Standard Operations Manual" and "Technical Bench Manual" for the Latent Print Unit. This is a massive undertaking and one that will require many months to complete. After each task has been identified, examined and prioritized, a policy statement regarding each function will be developed in draft form. The draft will be submitted to the BPD for review and comment, and upon completion of this review the task will be prepared for inclusion in the appropriate manual.

It is anticipated that the format for these manuals will be the same as that being used by the Boston Police Department Crime Laboratory, which is accredited by ASCLD-LAB, an accrediting institution working under the auspices of the American Society of Crime Lab Directors. Although, it has not been indicated to RSA that the supervision of the Latent Print Unit will be transferred to the Crime Laboratory, the design of the operational manuals consistent with the BPD

13

3260

Boston Police Department                                           June 22, 2004

laboratory would make that transition much easier if that option was considered in the future

It is the intention of RSA that operational manuals would also be designed for the Identification Unit simultaneously with the Latent Print Unit. Although, the operation of these two units differ significantly, its operation could also become much more efficient under new and more modern guidelines and procedures which could be easily passed on to new staff members within the unit. It is anticipated that the development of the manuals for the Identification Unit would require approximately six months to complete. The same process of policy and procedure development would be required. RSA would identify a task, design a policy statement regarding this task, and then submit it to BPD for review and comment. Upon completion of this process the task will be prepared for inclusion in the appropriate manual.

V.    Absence of Quality Assurance / Quality Control Program (Latent Print Unit)

As noted in the "Primary Problem Areas" of this proposal, there is no formal Quality Assurance or Quality Control program existing within the BPD Latent Print Unit. Although the presence of a working QA/QC program would not have guaranteed that the "Stephan Cowans" erroneous identification would not have occurred, the likelihood of it happening would have been greatly diminished. Well designed, management supported, quality assurance and quality control programs are the standard required in today's forensic environment. The volume, intensity and critical nature of physical evidence requests received by the Latent Print Unit are constantly increasing, and the pressures associated with this work are increasing proportionately. Under these levels of physical and mental demands, the BPD cannot adequately protect itself and the citizens it serves without having a formal QA/QC system in place. It is the QA/QC system itself that takes over when the employees themselves drop their guard inadvertently, lose concentration momentarily or for whatever other reason, fail to render the correct opinion in their initial examination. No agency is immune to analytical problems; therefore, no agency should be without a formal QA/QC program in place.

RSA proposes that the development of a formal written QA/QC program be part of the contractual elements of the project. This would include the development of a standard technical and administrative review system for all casework being conducted by the BPD Latent Print Unit. Although the BPD has an unwritten policy at this time that requires that all identifications be verified by a second Latent Print Examiner, this current policy fell desperately short in the "Stephan Cowans" case. The lack of supervisory involvement has created a major void in the current technical review case review process which must be filled before the BPD can be assured of a long term, quality, analytical product being generated by the Latent Print Unit on a daily basis.

14

3261

Boston Police Department                                    June 22, 2004

RSA proposes to initiate a formal, periodic internal and external proficiency testing program within the BPD Latent Print Unit. Any agency which professes to have a professional latent print unit participates in proficiency testing programs on a regular basis, and maintains documentation of the results for further reference.

During the initial evaluations which have been conducted, it has been determined that the BPD currently has no latent print examiners who have achieved professional certification as a "Certified Latent Print Examiner" through the International Association for Identification, even though this certification program has been in existence since 1978. RSA proposes that the existing staff members be evaluated, as soon as possible, to determine if they qualify for application and testing for the I.A.I. latent print certification program. If any of the existing employees qualify for testing then their individual training programs would be designed around achieving certification as soon as reasonably possible.

VI.    Absence of Continuing Education Program for Members of the Identification Unit and Latent Print Unit.

From information gathered it appears that the BPD has not designed any formal continuing education program for members of the Identification Unit or Latent Print Unit. Members of these units were not encouraged to participate in professional organizations or to attend state, regional or national training conferences to learn new skills or maintain expertise in existing skills. As noted earlier, even when employees of the BPD were fortunate enough to attend external training seminars, there was no method in place at BPD to disseminate that information to others within the department. Continuing education is a vital element of any modern forensic identification operation and is a mandatory requirement to meet the challenges of today's legal environment.

RSA proposes the development of a long term "Continuing Education Plan" for each staff member assigned to the Identification Unit and Latent Print Unit. These plans will include internal information dissemination methods along with external seminars, conferences and workshops as they are needed or as they become available. Some of the information can be gained from assigned readings and internet sources which will not require agency travel funds, although travel funds will be necessary for attendance at selected regional or national conferences.

VII.    Absence of any "Skills Based" Formal Selection Process for Entering into the Identification Unit or Latent Print Unit.

It appears that some of the long term problems, which have confronted the Identification Unit and the Latent Print Unit, have been a result of mistaken personnel actions of the BPD. From public reports and information received it appears that the Identification Unit has sometime been used as a sort of "unit of

15

last resort" for officers who have had problems elsewhere within the BPD. Although this is certainly not the case for many of the current employees, it still points to the fact that there seems to be no formal selection process for entry into the Identification Unit or advancement into the Latent Print Unit.

RSA proposes to assist the BPD in the development of a screening process to be used prior to the selection of staff members being assigned to the Identification Unit and the Latent Print Unit. The screening process to be used for selection of personnel for the Latent Print Unit would include a knowledge and skills based series of tests to insure that the most qualified candidates were selected for these advanced forensic positions.

Implementation Issues:

As can be seen from this proposal, much can be done to improve the Identification and Latent Print Units of the Boston Police Department. This proposal has been designed to address what we believe to be the most critical needs within each of these units. If RSA is selected for this project, it will be imperative that the entire project be included, since each of these areas of concentration is directly dependent on another. RSA would make every effort to proceed with as many of the specific projects simultaneously as possible. While casework was being conducted on-site by RSA staff members, many other parts of the project would be underway off-site by other members of RSA at the headquarters office in Meridian, Mississippi. Some off-site elements of the project, such as training plans, manuals, etc., might be assigned to staff members located in other parts of the United States as needed. Training of BPD staff members would be scheduled based on agency work schedules as much as possible, but in some instances it would require that BPD make significant changes to accommodate training opportunities. These schedules would be coordinated through a cooperative effort between BPD management staff and RSA management staff.

Obviously, a project of this magnitude will require an exceptional amount of pre-planning, along with an unusually large commitment to regular monitoring to insure the quality of the work being performed. It is the intention of RSA to include in this proposal the services of an on-site project manager, who will be directly responsible for the staff assigned to the on-site segments of the project. This person would be traveling to Boston for at least one or two days per trip on a weekly or bi-weekly basis as needed. In addition to this on-site supervision, it is intention of RSA to have selected members of the RSA management team on-site for inspection and project review at least once a month to review the progress of the project and provide status reports to the management staff of the BPD.

Project Time Line:

It is impossible to develop an accurate time line for this entire project without knowing more about the knowledge, skills and abilities of the individual BPD staff members. It will also be dependent on the level of existing backlogged casework and rate of incoming

16

3263

Boston Police Department                                          June 22, 2004

casework once the project is initiated. Certain parts of the project, such as manual development, etc. should be accomplished within a one year time frame, whereas others might take up to two years to complete. It would be unreasonable to submit a practical timeline without additional information being obtained. As further information becomes available, a time line for certain elements of the project can be developed, which would in turn result in a time line for the entire project being constructed. It is the full intention of RSA to develop an accurate time line as soon as reasonably possible.

### Performance Period:

Based upon information supplied during our meetings, and telephone conversations regarding this project, it would be the intention of RSA to provide these services for such a period of time as defined by the Boston Police Department. It is fully understood that the performance period may be adjusted by the BPD based upon budgetary considerations and staffing changes. Based upon the services requested as part of this proposal, it is the considered opinion of RSA that the performance period required for the implementation of all of the services would be approximately two years.

### Project Costs:

RSA proposes to provide the services included in this proposal under the following categories and applicable rates:

1.  Hourly Rate for General On-Site Services Performed:  $85.00 per hour / per RSA analyst: (Projected # of RSA hours per month = 400 - 425)

    a.  Includes all on-site services such as casework, personnel evaluations and testing, etc.

    b.  Does not include third party training.

    c.  Does not include providing expert witness testimony services.

2.  Hourly Rate for General Off-Site Service Performed:  $65.00 per hour / per RSA analyst:  (Projected # of RSA hours per month = 50 - 75)

    a.  Includes all off-site services such as development of Standard Operating Procedures Manuals, project status reports, etc.

    b.  Does not include third party training.

    c.  Does not include providing expert witness testimony services.

        Note:  Each hour of on-site or off-site service will be fully documented and will be included in the monthly invoice submitted by RSA.

17

3264

June 22, 2004

3. Travel Expenses: (For any purpose related to the proposal)

    a. Coach airfare or mileage at the current Federal rate of reimbursement. (Estimated: 10 - 12 round trip tickets per month)

    b. Meals at a rate of $40.00 per day per staff member, plus tips not to exceed 15%. (Estimated: 65 - 75 meal days per month)

    c. Lodging estimated to be $100 - $125 per night per night per staff member. (Estimated: 55 - 60 room nights per month. Not utilizing downtown hotels to avoid higher rooming cost)

    d. Rental vehicle at a projected rate of $85.00 per day, including insurance and gasoline. (Estimated: 20 - 25 days per month)

    e. Cost of reproducing training materials, manual drafts, and other larger documents. (Estimated at $200.00 per month)

4. Expert Witness Testimony Services:

    a. $1000.00 per day for each day spent in court.

    b. $500.00 per day for each day of travel associated with court appearances.

    c. Travel expenses as noted above.

5. On-Site Third Party Training:

Depending upon the specific training needed, the services of non-RSA instructors may be required. The charges for their services will be negotiated separately by RSA and would be invoiced to BPD as a separate line item on the applicable monthly invoice. The amount of these charges will vary depending on the topic, the instructor, the length of the training and whether or not this training is available to BPD through other sources. Every attempt would be made to assist BPD in receiving this training at the lowest cost possible.

**Project Cost Synopsis and Invoicing for Services Rendered:**

Based upon the above noted estimates, the anticipated monthly expenditures for this entire project would fall in the range of $49,000 to $55,000 per month for the entire performance period.

As noted earlier in this document, a monthly invoice from Ron Smith & Associates, Inc. would be submitted with supporting documentation as requested by the Boston Police Department. Arrangements could be made for direct deposit or in any other reasonable manner preferred by the BPD. Due to the large amount of out-of-pocket expenses

18

incurred by RSA each month, payment within 30 days of receipt of invoice would be expected and appreciated.

This completes the formal proposal requested by the Boston Police Department. If you have any specific questions regarding any particular item within this proposal please feel free to contact me for explanation or clarification. Ron Smith & Associates, Inc. appreciates the opportunity to submit this proposal for your consideration and we look forward to hearing from you soon.

Respectfully Submitted,


Ron Smith, President
Ron Smith & Associates, Incorporated


19

3266

# EXHIBIT C

FOCUS – 9 of 24 DOCUMENTS

Copyright 2004 Boston Herald Inc.
The Boston Herald

May 7, 2004 Friday
ALL EDITIONS

SECTION: NEWS; Pg. 002

LENGTH: 1013 words

HEADLINE: SPECIAL REPORT: JUSTICE DENIED;
UNFIT COPS PUT IN KEY EVIDENCE UNIT;
Fingerprint handlers were all thumbs

BYLINE: By Maggie Mulvihill and Franci Richardson

BODY:

The **Boston** Police Identification Unit has for decades been a **"dumping ground"** for troubled cops who were responsible for handling critical evidence used to put suspected rapists and killers behind bars, according to police sources and department records.

Some police officers deemed unfit for street duty were regularly exiled by former commissioners Paul F. Evans and Francis "Mickey" Roache to the eight-member unit, police sources said.

"It's the land of misfit toys," said one high-ranking officer who called the unit a **"dumping ground** for people the commissioner didn't like."

Some members of the unit are facing scrutiny in a criminal probe by Attorney General Tom Reilly. The unit has never been certified and has been manned by some officers who have a history of drug and alcohol abuse, theft and general incompetence, according to department officials.

For decades, the ID unit was housed in Back Bay station's unventilated basement. It's now on the first floor of police headquarters.

"It was in a cinderblock, windowless room and that is why no one wanted to work there. There wasn't any ventilation," said one police official, explaining how those sent to the ID unit viewed it as punishment duty.

"Evans used it. Roache used it. Historically it has been done that way," the official said.

The handling of **fingerprint** evidence – among other tasks carried out by those in the ID unit – is crucial to the successful prosecution of defendants. Questions about the ID unit surfaced during a Herald/Fox 25 investigation into the wrongful convictions of 22 innocent men over the last 22 years.

Among those who have been "reassigned" to the ID unit after embarrassing public incidents:

– Sgt. Thomas R. Matheson who failed to report the seizure of $10,000 from a suspected drug dealer during a 1988 Dorchester raid.

Matheson, a 14-year-veteran of the drug unit, was suspended for two weeks without pay, stripped of his detective rating and assigned to the ID unit in 1991. He retired two years ago, a department spokeswoman said.

– Sgt. Daniel Dovidio began serving a 45-day suspension in 2001 after an internal investigation showed he allowed officers to lie in their reports about the 1995 beating of Sgt. Michael Cox.

– Sgt. Detective Leonard W. Marquardt, who for years was the direct supervisor in Area E-5 of two veteran detectives later imprisoned for stealing at least $250,000 in cash and other property from suspected drug dealers.

Walter F. Robinson Jr. and Kenneth Acerra both served three years in prison following their 1997 guilty pleas in U.S.

SPECIAL REPORT: JUSTICE DENIED; UNFIT COPS PUT IN KEY EVIDENCE UNIT; F

District Court in **Boston.**

After their pleas, Marquardt resigned from the department, a police spokeswoman confirmed.

In 1972, Marquardt was suspended for six months after charges that he beat a suspect who stabbed another officer were sustained.

In 1989, Marquardt and another detective were ordered by a federal jury to pay $25,000 in punitive damages to Michael Needham after finding the officers guilty of falsely arresting Needham in a 1979 confrontation in a Jamaica Plain tavern.

– Officer Thomas Traynor, who was sent to the ID unit from Area A-1 in December 1996 after a federal drug informant claimed he drank beer with Traynor and his partner in their cruiser outside a downtown after-hours police club just before he got into a fatal accident on Route 128. Both officers were on-duty.

The convicted drug dealer, Ramin Mojabi, pleaded guilty to motor vehicle homicide in February, 1998 and was sentenced to seven-to 12-years in prison for the death of 25-year-old Juan Chavez, killed on his way to work at 6:40 a.m.

A year before Evans transferred him to ID, Traynor beat the second of two drunk driving arrests, records show. He retired in 2000, a police spokeswoman said.

Other BPD employees who worked in the ID unit were fired for stealing, including Whitney "Wade" Williams, a civilian worker, who was fired in 1995 from his clerk's post after eight years with the ID unit.

That came after police discovered he used weapons, ammunition and BPD gear such as caps and windbreakers with the department logo to pull off armed robberies.

Technicians in the ID unit – including officer Dennis LeBlanc – are now part of a probe by Reilly's office into how they used another person's **fingerprint** to convict Stephan Cowans' of the shooting of a **Boston** cop in 1997.

LeBlanc, who was first assigned to the ID unit in 1985, was suspended for 10 days in 1992 after he was caught pantless and drunk while off-duty on the banks of the Charles River, police sources confirmed.

Cowans was freed from prison in January after 6 1/2 years behind bars following his wrongful conviction for shooting Sgt. Detective Gregory Gallagher in the buttocks with Gallagher's own gun.

LeBlanc, a key witness at trial, testified the **fingerprint** belonged to Cowans.

Newly appointed BPD Commissioner Kathleen O'Toole said she is revamping the entire ID unit, including moving to have it certified, and adding three officers and more supervisors. She asked Reilly to investigate the ID unit immediately after Cowans was exonerated.

"There have been some very competent people who have worked in that unit as well, so I'd hate to paint with a broad brush," said O'Toole.

"I can say this. On my watch, the ID section will not be a **dumping ground.** No unit in this department should be used as a **dumping ground.** If we have disciplinary problems we need to address them head on and deal with them without transferring a problem from one unit to another."

According to police sources, officers deemed unfit for street duty were regularly exiled by former commissioners Paul F. Evans and Francis "Mickey" Roache to the eight-member **Boston** Police identification unit.

The **Boston** Herald/Fox 25 investigation found officers assigned there who:

Had a history of drug and alcohol abuse

Had a history of theft

Served a suspensions after internal police probe showed he allowed officers to lie on their reports

Was suspended for beating suspect who stabbed another cop

Was drinking with federal drug informant just before the man killed a driver in a DWI crash.

**GRAPHIC:** The Land of Misfit Toys

SPECIAL REPORT: JUSTICE DENIED;  UNFIT COPS PUT IN KEY EVIDENCE UNIT;  F

WASTED YEARS: Stephan Cowans spent more than six years in prison when another man's **fingerprints** were used to convict him in the shooting of a Hub cop. Herald file photo

**LOAD–DATE:** May 7, 2004

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  05-11574 RGS

STEPHAN COWANS.,
    Plaintiffs,

v.

CITY OF BOSTON, BOSTON POLICE
DEPARTMENT, DONALD L. DEVINE,
ROBERT FOILB, GREGORY D.
GALLAGHER, DENNIS LEBLANC,
JOHN H. MCCARTHY, PAUL T.
MCDONOUGH, ROSEMARY
MCLAUGHLIN, HERBERT L.
SPELLMAN, and DOES 1-10
    Defendants.

## DEFENDANT CITY OF BOSTON'S ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORYS

### GENERAL OBJECTIONS

1.     Defendant objects to Plaintiff's Definitions and Instructions to the extent they are inconsistent with, or impose obligations not authorized by the applicable rules of civil procedure.

2.     Defendant objects to Plaintiff's Second Set of Interrogatories to the extent it seeks information: (a) protected by the attorney-client privilege; (b) prepared in anticipation of litigation or trial; (c) constituting attorney work-product; or (d) otherwise privileged.

3.     Defendant objects to Plaintiff's Definitions and Instructions to the extent the Plaintiff seeks information beyond the scope of discovery.  Such "definitions" and "instructions" are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

4.      Defendant objects to Plaintiff's Second Set of Interrogatories to the extent it seeks

confidential or proprietary documentation or information, including trade secrets, private

customer information, or other material or information protected from disclosure by law,

contract or otherwise.

5.      Defendant objects to Plaintiff's Second Set of Interrogatories as it seeks

information spanning nineteen years, see Instruction No. 1, and as such are in violation of

Rule 26(c) in that they are oppressive, and impose undue burden and expense on the

Defendant;

6.      As used herein, the term "irrelevant" means that an interrogatory calls for

information that is not relevant to the subject matter of this action and that is not

reasonably calculated to lead to the discovery of admissible evidence.

7.      As used herein, the term "unduly burdensome" means that it would be

unreasonably oppressive, annoying, time consuming and expensive to compile and

furnish the information called for in view of the degree of relevancy and materiality, if

any.

8.      As used herein, the term "over broad" means that an interrogatory is unreasonably

general, vague, and non specific.

### **Reservation of Rights**

1.      Defendant's Objections and Answers are based upon information now known to

it. Because discovery is continuing, Defendant reserves the right to amend, modify, or

supplement their objections and answers if they learn of new information.

2.      In providing these objections and answers, Defendant does not in any way waive:

(a) all objections as to competency, relevancy, materiality and admissibility; (b) all

objections as to vagueness, ambiguity, and undue burdensomeness; (c) all rights to object

on any ground to the use of responses contained herein in any proceeding; and (d) all

2

rights to object on any ground to any further discovery request or demand related to any

of the interrogatories addressed herein.

3.    Defendant objects to these Interrogatories inasmuch as they purport to pose

inquiries to each of the named defendants, without specifying which query is posed to

which defendant. The majority of these Interrogatories are directed toward records

maintained by the City, and accordingly, the City provides the following answers

pursuant to Fed.R.Civ.P. Rule 33(a) and (d), providing such information as is available to

it and signed by an Official of the Boston Police Department as its Keeper of Records.

## SPECIFIC OBJECTIONS AND ANSWERS

Subject to and without waiving the foregoing General Objections and Reservation

of Rights, which are incorporated by reference into each of the following answers,

Defendant City of Boston states as follows:

INTERROGATORY NO. 15

For all individuals assigned to the BPD's Identification Unit and/or the former
Latent Print Unit, describe in detail the reasons and circumstances surrounding their
respective assignments, and the duties with which they were charged.

ANSWER:

OBJECTION. Defendant objects to this Interrogatory on the grounds that it is overly
broad, unduly burdensome, and is not reasonably calculated to lead to admissible
evidence in that it seeks information spanning a nineteen year time period and inquires
into the work histories of individuals unrelated to this case. Further answering,
Defendant refers to its Answer to Plaintiff's First Set of Interrogatories, Number 3.

INTERROGATORY NO. 16

Describe in detail the training provided to members of the Identification Unit
and/or the former Latent Print Unit of the BPD.

ANSWER:

OBJECTION. Defendant objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and is not reasonably calculated to lead to admissible evidence in that it seeks information spanning a nineteen year time period and inquires into the work histories of individuals unrelated to this case. Further answering, Defendant refers to its Answer to Plaintiff's First Set of Interrogatories, Number 4.

INTERROGATORY NO. 17

Describe in detail the responsibilities of supervisors of the BPD Identification Unit, including any policies, procedures and standards, with respect to training, instruction, supervision, review and discipline of subordinates in the Identification Unit and/or the former Latent Print Unit of the BPD.

ANSWER:

OBJECTION. Defendant objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and is not reasonably calculated to lead to admissible evidence in that it seeks information spanning a nineteen year time period and inquires into the work histories of individuals unrelated to this case. Further answering, Defendant refers to its Answer to Plaintiff's First Set of Interrogatories, Number 7.

INITERROGATORY NO. 18

Identify and describe in detail the circumstances, including the dates and names of the individuals involved, of each instance in which a complaint, legal action, internal review, internal investigation or disciplinary action was taken against any member of the BPD Identification Unit and/or the former Latent Print Unit of the BPD in connection with his or her  employment by the BPD (whether prior to, during or following their assignment to those units) and/or any other law enforcement agency.  If legal action was taken, identify the case name and number, the court where it was filed, the outcome, and whether trial or deposition testimony was given by the Defendant.

ANSWER:

OBJECTION. Defendant objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and is not reasonably calculated to lead to admissible evidence in that it seeks information spanning a nineteen year time period and inquires into the work histories of individuals unrelated to this case. Further answering, Defendant refers to its Answer to Plaintiff's First Set of Interrogatories, Number 10.

Objections by:
William F. Sinnott
Corporation Counsel


_____

Mary Jo Harris (BBO# 561484)
Special Assistant Corporation Counsel
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109
(617) 523-6666

Thomas R. Donohue, Esq.
BBO# 643483
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4039


## CERTIFICATE OF SERVICE

I, Mary Jo Harris, counsel for the Defendant City of Boston hereby certify that a copy of the attached document has been sent to all counsel of record this ~~31~~ day of ~~May~~, 2006.
June 1, 2006

_____

Mary Jo Harris

5

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  05-11574 RGS

STEPHAN COWANS.,
          Plaintiffs,

v.

CITY OF BOSTON, BOSTON POLICE
DEPARTMENT, DONALD L. DEVINE,
ROBERT FOILB, GREGORY D.
GALLAGHER, DENNIS LEBLANC,
JOHN H. MCCARTHY, PAUL T.
MCDONOUGH, ROSEMARY
MCLOUGHLIN, HERBERT L.
SPELLMAN, and DOES 1-10
          Defendants.

**DEFENDANT CITY OF BOSTON'S RESPONSES TO PLAINTIFF'S
THIRD SET OF DOCUMENT REQUESTS**

**GENERAL OBJECTIONS**

1.      Defendant objects to Plaintiff's Definitions and Instructions to the extent they are

inconsistent with, or impose obligations not authorized by the applicable rules of civil

procedure.

2.      Defendant objects to Plaintiff's First Set of Document Requests to the extent it

seeks information: (a) protected by the attorney-client privilege; (b) prepared in

anticipation of litigation or trial; (c) constituting attorney work-product; or (d) otherwise

privileged.

3.      Defendant objects to Plaintiff's Definitions and Instructions to the extent the

Plaintiff seeks information beyond the scope of discovery.  Such "definitions" and

"instructions" are overly broad, unduly burdensome and not reasonably calculated to lead

to the discovery of admissible evidence.

4.      Defendant objects to Plaintiff's First Set of Document Requests to the extent it seeks confidential or proprietary documentation or information, including trade secrets, private customer information, or other material or information protected from disclosure by law, contract or otherwise.

5.      As used herein, the term "irrelevant" means that a document request calls for information that is not relevant to the subject matter of this action and that is not reasonably calculated to lead to the discovery of admissible evidence.

6.      As used herein, the term "unduly burdensome" means that it would be unreasonably oppressive, annoying, time consuming and expensive to compile and furnish the information called for in view of the degree of relevancy and materiality, if any.

7.      As used herein, the term "over broad" means that a document request is unreasonably general, vague, and non specific.

### Reservation of Rights

1.      Defendant's Objections and Answers are based upon information now known to it. Because discovery is continuing, Defendant reserves the right to amend, modify, or supplement their objections and answers if they learn of new information.

2.      In providing these objections and answers, Defendant does not in any way waive: (a) all objections as to competency, relevancy, materiality and admissibility; (b) all objections as to vagueness, ambiguity, and undue burdensomeness; (c) all rights to object on any ground to the use of responses contained herein in any proceeding; and (d) all rights to object on any ground to any further discovery request or demand related to any of the interrogatories addressed herein.

3.      Defendant objects to these Document Requests inasmuch as they purport to pose

inquiries to each of the named defendants, without specifying which query is posed to

which defendant.  The majority of these Document Requests are directed toward records

maintained by the City, and accordingly, the City provides the following answers

pursuant to Fed.R.Civ.P. Rule 33(a) and (d), providing such information as is available to

it after a reasonable and diligent search of the records maintained by the Boston Police

Department.

## SPECIFIC RESPONSES

### REQUEST NO. 38

All documents concerning the policies, procedures, and circumstances under
which any officer was assigned as a member of the Identification Unit and/or the former
Latent Print Unit of the BPD from 1985 – 2004 (to the extent that such documents have
not been produced in response to Request 12).

### RESPONSE:

OBJECTION.  Defendant objects to the request on the grounds that it is overly broad,
unduly burdensome and not reasonably calculated to lead to the discovery of admissible
evidence, in that it seeks information over a nineteen year period, and any extant
documents existing twelve years prior to the shooting of Gallagher have no possible
relevance to the practices in place in 1997; nor do policies instituted subsequent to the
discovery of the erroneous fingerprint identification have any bearing on the practices in
place from 1997 – 2004.  Further, in its Response to Plaintiff's First Document Request,
the City produced all information regarding assignments to positions within in its
possession, custody or control for the time period at issue.

### REQUEST NO. 39

All documents concerning the training provided to any member of the
Identification unit and/or the former Latent Print Unit of the BPD from 1985 until 2004
(to the extent that such documents have not been produced in response to Request 13).

### RESPONSE

OBJECTION.  Defendant objects to the request on the grounds that it is overly broad,
unduly burdensome and not reasonably calculated to lead to the discovery of admissible
evidence, in that it seeks information over a nineteen year period, and any extant
documents existing twelve years prior to the shooting of Gallagher have no possible

relevance to the training practices in place in 1997; nor do training practices instituted subsequent to the discovery of the erroneous fingerprint identification have any bearing on the practices in place from 1997 – 2004. Further, in its Response to Plaintiff's First Document Request, the City produced all responsive information regarding training of the named defendants in its possession, custody or control for the time period at issue.

**REQUEST NO. 40**

All documents concerning the duties of any and all members of the Identification Unit and /or the former Latent Print Unit of the BPD, including their duties with respect to the shooting of Sergeant Gallagher, from 1985 until 2004 (to the extent that such documents have not been produced in response to Request 14).

**RESPONSE**

OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks information over a nineteen year period, and any extant documents existing twelve years prior to the shooting of Gallagher have no possible relevance to the training practices in place in 1997. Further, in its Response to Plaintiff's First Document Request, the City produced all responsive information regarding the duties of the named defendants with regard to their assignments and the investigation into the shooting of Gallagher that are in its possession, custody or control.

**REQUEST NO. 41**

All documents concerning the responsibilities of supervisors of the BPD Identification Unit and /or the former Latent Print Unit with respect to training, instruction, supervision, review, and discipline of subordinates in the Identification Unit and the former Latent Print Unit of the BPD from 1985 until 2004 (to the extent that such documents have not been produced in response to Request 21).

**RESPONSE**

OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks information over a nineteen year period, and any extant documents existing twelve years prior to the shooting of Gallagher have no possible relevance to the supervisory practices in place in 1997. Further, in its Response to Plaintiff's First Document Request, the City produced all responsive information regarding the duties of the named supervisory officers with regard to their assignments and the investigation into the shooting of Gallagher that are in its possession, custody or control.

**REQUEST NO. 42**

All documents concerning the policies, procedures and standards by which supervisors oversaw fingerprint identification work undertaken by the Identification Unit and /orthe former Latent Print Unit of the BPD from 1985 until 2004 (to the extent that such documents have not been produced in response to Request 22).


**RESPONSE**


OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks information over a nineteen year period, and any extant documents existing twelve years prior to the shooting of Gallagher have no possible relevance to the supervisory practices in place in 1997. Further, in its Response to Plaintiff's First Document Request, the City produced all responsive information regarding the duties of the named supervisory officers with regard to their assignments and the investigation into the shooting of Gallagher that are in its possession, custody or control.

**REQUEST NO. 43**

All documents concerning any efforts to supervise and verify the accuracy of fingerprint identifications made by members of the Identification Unit and/or the former Latent Print Unit of the BPD from 1985 until 2004 (to the extent that such documents have not been produced in response to Request 23).


**RESPONSE**


OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks information over a nineteen year period, and any extant documents existing twelve years prior to the shooting of Gallagher have no possible relevance to the supervisory practices in place in 1997. Further, in its Response to Plaintiff's First Document Request, the City produced all responsive information regarding the duties of the named supervisory officers with regard to their assignments and the investigation into the shooting of Gallagher that are in its possession, custody or control.

**REQUEST NO. 44**

All documents maintained and/or archived by the BPD as part of the personnel file and/or record for each individual who worked in the Identification Unit and/or the former Latent Print Unit of the BPD from 1985 until 2004.

**RESPONSE**

OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks personnel information of past and present employees spanning a nineteen year period, and any extant personnel documents relating to the named defendants have been identified and produced.

**REQUEST NO. 45**

All documents concerning the law enforcement background, credentials, and expertise of each individual who worked in the Identification Unit and/or the former Latent Print Unit of the BPD from 1985 until 2004, including applications for employment, resumes, and curriculum vitae.

**RESPONSE**

OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks personnel information of past and present employees spanning a nineteen year period, and any extant personnel documents relating to the named defendants have been identified and produced.

**REQUEST NO. 46**

All documents concerning complaints filed, legal action taken, or disciplinary action taken against any individual who worked in the Identification Unit and/or the former Latent Print Unit of the BPD from 1985 until 2004 in connection with his or her employment by the BPD and/or any other law enforcement agency.

**RESPONSE**

OBJECTION. Defendant objects to the request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, in that it seeks personnel information of past and present employees spanning a nineteen year period, and any extant, sustained disciplinary action taken against any named defendant has been identified and produced.

**REQUEST NO. 48**

The fingerprint enlargements and/or charts created for and/or used at trial by Defendants LeBlanc or McLaughlin in the matter of *Commonwealth of Massachusetts v. Stephan Cowans*, Suffolk Superior Court Criminal Division No. 97-11231 (to the extent that such documents have not been produced in response to Request 16).

**RESPONSE**

The Defendant will make the requested materials available for inspection at a mutually convenient time.

DEFENDANT CITY OF BOSTON
By its attorneys:
William F. Sinnott
Corporation Counsel


_Mary Jo Harris_ (BBO# 561484)
Special Assistant Corporation Counsel
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109
(617) 523-6666

Thomas R. Donohue, Esq.
BBO# 643483
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4039


<u>CERTIFICATE OF SERVICE</u>

I, Mary Jo Harris, counsel for Defendant City of Boston hereby certify that a copy of the attached document has been served upon all counsel of record this ___31___ day of May, 2006 by first class mail.

_June 1, 2006_                                    _Mary Jo Harris_

# EXHIBIT F

GOODWIN | PROCTER

Sheryl A. Koval
617.570.1147
skoval@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

June 15, 2006

**By Mail and Facsimile**

Thomas Donahue, Esq.
City of Boston Law Department
City Hall Plaza
Boston, MA 02201

Mary Jo Harris, Esq.
Morgan, Brown & Joy
200 State Street
Boston, MA 02109

Re:    **Stephan Cowans v. City of Boston, et. al.**
       **(D. Mass. Civ. No. 05-11574-RGS)**

Dear Mr. Donahue and Ms. Harris:

I write in regard to the City of Boston's ("City's") written discovery responses, which were
provided on June 1, 2006. A number of these responses, while appearing to answer Mr. Cowans
requests, are evasive, provide little substantive information and are, therefore, deficient.

In its interrogatory responses, in many instances, the City attempts to side-step directly
answering the inquiry posed by referring Plaintiff to the personnel files of the defendants
produced. It is not clear from the reference to personnel files what the answer is and the inquiry
requires more than just referring Plaintiff to materials produced. For example, in Interrogatory
Nos. 4-5, instead of describing the training and duties of the defendants as asked, the City leaves
Mr. Cowans with the answer that he should refer to training certificates and a "listing of
assignments." However, as to the training certificates, it is unclear if the City is responding this
was all the training provided. And, as to the listing of assignments, Mr. Cowans interrogatory
asks for a description of each officer's duty with respect to the Gallagher investigation. This
information is not reflected in personnel records. Again, it is unclear whether the City is merely
lazy in its answer, or this is all of the materials and information it possesses.

Furthermore, in its interrogatory responses, the City objects wholesale to all of Plaintiff's Second
of Interrogatories stating that these interrogatories as too broad because seek information back to
1985. However, the personnel files appear to reveal that LeBlanc worked in the identification
until from the mid-1980s until the present. As such, any information concerning assignments to
the unit, training, supervision, review, and disciplinary action of members of that unit at that time
are directly relevant. Furthermore, the City directs Plaintiff to its answers to interrogatories that
only deal with the defendants in this action. The interrogatories in set two, however, are
designed to be more broad and seek information about the policies and procedures of the unit in
general.

# GOODWIN | PROCTER

June 15, 2006
Page 2

In its responses to Plaintiff's request for documents, similarly, the City objects to producing personnel files, procedures, policies, training supervision, verification, and disciplinary action because these documents are not relevant. However, the training provided at the time LeBlanc and McLaughlin entered the unit and the policies and practices of the unit over time are directly relevant to Mr. Cowans' § 1983 action against the City and these documents should be produced.

We ask that the City correct these deficiencies within 7 days of the date of this letter and provide answers to interrogatories and the documents requested at that time. Additionally, the City has also indicated that it has additional documents it will produce in response to these requests. If we do not receive these responses and documents within 7 days, we will have no choice but to move to compel these materials.

Additionally, as we are commencing depositions, we reserve the right to recall any witness whose deposition occurs prior to the production of these documents and the supplementation/amendment of the City's written discovery responses as these items should have been provided to us in advance of such depositions.

I appreciate your cooperation in this matter.

Very Truly Yours,

Sheryl A. Koval

Sheryl A. Koval

cc:     Joseph F. Savage
        R. David Hosp
        Robert N. Feldman

# EXHIBIT G

MORGAN, BROWN & JOY LLP

Sheryl A. Koval, Esq.
June 21, 2006
Page Two


To the extent that you seek training provided to LeBlanc and McLaughlin since their assignment to the unit, those materials have been produced. The City has also provided you with its Rules and Procedures outlining supervisory responsibilities, the make up of the Identification Unit, and record of discipline filed against the named defendants from January 1992 to the present, as you requested in your First Set of Interrogatories.

Finally, in your letter you allude to "additional documents" that have yet to be provided to you. As of this writing, you have been provided with copies of all audio tapes from the Gallagher shooting investigation (see City's Response to Request No. 36), all documents regarding LeBlanc's disciplinary record (see City's Response to Request No. 29), we are scheduled to review all physical evidence on Thursday, June 22, 2006 (see City's Response to Requests No. 1, 37, 48) and all manuals regarding AFIS will be provided to you at that meeting (see City's Response to Request No. 8). I have asked the Boston Police Department to search for any documents that may have been presented to the Police Commissioner by Ron Smith & Associates, as she mentioned at her deposition. If any are found, I will immediately produce them to you; if a search is unavailing, I will inform you of that as well. There are no outstanding documents which you have requested that have not yet been produced (save those that have been objected to).


Sincerely,

Mary Jo Harris


cc:     Thomas Donoghue, Esq.
        Kenneth Anderson, Esq.
        Frances Robinson, Esq.
        (by first class mail only)



# MORGAN, BROWN
# & JOY, LLP

200 STATE STREET
BOSTON, MA 02109-2605
TEL. 617-523-6666
FAX 617-367-3125

WWW.MORGANBROWN.COM

---

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| **Sheryl Koval** | **Mary Jo Harris** |

| COMPANY: | DATE: |
|---|---|
| | 6/21/2006 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 617-523-1231 | 3 |

| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
|---|---|
| | |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| **Cowans v. City of Boston, et al** | |

☒ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:
*THIS FACSIMILE IS CONFIDENTIAL, SUBJECT TO THE ATTORNEY-CLIENT AND WORK
PRODUCT PRIVILEGE AND INTENDED ONLY FOR THE NAMED ADDRESSEE(S). IF YOU ARE
NOT A PERSON FOR WHOM THIS FACSIMILE WAS INTENDED, PLEASE DIRECT IT TO THE
NAMED ADDRESSEE(S) OR DESTROY IT.*

---

## MORGAN, BROWN & JOY LLP

### ATTORNEYS AT LAW
### 200 STATE STREET
### BOSTON, MASSACHUSETTS 02109-2605
### TELEPHONE (617) 523-6666
### FACSIMILE (617) 367-3125

MARY JO HARRIS                              June 21, 2006          DIRECT DIAL (617) 788-5011
                                                                    mharris@morganbrown.com

By Facsimile No. (617) 523-1231

Sheryl A. Koval, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

> Re:    **Stephan Cowans v. City of Boston, et al.,**
>        **U.S.D.C. Civil Action No. 05-11574-RGS**

Dear Ms. Koval:

     I write in response to your letter of June 15, and as a follow up to my letter to you of May 31, 2006 regarding discovery issues.

     First, with regard to your quarrel with the City's designation of documents in response to your requests for training and assignment information (Interrogatories Number 4 and 5), I confirm that the training materials produced to you in the personnel files (Bates stamp numbers 5088 – 5183, 5184 – 7004) are the only record of training given to the named defendants in the City's possession, custody or control. I also confirm that the personnel files contain the dates of Spellman, McDonough and McCarthy's assignment to the Homicide Unit. I have produced to you the complete Homicide Unit investigatory file (Bates stamp numbers 4029 – 5087), which includes every report written by every police officer who had any role whatsoever with regard to the Gallagher shooting. The City's answers further indicate that Spellman was the supervising sergeant of a squad, and that McDonough and McCarthy worked under his command. Respectfully, I believe that this response adequately informs you of the dates each was assigned to Homicide and the duties with which they were charged, including their duties with respect to the Gallagher shooting investigation.

     Second, with regard to your Second Set of Interrogatories, you seek information from 1985 to 2004, including all reasons persons were assigned to the Identification/Latent Print Unit and dates thereof, all training provided to those employees, duties of supervisors, and any and all discipline or legal action made or brought against those employees. As I indicated in my letter of May 31, the City takes the position that these requests are overbroad, and has objected on those grounds. I do not agree that information that pre-dates the arrest and conviction of Mr. Cowans by more than a decade is relevant to the policies in place at the Latent Print Unit in 1997. Since we clearly cannot resolve this discovery dispute, I shall file a Motion for a Protective Order seeking relief from these requests.

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHAN COWANS, )<br><br>Plaintiff, )<br><br>v. )<br><br>CITY OF BOSTON; BOSTON POLICE )<br>DEPARTMENT; DONALD L. DEVINE, Deputy )<br>Superintendent of the Bureau of Investigative )<br>Services of the Boston Police Department, in his )<br>individual capacity; ROBERT FOILB, Supervisor )<br>of the Boston Police Department Identification )<br>Unit, in his individual capacity; GREGORY D. )<br>GALLAGHER, in his individual capacity; DENNIS )<br>LEBLANC, in his individual capacity; JOHN H. )<br>MCCARTHY, in his individual capacity; PAUL T. )<br>MCDONOUGH, in his individual capacity; )<br>ROSEMARY MCLAUGHLIN, in her individual )<br>capacity; HERBERT L. SPELLMAN, in his )<br>individual capacity; and DOES 1–10; )<br><br>Defendants. ) | Civil Action No: 05-11574 (RGS) |

## PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES FROM DEFENDANT CITY OF BOSTON

Plaintiff Stephan Cowans ("Mr. Cowans") asks this Court to compel defendant the City of Boston ("the City") to produce to Mr. Cowans sufficient written answers to Plaintiff's First and Second Sets of Interrogatories and documents and sufficient written responses to Plaintiff's First, Second and Third Requests for the Production of Documents.

While the City has purported to answer the written discovery served by Plaintiff, its answers are evasive, not in good faith, provide little or no substantive information and, therefore, are deficient. Furthermore, its objections upon which it is withholding documents are baseless.

These documents and responses directly bear on Mr. Cowans' claims in this case. Because these written responses and documents are relevant and long overdue, Mr. Cowans asks that this Court compel adequate responses to Plaintiff's interrogatories and document requests and compel the production of all relevant documents.

## **BACKGROUND**

Mr. Cowans sued the City and Officer LeBlanc, among others, for his wrongful conviction based on a fraudulent fingerprint identification. In 1998, Mr. Cowans was wrongfully convicted of shooting Boston Police Department ("BPD") Sergeant Gregory Gallagher. The primary evidence against Mr. Cowans was a fingerprint allegedly left behind at the scene of the crime by the perpetrator. This fingerprint was identified by Officer LeBlanc and verified by Officer McLaughlin as belonging to Mr. Cowans. In 2004, when Mr. Cowans was exonerated based on his actual innocence, which was determined by DNA testing, the BPD reviewed the fingerprint evidence. Based on this review, the BPD conclusively determined that the fingerprint found at the scene did not match that of Mr. Cowans. Independent fingerprint experts hired by the City of Boston audited the Latent Print Unit of the BPD and the fingerprint identification that resulted in Mr. Cowans' conviction. As a result of this audit those experts concluded that no competent fingerprint examiner could have matched Mr. Cowans' fingerprints with those found at the scene, that one of the Fingerprint Unit officers discovered the mistake prior to trial and may have deliberately concealed the mistake, and that the officers in the Unit were untrained and unsupervised.

Furthermore, during the independent expert's evaluation of the BPD Latent Print Unit, the experts concluded that:

> Generally speaking, it appears that over the last several years the Latent
> Print Unit has developed into a unit that has been satisfied with survival

-2-

> instead of success. The absence of involvement and administrative supervision from upper management, coupled with the lack of on site technical leadership have contributed to an environment in which excellence is not expected, therefore not achieved. Maintaining the status quo became Job #1, regardless of what the rest of the forensic identification world was doing. This situation was further complicated by a never ending stream of analytical work that exceeded the perceived abilities of the examiners. Survival became acceptable and new employees assigned to the unit quickly became accustomed to this philosophy.

See Expert Report dated September 5, 2004 at 34, attached hereto as Exhibit A; see also Expert Report dated June 22, 2005, attached hereto as Exhibit B (detailing systematic failures of the BPD Latent Print Unit)..

Moreover, subsequent investigations revealed (in the words of the Massachusetts Attorney General) that Mr. Cowans' ordeal was the result of "systemic failures of the fingerprinting lab," and (according to investigative reports) that, prior to its closure in the wake of Mr. Cowans' exoneration, the Latent Fingerprint Unit was, "for decades … a 'dumping ground' for troubled cops who were responsible for handling critical evidence used to put suspected rapists and killers behind bars." (See News Articles Attached hereto as Exhibit C).

As a result of the expert report, the Latent Fingerprint Unit was closed in 2004 and was not reopened until January of this year under civillian control. Additionally, an internal affairs investigation was conducted and a grand jury was convened to assess the wrongdoing that had occurred.

Furthermore, Mr. Cowans' preliminary investigation into this matter has revealed that additional failures by the BPD may have occurred in the Homicide Unit in terms of Mr. Cowans' name being provided as a suspect, the line-ups and picture arrays, and the overall failure of the Homicide Unit to follow up on other possible suspects.

LIBA/1694173.2

## FACTS

On October 17, 2005, Mr. Cowans served discovery requests and interrogatories on the City. The City provided documents responsive to some of his requests on January 12, 2006 and throughout the months of May and June, 2006.

On June 1, 2006, after numerous requests to do so, the City produced its written responses to Mr. Cowans discovery requests. See City's Discovery Responses, attached as Exhibits D-H). These discovery requests, however, are woefully deficient, side-step the requests, and provide little-to-no substantive information. The follow is a summary of those deficiencies:

- In response to document request numbers 7, 11, 15, 16, 17, 21, 24, 25, 27, 28, 31, 32 and 33 the City simply states "Produced" in contrast to its other answers where it states "All documents responsive to this request have been produced." It is unclear is there are outstanding documents responsive to these requests or the City merely was lazy in its answers.

- In response to document request number 30, which asks for deposition testimony by the defendants in connection with his/her employment, the City objects that this request is overbroad. This request however, is not overboard in that, as discussed above, there appears to have been a policy or practice of using the Latent Print Unit as a dumping ground. These documents are directly relevant to that fact.

- In response to document request numbers 38-46, which seek documents pertaining to the assignment of officers, training, duties, supervision, standards/policies/procedures, quality assurance, personnel files, skills and expertise and disciplinary records for officers in the Latent Print Unit from 1985-2004, the City objects that these requests are overbroad. Again, however, these documents go directly to the liability of the City for its policies and practices with regard to that Unit.

- In response to interrogatory numbers 15-18, which requests information regarding the assignment of officers, policies, procedures, standards, training and discipline of officers assigned to the Latent Print Unit from 1985-2004, the City again objects on the ground that Plaintiff's requests are overbroad as they cover a 19 year period and ask for information on "unrelated individuals." However, these documents are directly relevant to the idea that the Latent Print Unit was a

dumping ground for "bad" police officers and the individuals there were untrained and unsupervised -- precisely the substance of Mr. Cowans' Monell claim.

On June 15, 2006, counsel for Mr. Cowans sent a letter detailing these deficiencies (see letter, attached as Exhibit I) and asking the City to respond no later than 7 days from the date of the letter (June 22, 2006). Counsel for the City responded by letter on June 21, 2006 but has not agreed to correct these deficiencies. (See Response Letter, attached as Exhibit J).

At the outset, Mr. Cowans was willing to allow the City additional time to gather its responses in light of a mediation scheduled for April 2006, specifically in light of the City's representations that it needed time to prepare for the mediation because this is a "multi-million dollar" case. The City delayed in providing any responsive documents until mid-January 2006 and still has not adequately responded to much of the discovery served. Because of this delay, and because the City, despite its prior representations, was unprepared to make a substantive offer to Mr. Cowans at the mediation indicating an unlikelihood that this case will reach a settlement, Mr. Cowans has no choice by to pursue this discovery through this motion to compel and prevent any further delays.

## ARGUMENT

Mr. Cowans is entitled to discovery "regarding any matter, not privileged, that is relevant to" his claims. Fed. R. Civ. P. 26(b)(1). Even if the evidence may not be admissible at trial, discovery must be had as long as it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "Relevancy is to be broadly construed at the discovery stage of litigation and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 10 (D. Mass. 1990) (emphasis added). Because written responses to interrogatories and document requests as well as documents responsive to

-5-

the above-requests are relevant to Mr. Cowans' § 1983 claims against the defendants and because there is no valid basis upon which these documents can be withheld, this Court should compel the defendants to respond to written discovery and produce all responsive documents immediately.

The City's six month delay in providing responses to Mr. Cowans' interrogatories and requests for the production of documents and then providing answers which are completely lacking in substance is unacceptable and unfounded. These requests are narrowly tailored to elicit information directly relevant to Mr. Cowans' § 1983 claims against the defendants and Mr. Cowans' claims under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700-701 (1978) against the City in particular. Mr. Cowans asks that the Court order the City to respond adequately to this written discovery and provide all response documents immediately.

The City is merely attempting, yet again, to side-step providing legitimate responses to Mr. Cowans' well-founded requests. Mr. Cowans has claimed, based on the City's own expert reports and statements of its officers, that the City inadequately trained and supervised the members of its police force. This goes beyond information relating to just the defendant officers. The policies and procedures relating the training and supervision of the members homicide and Latent Print Units as a whole are implicated, as are the circumstances and rationales for assigning officers to those units. While defendant may believe these requests are "overbroad," these requests reflect the time frame when the defendant officers were working in the Latent Print Unit and the circumstances under which they may have come into the unit and their work while there.

Furthermore, in the instances where the City actually provides answers, these answers are so deficient so as to be of no substantive value to Mr. Cowans. The City cannot merely point to

-6-

its documents to answer a question that requires a detailed explanation which the documents do

not reflect. This is not an instance where Fed. R. Civ. P. 33(d) is applicable and the City may

just point to its business records. The City has complete control over a number of the defendants

in this action who possess this information. It is their obligation to respond in good faith – which

in this case would include speaking to the officers within their control about training,

supervision, policies, procedures, and discipline in order to provide a full response. The

documents do not adequately answer the question presented. 8A Wright & Miller, *Federal

Practice and Procedure* §2178, 331 (2d ed. 1994) ("If a question calls for the recollections of

parties or their employees or agents, the fact that some pertinent data might also be found in the

records would not warrant use of [Rule 33(d)]"); *Sabel v. Mead Johnson & Co.*, 110 F.R.D. 553,

555 (D.Mass. 1986) ("The party invoking the option provided by Rule 33 may not do so if all

which can be said is that the answer *might* be found in the records; the party invoking the option

must be able to secure the information which is sought by the interrogator *in the records*.").

Moreover, many of the City's responses are just plain confusing and incomplete and require

clarification to have any meaning. Answering in response to an inquiry for a detailed description

of all training – which includes formal, informal and on-the-job training – pointing to a handful

of training certificates, without explanation, is not an adequate response. Additionally,

oscillating between stating "PRODUCED" and "all records responsive to this request have been

produced" only leads to greater confusion.

## CONCLUSION

Because the City's responses to Plaintiff's written discovery are deficient, Mr. Cowans

respectfully asks this court to compel substantive answers to both his document requests and

interrogatories and all documents that have not been produced, either because they have been

purposefully withheld based on the City's unsupportable objections or because the City has not yet gotten around to producing them.

RESPECTFULLY SUBMITTED,

STEPHAN COWANS

By his attorneys,

/s/ Sheryl A. Koval
Joseph Savage (BBO# 443030)
R. David Hosp (BBO# 634091)
Sheryl A. Koval (BBO# 657795)
Goodwin | Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100

Dated: June 23, 2006

## CERTIFICATION PURSUANT TO
## LOCAL RULE 7.1(A)(2) AND FED. R. CIV. P. 37.1

I certify that I have attempted to confer with counsel for the City in a good faith attempt to resolve or narrow the issues presented by this motion through a conference on June 22, 2006.

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 23, 2006.

/s/ Sheryl A. Koval
Sheryl A. Koval

LIBA/1694173.2

# EXHIBIT I

Volume 1, Pages 1-178

Exhibits: 1-14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------

STEPHAN COWANS,

               Plaintiff

v.                  Docket No. 05-11574 (RGS)

CITY OF BOSTON, et al.,

               Defendants

(Full caption on Page 2)

---------------------------

DEPOSITION OF KATHLEEN M. O'TOOLE

Wednesday, June 14, 2006, 10:03 a.m.

Boston Police Headquarters

One Schroeder Plaza, 4th Floor

Boston, Massachusetts


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

ksilva@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

Kathleen M. O'Toole
Volume 1 - June 14, 2006

Page 124

1    training programs of this nature.

2                (Marked, Exhibit 8, letter, 6/22/04.)

3        Q.   I'll show you what's been marked as Exhibit

4    8, Bates stamp numbers 3248 through 3266.   I'll ask

5    you if you recognize that document.

6        A.   Again, the Ron Smith logo is familiar to

7    me, but I don't remember whether I've looked at this

8    specific document.

9        Q.   If I could direct your attention to page

10   3252.

11       A.   Yes.

12       Q.   The bottom paragraph, second sentence from

13   the start, tell me if I read this correctly.   "It

14   appears from our preliminary observation that these

15   voids have developed slowly over the last 20 to 30

16   years and were not purposely created but instead

17   were a result of non-attention or non-concern from

18   the upper management staff.   This seems to have been

19   aggravated by the assignment in some instances of

20   less than desirable employees who were reassigned to

21   the identification unit."   Did I read that

22   correctly?

23       A.   Yes.

24       Q.   The latent print unit was a unit where less

Kathleen M. O'Toole
Volume 1 - June 14, 2006

1  than desirable employees were being reassigned to?

2      A.  Not on my watch.

3      Q.  My question was a little more specific than

4  that, though.  Was it ever brought to your attention

5  that the latent print unit was a unit where less

6  than desirable employees had been assigned from

7  other units?

8      A.  Anecdotally, but nobody ever mentioned any

9  specific individuals.

10      Q.  When did you first anecdotally learn that

11  the latent print unit would be a place where less

12  desirable employees would be sent?

13      A.  I don't remember if it was ever mentioned

14  during my early years on the job.  But during the

15  course of this investigation, you know, the

16  perception was that it had been over the years.  You

17  know, people mentioned that.  People also mentioned

18  that there were many very capable and committed

19  people in the unit that, you know, maybe weren't

20  given the tools to effectively perform their jobs.

21  So, you know, I actually went and spoke to the unit

22  a few times, because, needless to say, morale was a

23  concern there, you know, in the aftermath of some of

24  Ron Smith's reports.  What I think Ron Smith was

Page 126

1    trying to take into consideration was that several

2    of the employees there had worked very hard, were

3    conscientious employees, had actually gone out and

4    pursued their own training, so that you couldn't

5    paint with a broad brush and say that, you know,

6    they were all misfits there by any stretch of the

7    imagination.

8        Q.  Did you do or cause to be done any

9    investigation to determine if the latent print unit

10   had been used as a place to transfer less desirable

11   employees?

12       A.  No.  My perspective was, "Let's resolve it

13   and move forward.  Let's fix it and not waste any

14   time doing so."  I didn't think it was necessary to

15   question, you know, past supervisors or past

16   management structures.  I know how difficult it is

17   to manage an organization of this size, and, you

18   know, rather than second guess what had happened in

19   the past, I was more focused on resolving the

20   problem and moving forward.

21       Q.  Well, presuming you don't mean to say that

22   it's sometimes so difficult to manage this

23   organization that it would ever be justified to use

24   the latent print unit as a place to send less

Kathleen M. O'Toole
Volume 1 - June 14, 2006

Page 127

1    desirable employees, are you?

2        A.  No.  I don't think any unit should be used

3    as a place to send less desirable employees.  But,

4    again, that was a statement that I heard expressed

5    more than once around here, but I also heard people

6    express sympathy for those in the unit who'd really

7    worked hard, who were really capable people, who'd

8    gone out and spent their own money to get training.

9    They made a commitment to their own professional

10   careers.  So, you know, I think it would be

11   inappropriate to paint with a broad brush, because

12   there were some really committed people in that

13   unit.

14       Q.  I don't think the question implies that

15   every single person in the unit was a less desirable

16   employee.  Even if there was one that was sent to

17   the unit because they were less than desirable, I

18   assume you'd agree with me that that's completely

19   inappropriate as a management technique?

20       A.  If that were the case, absolutely.

21       Q.  And you've heard anecdotally that's the

22   case, but you don't know it firsthand?

23       A.  Right.

24       Q.  And that that was not your policy?

Page 128

1      A.   Yes.

2      Q.   While you've been commissioner?

3      A.   Yes.

4           MR. SAVAGE:   Can we go off the record

5      for a second.

6           (Luncheon recess.)

7      Q.   Commissioner O'Toole, I think you have in

8      front of you Exhibit 8.  While you indicated that

9      you didn't have a specific recollection of having

10     seen this document prior to today, did you have some

11     opportunity to review it at the break?

12     A.   Yes.

13     Q.   Is it fair to say that it contains a number

14     of observations by Ron Smith & Associates about

15     deficiencies in the latent print unit?

16     A.   Yes.

17     Q.   Having reviewed what Ron Smith & Associates

18     have written here, are there any of their

19     assessments or conclusions that you do not agree

20     with?

21     A.   No.

22     Q.   The content of that document, was that all

23     information that had come to your attention either

24     orally or in some other form prior to today?

Kathleen M. O'Toole
Volume 1 - June 14, 2006

Page 129

1       A.   Yes.  As I reviewed it, it was very

2   familiar to me, so it's very possible that I did

3   actually read this document in its entirety.

4              (Marked, Exhibit 9, organizational

5   structure.)

6       Q.   Commissioner O'Toole, I show you what's

7   been marked as Exhibit 9, and I represent to you

8   that these were documents produced by the Boston

9   Police Department in response to any requests for

10  rules or procedures that may relate to the

11  identification unit or the latent print unit.

12      A.   Yes.

13      Q.   Have I represented correctly that that's

14  what this purports to be?  Did I say that right?

15             MS. HARRIS:  I believe that there were

16  requests for a number of different protocols within

17  the department, if my memory serves, but I can

18  represent that any responsive documents that we had

19  with regard to the latent print unit have been

20  produced to you.

21             MR. SAVAGE:  Okay.  And Exhibit 9

22  appears to be Bates number COB 7005 to COB 7074.

23      Q.   Without asking you to read every sentence

24  of this, do you recognize these to be general rules

# EXHIBIT J

Volume 1, Pages 1-131

Exhibits: 15-22

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------

STEPHAN COWANS,

                Plaintiff

v.                        Docket No. 05-11576 (RGS)

CITY OF BOSTON, et al.,

                Defendants

(Full caption on Page 2)


---------------------------

DEPOSITION OF ROBERT SILVA

Monday, June 26, 2006, 10:32 a.m.

Boston Police Headquarters

One Schroeder Plaza, 4th Floor

Boston, Massachusetts

----Reporter:  Kathleen Mullen Silva, RPR, CRR----

ksilva@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

Robert Silva
Volume 1 - June 26, 2006

Page 14

1    would say roughly we had maybe a total of, I want to

2    say 30 people working around the clock.  The

3    ballistics unit and the crime lab shut down.  They

4    would go home at like 5:00.  If they needed someone

5    from the crime lab, they were on call; they would

6    respond to the crime scene.  The same thing with the

7    ballistics unit.

8        Q.  Now, did each of these sections have their

9    own supervisors?

10       A.  Yes, they did.

11       Q.  With respect to the latent fingerprint

12   unit, what type of position operated as the

13   supervisor?

14       A.  A sergeant detective.

15       Q.  Was it always a sergeant detective?

16       A.  Until he retired, yes.

17       Q.  Starting from the period when you started

18   at the identification unit, can you tell me, was

19   there one individual who functioned in that

20   position, or were there a series of individuals who

21   functioned in that position?

22       A.  In the latent fingerprint section?

23       Q.  Yes.

24       A.  There was one individual.

Robert Silva
Volume 1 - June 26, 2006

Page 15

1      Q.  And who was that?

2      A.  Sergeant Arthur Leets, L-e-e-t-s.

3      Q.  L-e-e-t-s?

4      A.  Yes.

5      Q.  Do you know when he served as the sergeant

6   detective in charge of the latent fingerprint unit?

7      A.  I think he retired -- he served up until

8   the time he retired, and that was -- I want to say

9   1991 or 1992.

10      Q.  Was he there when you came to the unit?

11      A.  Yes, he was.

12      Q.  So he was there from 1984 through 1991 or

13   '92?

14      A.  Yes, that's right.

15      Q.  After he retired, who served as the

16   sergeant detective in charge of the latent

17   fingerprint unit after that?

18      A.  We didn't have a sergeant detective.  There

19   was no one there.

20      Q.  For how long was there no one in that

21   position?

22      A.  April 1 of -- I don't remember the -- '98,

23   I think, '98 or '97.

24      Q.  And at that point you became the sergeant

Robert Silva
Volume 1 - June 26, 2006

Page 16

1    detective in charge?

2        A.   The sergeant in charge.

3        Q.   The sergeant in charge.  Do you recall

4    whether you took over in charge prior to or after

5    the time when Mr. Cowans was being prosecuted?

6        A.   I believe it was after.

7        Q.   So from 1991 or '92 through 1997 or 1998,

8    there was no supervisor for the latent fingerprint

9    unit, is that correct?

10       A.   Yes, that's right.

11       Q.   And at that point, do you know how many

12   individuals were serving in the latent fingerprint

13   unit at that point?

14       A.   Well, before I was in charge, I worked in

15   the latent fingerprint section.  So there were three

16   people when I first went to latent fingerprint.

17   That increased to five, and --

18            MR. ANDERSON:  Can I clarify when he

19   went?  Is this when he went originally or after

20   becoming a sergeant?

21       A.   Before I came to the unit as a sergeant, I

22   worked in the latent fingerprint section.  There

23   were five people in there at that -- over a period

24   of time, it came to be that there were five people.

Robert Silva
Volume 1 - June 26, 2006

Page 91

1        Q.   Is that still your honest opinion at this

2   point?

3        A.   Well, it's a little late.  Yes.

4        Q.   Were there any minimum requirements in

5   terms of training or experience to join the latent

6   print unit?

7        A.   No.

8        Q.   Was there any training that was required?

9        A.   We started out with a basic fingerprint

10   training.  And you do basic fingerprint, you do your

11   basic photography, and the crime scene collection

12   preservation of evidence.  From there you'd go to a

13   latent fingerprint course and an advanced latent

14   fingerprint photography course.  You do the first

15   three courses, and then a lot of the work we do was

16   apprentice work.  So you'd wind up working with

17   someone as an apprentice doing the processing of the

18   crime scenes, doing the photography.  Again, doing

19   the latent print photography and doing the actual

20   latent fingerprint work.

21        Q.   But you'd have the first three courses

22   before you even got into the apprentice work?

23        A.   No.  Actually, it was a matter of you

24   coming into the unit and getting trained as you went

Robert Silva
Volume 1 - June 26, 2006

Page 92

1    along.   Before 9/11, the courses -- we'd be able to

2    pick up the basic fingerprints, the photography and

3    the crime scene search pretty easy.   After 9/11, it

4    just slowed right down.   The FBI shifted back to

5    homeland security.

6              You do a basic fingerprint course.   Then

7    you do an apprenticeship for a period of time.   When

8    a course came up, that's when you would be able to

9    go to that course and get a certificate from it.

10   And the same thing with the crime scene search.   You

11   know, once you got your certificate, you'd come back

12   and you'd continue working in the unit building up

13   your reputation and going forward with the latent

14   fingerprint work.

15      Q.   So in your view, the department should have

16   been approving the opportunity to go to these

17   courses?

18      A.   Yes.

19      Q.   And if somebody was in the unit for, let's

20   say, 12, 13, 14 years without ever having a basic

21   fingerprint course, would that be pretty standard?

22      A.   I don't know about 14, 15 years.   I think

23   that's a little -- that's a lot without any

24   training.   Somewhere in between you had to go to

Page 98

1    A.  Yes, sir.

2    Q.  When you went to the identification unit,

3  was that an assignment that you requested?

4    A.  I requested it.  A lot of people didn't.

5  They just put them in there.

6    Q.  So people that didn't request it got put

7  there?

8    A.  Yeah.  There were -- if the city didn't

9  want someone on the street, the ID was where they

10  would put them.

11    Q.  Was it somewhat of a dumping ground?

12        MR. DONOHUE:  Objection.

13    A.  Yes.

14    Q.  Would this be consistent with 1984, when

15  you went there, or was this throughout your entire

16  career there?

17    A.  When I went there in '84.

18    Q.  Did it remain, in your opinion, a dumping

19  ground?

20    A.  No.

21    Q.  When did it stop becoming a dumping ground?

22  Let me qualify that testimony.  I guess when I'm

23  talking about the identification unit, are we

24  talking about the whole identification unit, you

Robert Silva
Volume 1 - June 26, 2006

Page 99

1    know, including latent prints, including the main

2    index, including photography?

3        A.   That would be the identification unit that

4    I would be speaking to, yes.

5        Q.   Using that definition, when did it stop

6    becoming a dumping ground?

7        A.   In the '90s.

8        Q.   Early '90s, mid '90s, late '90s?

9        A.   I want to say mid '90s.

10       Q.   Are you familiar with Sergeant Lenny

11   Marquertte?

12       A.   Yes, sir.

13       Q.   And he was assigned to the identification

14   unit at some point?

15       A.   Yes, he was.

16       Q.   Would that have been roughly the mid '90s?

17       A.   Yes.

18       Q.   Was he there before he was indicted?

19       A.   No.  I think he came after the indictment.

20       Q.   So he was actually working there when he

21   was under federal indictment?

22       A.   Yes.

23       Q.   And this is sometime in the mid '90s?

24       A.   Yes.

Robert Silva
Volume 1 - June 26, 2006

Page 100

```
 1        Q.  Were you considering him one of the people

 2   that would have been there as part of the dumping

 3   ground?

 4        A.  Yes.

 5        Q.  Were there others that you would consider

 6   as being there as part of the dumping ground?

 7        A.  Yes.

 8        Q.  Who would those be?

 9        A.  There's a fellow by the name of Frank

10   O'Rourke, Steve Gafney.

11        Q.  Is he a sergeant?

12        A.  No.

13        Q.  There is a Sergeant Gafney, though, right?

14        A.  There is a Sergeant Gafney, yes.  Steve has

15   passed away.

16        Q.  When did Frank O'Rourke go to the

17   identification unit?

18        A.  I think he was there when I got there in

19   '84.

20        Q.  And in what capacity did he serve in the

21   identification unit?

22        A.  He was a -- he worked on the main index

23   classifying and searching fingerprints.

24        Q.  Why would you say he was part of the
```

Robert Silva
Volume 1 - June 26, 2006

Page 101

1    dumping ground?

2        A.   Frank was known to hang out in the South

3    End.   There used to be Paul's Army Surplus Store.   A

4    lot of the Micmac Indians that would come here to

5    work on the high-rise buildings, he, in fact, would

6    sit out and drink with them.   And we'd get a phone

7    call from people in Paul's to come and get him and

8    bring him back to the station.

9        Q.   Was this during the time he was supposed to

10   be working, he would be out drinking?

11       A.   Yes.

12       Q.   Do you know how long he served in the

13   identification unit?

14       A.   No, I'm sorry, I don't.   I don't remember.

15       Q.   If he was there when you got there in '84,

16   do you think he was there up until about 1990?

17       A.   I just don't have a definite date.   I'm

18   sorry.

19       Q.   What about Steve Gafney, what made him part

20   of the dumping ground?

21       A.   I don't know why Steve came there.   He was

22   just put there.   He didn't volunteer to come.

23       Q.   Was he there when you arrived, if you know?

24       A.   No.   He came after I got there.

Robert Silva
Volume 1 - June 26, 2006

Page 102

1      Q.   And can you ballpark that, late '80s, early

2   '90s, mid '90s?

3      A.   Late '80s.

4      Q.   And what was his function in the

5   identification unit?

6      A.   He was to do main index work as well.

7      Q.   Was he competent to examine fingerprints,

8   in your opinion?

9      A.   Yes, he was.

10      Q.   Did he have a drinking problem?

11      A.   Yes.

12      Q.   Did he show up for work intoxicated, or did

13   he drink on the job?

14      A.   No.  I think it was more he would slip out.

15   He'd take a supper break and come back, and he'd

16   have a gleam in his eye.

17      Q.   And after he'd come back with the gleam in

18   his eye, would he continue to look at fingerprints

19   at that time?

20      A.   No.

21      Q.   What would happen?

22      A.   We'd just tell him to go sit in the back

23   room or just sit off to the side.  "We'll take care

24   of it."

Page 103

 1      Q.   When you say "we would tell him," who was

 2   "we"?

 3      A.   Dennis, myself, the other people -- whoever

 4   was working that shift.  Rosie.  There were the 4:00

 5   to midnight guys.  And we just had -- back then, we

 6   were short of personnel.  So the day people would

 7   spill over into the night people.  The night people

 8   would spill over into the midnight crew.  So we were

 9   like there all the time.

10      Q.   The three people that you mentioned who

11   would tell Steve Gafney just to go --

12      A.   Just go sit in the back.

13      Q.   -- sit in the back were all patrol

14   officers?  It was you, Officer LeBlanc and Officer

15   McLaughlin, right?

16      A.   Right.

17      Q.   Were there any other supervisors there at

18   the time?

19      A.   They were there, but we kept them out of

20   the loop.

21      Q.   Is this something you wanted to keep

22   in-house?

23      A.   It was just patrolman to patrolman, and we

24   would just take care of him.

Robert Silva
Volume 1 - June 26, 2006

Page 104

1    Q.  When Frank O'Rourke would go out and drink

2  with the construction workers, would he come back

3  into the station at that time?

4    A.  We would usually have to go get him.

5    Q.  And who would call you to go get him?

6    A.  The people that worked in Paul's Army Navy

7  at the time.  Paul's wife -- I can't think of her

8  name -- but she'd call us all the time and tell us,

9  you know, "Frank is out here again."

10    Q.  And this is during the time he was supposed

11  to be in the main index reviewing fingerprints?

12    A.  Yes, sir.

13    Q.  When you went and brought him back into the

14  station, would you bring him back into the station

15  or bring him home, or what would you do with him?

16    A.  We'd usually try and take him home.

17    Q.  Were the sergeants aware of this situation?

18    A.  No.

19    Q.  And there was no sergeant who would notice

20  that somebody was gone for several hours at a time?

21    A.  No.  Nobody was really gone for several

22  hours, if you will.  It would be they'd go out --

23  other than Frank O'Rourke sitting on the sidewalk

24  with the guys out there in front of Paul's, nobody

Robert Silva
Volume 1 - June 26, 2006

Page 105

1    really -- you know, we would take him home, take our

2    lunch break and then come back.

3        Q.  And nobody would question where you were

4    going?

5        A.  No, sir.

6        Q.  And these phone calls that would come in

7    saying, "Come get Frank off the corner, bring him

8    home," none of those would ever come through a

9    sergeant; they would come directly to the patrol

10   officers?

11       A.  They would come directly to the patrol

12   officers, yes.

13       Q.  Other than Frank O'Rourke and Steve Gafney

14   and Lenny Marquertte, were there other people you

15   considered to be part of the dumping ground?

16       A.  Keegan, Jimmy Keegan.

17       Q.  Do you know what years he would have been

18   on the identification unit?

19       A.  Late '80s, early '90s.  Detective Marty

20   Kraft.

21       Q.  Let me stick with Jimmy Keegan for now.

22       A.  Okay.

23       Q.  Why would you say he was part of a dumping

24   ground?

Robert Silva
Volume 1 - June 26, 2006

Page 106

1      A.  I guess he wasn't under indictment, but he

2   was under investigation.

3      Q.  Do you know what he was under investigation

4   for?

5      A.  I want to say larceny.  But he was working

6   for this -- he was doing details, and they alleged

7   that he had somebody working in the gas company or

8   electric company that he knew, and he was signing

9   cards.

10     Q.  Do you know if he was ever disciplined for

11  that by the Boston Police Department?

12     A.  He was found not guilty in court, and I

13  don't know if he did any discipline through the

14  department.

15     Q.  He was criminally charged --

16     A.  Yes.

17     Q.  -- for larceny with detail cards that were

18  signed for work that he didn't perform?

19          MR. DONOHUE:  Let Mr. Anderson finish

20  the question first.

21          MR. ANDERSON:  Let me rephrase the

22  question.

23     Q.  He was criminally charged for larceny for

24  having somebody sign detail cards for work he didn't

Robert Silva
Volume 1 - June 26, 2006

Page 107

1    perform?

2        A.   That's right, yes.

3        Q.   During the time he was criminally charged,

4    he was sent to the identification unit?

5        A.   Yes.

6        Q.   Did he also work in the main index, or what

7    did he do?

8        A.   He worked in the main index as well.

9        Q.   Was he in the main index at the time he was

10   criminally charged, or was he somewhere else and got

11   sent there at the time he was criminally charged?

12       A.   He was somewhere else and got sent.

13       Q.   Do you know when he was sent to the main

14   index if he underwent any training to have him

15   assimilate into the main index?

16       A.   Again, when someone new came in, we had to

17   show them how to do the fingerprints, how our system

18   was set up.  And once they got used to doing that,

19   if there was a school available, they, in fact,

20   would send them to the school.

21       Q.   When you first came in, it would be an

22   apprentice training?

23       A.   Yes.

24       Q.   Until a slot opened up to go to the school?

Robert Silva
Volume 1 - June 26, 2006

1      A.   Yes.

2      Q.   Do you know how long you would have been

3   there working in the apprentice system before there

4   would have been a spot opened up?

5      A.   No, I'm sorry, I don't.

6      Q.   When was Detective Martin Kraft assigned to

7   the identification unit?

8      A.   Marty came in -- I want to say early '90s.

9      Q.   Was this before he went to the turret?

10      A.   I don't know.

11      Q.   What was his function in the identification

12   unit?

13      A.   They sent him there to do fingerprint work

14   as well.

15      Q.   Do you know how long he was in the

16   identification unit?

17      A.   Off the top of my head, no.  It might have

18   been a couple -- two or three years.

19      Q.   Was he in the main index as well?

20      A.   Yes, sir.

21      Q.   Is it fair to say that somebody coming into

22   the main unit would start in the main index and as

23   they developed experience and skills, they would

24   move from there to the latent print section?

Page 120

1    course.

2        Q.   Now, up until the time you did this -- I'm

3    assuming this was sometime in late '97 or '98 at the

4    time?

5        A.   '98, yes.

6        Q.   Up to that time, had there been any type of

7    similar training in the whole time you'd been in the

8    identification unit?

9        A.   No, sir.

10       Q.   Now, do you think that the identification

11   unit was adequately staffed at the time you were

12   there?

13       A.   No, sir.

14       Q.   Do you think you had half the amount of

15   people you needed, 75 percent of the people you

16   needed?

17       A.   No.  We lost seven people one year to

18   retirement.  We lost seven people the following year

19   to retirement or two years later, and they were not

20   replaced.  So we never went back to the level that

21   we were.

22       Q.   Was there a time in your tenure with the

23   identification unit when it was properly staffed?

24       A.   Today.  No, sir.