UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEPHAN COWANS

        Plaintiff,

  - against -

CITY OF BOSTON; BOSTON POLICE
DEPARTMENT; DONALD L. DEVINE,
Deputy Superintendent of the Bureau of
Investigative Services of the Boston Police
Department, in his individual capacity;
ROBERT FOILB, Supervisor of the Boston
Police Department Identification Unit, in his
individual capacity; GREGORY D.
GALLAGHER, in his individual capacity;
DENNIS LEBLANC, in his individual capacity;
JOHN H. MCCARTHY, in his individual
capacity; PAUL T. MCDONOUGH, in his
individual capacity; ROSEMARY
MCLAUGHLIN, in her individual capacity;
HERBERT L. SPELLMAN, in his individual
capacity; and DOES 1-10;

        Defendants.

Civil Action No.05-11574 (RGS)

## AMENDED PLAINTIFF'S PROPOSED JURY INSTRUCTION ON ADVERSE INFERENCES AGAINST DEFENDANT LEBLANC[1]

      Pursuant to the Court's Memorandum and Order on Plaintiff's Motion to Compel

Deposition and for Costs, entered January 4, 2007, plaintiff respectfully requests that the Court

give the jury the following instruction:

---

[1]     This proposed jury instruction is amended only to the extent that it includes attachments that were inadvertently not included in the Proposed Jury Instruction on Adverse Inferences Against Defendant LeBlanc filed January 16, 2007.

**PROPOSED JURY INSTRUCTION**

**ADVERSE INFERENCES AGAINST DEFENDANT LEBLANC FOR INVOCATION OF FIFTH AMENDMENT PRIVILEGE**

You have heard that defendant LeBlanc declined to answer questions on the grounds of his Fifth Amendment privilege against self-incrimination.

The Fifth Amendment of the United States Constitution affords every person the right to decline to answer any questions if he or she believes that the answers may tend to incriminate them. However, in civil cases, you are permitted to draw the inference that the withheld information would have been unfavorable to the defendant.

Any inference you may draw should be based upon all of the facts and circumstances in this case as you may find them. You may infer any of the following:

At all relevant times, LeBlanc was performing his regular duties as a Boston Police Officer.

At all relevant times, LeBlanc was acting in his official capacity as a Boston Police Officer.

At all relevant times, LeBlanc acted under the color of state law.

LeBlanc's conduct deprived Mr. Cowans of his constitutional rights.

LeBlanc acted in bad faith, or with the intent to violate Mr. Cowans' constitutional rights, or with deliberate indifference to those rights.

LeBlanc failed to disclose material information to the prosecutor and defense attorney that was favorable to Mr. Cowans.

LeBlanc acted with deliberate indifference by withholding material, exculpatory, and impeachment evidence.

LeBlanc's suppression of evidence directly and proximately caused Mr. Cowans to be wrongfully convicted and to suffer injuries and damages.

LeBlanc fabricated his testimony that the second latent fingerprint on the glass mug came from Mr. Cowans.

LeBlanc knowingly or recklessly identified Mr. Cowans as the perpetrator of the Gallagher shooting when he knew or should have known that this was not the case.

LeBlanc's fabrication of inculpatory evidence was the direct and proximate cause of Mr. Cowans wrongful conviction, directly and proximately causing Mr. Cowans' injuries and damages.

LeBlanc commenced or caused to be commenced a criminal prosecution, instituted with malice or without probable cause, against Mr. Cowans.

LeBlanc acted to secure a conviction of Mr. Cowans regardless of the evidence.

LeBlanc ignored, failed to disclose, or misrepresented the evidence that indicated Mr. Cowans' innocence.

As a proximate result of LeBlanc's conduct, Mr. Cowans was arrested, was prosecuted, was forced to endure an unfair trial and wrongful conviction, and was wrongly imprisoned for nearly seven years.

LeBlanc rendered a fingerprint opinion with deliberate falsity or reckless disregard for the truth.

LeBlanc acted in concert with and between the Latent Print and Homicide Units to deprive Mr. Cowans of his constitutional due process rights by failing to disclose exculpatory evidence, fabricating inculpatory evidence and failing to properly investigate the claims against Mr. Cowans.

LeBlanc affirmatively agreed to act together with others to conceal the misidentification of the second latent fingerprint as belonging to Mr. Cowans, in failing to investigate other exculpatory leads and in misidentifying Mr. Cowans as the perpetrator.

LeBlanc undertook overt acts in furtherance of a conspiracy to misidentify and conceal the misidentification of the second latent fingerprint as belonging to Mr. Cowans.

LeBlanc agreed and acted to withhold and conceal information from the prosecutor so it would not be disclosed to Mr. Cowans.

LeBlanc's conspiratorial acts directly caused the constitutional deprivations suffered by Mr. Cowans' false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all the other grievous permanent damages and injuries.

LeBlanc, as a member of the team responsible for investigating the Gallagher shooting, had a duty to Mr. Cowans to properly investigate crimes put before him and refrain from fabricating evidence against Mr. Cowans.

LeBlanc breached this duty by purposefully misidentifying the second latent print and concealing the misidentification.

LeBlanc knew that his breach of duty would inflict great emotional distress on Mr. Cowans.

LeBlanc knew that a reasonable person in Mr. Cowans' situation, having suffered wrongful arrest, prosecution and conviction would have experienced severe emotional distress.

LeBlanc intended to inflict emotional distress or should have known that emotional distress would have resulted from the falsification of evidence against Mr. Cowans and the wrongful arrest, prosecution and conviction resulting from that falsification.

LeBlanc's conduct was "extreme and outrageous" and "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community."

LeBlanc knew that his conduct would inflict great emotional distress on Mr. Cowans.

LeBlanc knew that a reasonable person in Mr. Cowans' situation, having suffered wrongful arrest, prosecution and conviction would have experienced emotional distress and Mr. Cowans has.

LeBlanc's conduct was the cause of Cowans' distress which was severe and of a nature that no reasonable person should be expected to endure.

LeBlanc intentionally caused Mr. Cowans to be wrongfully and unjustifiably imprisoned. LeBlanc's conduct was a proximate cause of Mr. Cowans' arrest, prosecution, wrongful conviction, and wrongful imprisonment.

Bryant McEwan's elimination prints were available at the time LeBlanc misidentified the print on the glass mug as belonging to Mr. Cowans.

LeBlanc did not compare Bryant McEwan's elimination prints to the print on the glass mug, or if he did compare such prints, he deliberately misrepresented the results of such comparison.

LeBlanc did not run the print from the glass mug through the Automated Fingerprint Identification System before misidentifying it as Mr. Cowans' print.

LeBlanc purposely did not reverse the color on the latent print from the glass mug before comparing the print to Mr. Cowans' inked print.

LeBlanc knew that the failure to reverse the color on the latent print before making a comparison is improper and more likely to lead to a misidentification.

The envelopes found in LeBlanc's desk bearing Rosemary McLaughlin's signature were given to him by Rosemary McLaughlin in violation of department practice and policy, and were used by him to falsely indicate that McLaughlin verified prints he had identified when in fact she had not verified such prints.

LeBlanc knew prior to Mr. Cowans' criminal trial that the print on the glass mug did not, in fact, belong to Mr. Cowans.

LeBlanc concealed his knowledge that the print on the glass mug did not belong to Mr. Cowans throughout Mr. Cowans' trial.

LeBlanc provided erroneous testimony in court during the criminal trial of Mr. Cowans and was not prepared to provide accurate data pertaining to the matter.

LeBlanc prepared a trial exhibit, which was used at trial, showing the latent print from the mug and Mr. Cowans print without color-reversing the latent print, knowing that the failure to color-reverse the print would likely confuse the jury.

LeBlanc does not dispute that the fingerprint of Mr. Cowans does not match the fingerprint taken from the glass mug.

LeBlanc does not dispute that the fingerprint taken from the glass mug in fact belongs to Bryant McEwan.

LeBlanc admits all findings or conclusions reached by Robert Hazen in Mr. Hazen's report dated February 3, 2004 (O'Toole Exhibit 1 attached).

LeBlanc admits all findings or conclusions reached by Pat Wertheim in Mr. Wertheim's report dated June 15, 2004 (McLaughlin Exhibit 33 attached).

LeBlanc admits all findings or conclusions reached by Ron Smith or Ron Smith & Associates, Inc. in all Ron Smith & Associates, Inc. reports (including O'Toole Exhibits 5-8 attached).

At all relevant times, LeBlanc was a highly talented latent print examiner, highly regarded for his ability and his talent as an examiner by his fellow officers.

At all relevant times, LeBlanc had issues with drugs and alcohol, used prescription drugs at work, drank at work, and his drinking interfered with his work.

Respectfully submitted,

Stephan Cowans

By his attorneys,


  /s/ Sheryl A. Koval
Joseph F. Savage Jr. (443030)
R. David Hosp (634091)
Sheryl A. Koval (657735)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

Robert N. Feldman (BBO# 630734)
Melissa N. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100

Dated: January 17, 2007

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 17, 2007.

/s/ Sheryl A. Koval
Sheryl A. Koval

LIBA/1757535.2

EXHIBIT
O'Toole
1
6/14/06    KMS

# FORENSIC USE OF FRICTION SKIN

Robert J. Hazen
Supervisor I/C
  (Retired)
FBI Latent Fingerprint
  Section and
Fingerprint Science
  Instruction
FBI Academy



Fingerprint Consultant
Certified Latent Print
Examiner

February 3, 2004

Commissioner James Hussey
Boston Police Department
ONE Schroeder Plaza
Boston, Massachusetts 02120

Attachment #7

Dear Commissioner Hussey:

   This supplements and confirms telephonic report to you on February 2, 2004.

   A latent fingerprint examination was conducted on the latent fingerprint previously identified as a fingerprint of Stephan E. Cowans. The specimens were delivered to me by Detective Paul C. McLaughlin on January 30, 2004. The results of that examination are as follows:

Specimens:

        One partial glass mug
        Two negatives
        Two enlarged photographs
        Two sets of inked fingerprints of Stephan E. Cowans

Findings:

   The partial latent fingerprint previously identified as a finger-print of Stephan E. Cowans is not identical with the fingerprints of Cowans.

   This latent fingerprint was developed with Cyanocrylate Ester. Latent prints are made visible by the white vapor molecules of cyanocrylate positively charged, being attracted to lipid deposits on the summits of the ridges which are negatively charged. This causes the summits of the ridges to appear white and the furrows between the ridges to be black. Whereas with an inked fingerprint the summits of the ridges are black and the furrows between the ridges are white. Thus the latent fingerprint is in reverse color.

-1-

The comparison of a partial reverse color latent fingerprint with inked fingerprints is a risky and dangerous procedure. A color reversal of the latent fingerprint should always be made, so that at all times the latent fingerprint and inked fingerprint are of the same color. ie the summits of the ridges are black and the furrows between the ridges are white.

If the aforementioned procedure had been followed, the Latent Print Examiner would have quickly known that this latent fingerprint was not identical with the fingerprints of Cowans.

Enclosed for review by your Latent Print Examiners are a set of enlargements with the latent fingerprint in the correct color.

The partial glass mug and the fingerprints of Cowans were returned to Detective McLaughlin.

The two negatives and the two enlarged photographs retained by me for further study are being returned directly to Detective McLaughlin.

If I can be of further assistance, please just call.

Sincerely yours,

Robert J. Hazen

(2 enclosures)
1 cc Detective Paul C. McLaughlin
with enclosures

-2-

175



ARIZONA DEPARTMENT OF PUBLIC SAFETY

SCIENTIFIC EXAMINATION REPORT

AGENCY      MASSACHUSETTS STATE POLICE                    DR NO. 2004061007

FILE NO.    0403448030026                                 Page 3 of 3

OFFICER     MATTHEWS, #1794

DATE        June 15, 2004

NAME(S)     LEBLANC, DENNIS
            MCLAUGHLIN, ROSEMARY

**RESULTS:**

A latent fingerprint near the rim of the glass mug in Item 1 was examined as requested. This latent print was verified as having been made by Bryant McEwen. Stephan Cowans was excluded as the source of this latent print. Charted enlargements purportedly making the identification of this latent print to Stephan Cowans show evidence of manipulation to hide or obscure dissimilarities.

CUSTODY OF EVIDENCE                 PAT WERTHEIM, #4257
                                    Criminalist
RECEIVED       Lt. Frank Matthews #1794      Southern Regional Crime Laboratory
                                    (520) 746-4575
DISPOSITION    Lt. Frank Matthews #1794

*Accredited by the ASCLD Laboratory Accreditation Board*

*Any notes, photographs, charts, or graphs generated during the examination are retained in the laboratory.*



2323



### ARIZONA DEPARTMENT OF PUBLIC SAFETY

### SCIENTIFIC EXAMINATION REPORT

| | |
|---|---|
| **AGENCY** | MASSACHUSETTS STATE POLICE |
| **FILE NO.** | 0403448030026 |
| **OFFICER** | MATTHEWS, #1794 |
| **DATE** | June 15, 2004 |
| **NAME(S)** | LEBLANC, DENNIS |
| | MCLAUGHLIN, ROSEMARY |

**DR NO.** 2004061007

Page 1 of 3

#### ITEMS:

| | |
|---|---|
| #PAW-1. | testimony transcript of Dennis LeBlanc — retained in laboratory files |
| #PAW-2. | testimony transcript of Rosemary McLaughlin — retained in laboratory files |
| #PAW-3. | photocopies of known prints of Stephan Cowans — retained in laboratory files |
| #PAW-4. | assorted copies of miscellaneous documents — retained in laboratory files |
| #1. | broken glass mug |
| #2. | court charts for Stephan Cowans |
| #3. | court charts for Bonnie Lacy |
| #4. | photographs of glass mug |
| #5. | elimination prints |
| #6. | known fingerprints of Matthew Vickers |
| #7. | elimination prints of Bonnie Lacy, Jackie McEwen, Carl B. Lacy, and Tony Behrendt |
| #8. | reports of Dennis LeBlanc |
| #9. | report of Sharon Wong |
| #10. | report of Dennis LeBlanc and fingerprints of Bonnie Lacy |
| #11. | AFIS search documents |
| #12. | photographs of glass mug and left thumb print of Stephan Cowans |
| #13. | marked photographic enlargements |

| | |
|---|---|
| **CUSTODY OF EVIDENCE** | PAT WERTHEIM, #4257 |
| | Criminalist |
| **RECEIVED**   Lt. Frank Matthews #1794 | Southern Regional Crime Laboratory |
| **DISPOSITION**   Lt. Frank Matthews #1794 | (520) 746-4575 |

*Accredited by the ASCLD Laboratory Accreditation Board*

*Any notes, photographs, charts, or graphs generated during the examination are retained in the laboratory.*

2321



ARIZONA DEPARTMENT OF PUBLIC SAFETY

SCIENTIFIC EXAMINATION REPORT

AGENCY    MASSACHUSETTS STATE POLICE                    DR NO. 2004061007

FILE NO.    0403448030026                                Page 3 of 3

OFFICER    MATTHEWS, #1794

DATE    June 15, 2004

NAME(S)    LEBLANC, DENNIS

McLAUGHLIN, ROSEMARY

#14.    numerous glass shards

#15.    polaroid photographs and fingerprint lifts

#16.    photographs of latent print and Cowans left thumb

#17.    polaroid photographs and negatives

#18.    fingerprints, photocopies, and major case prints of Stephan Cowans

#19.    one glass shard, polaroid photograph, Bonnie Lacy fingerprints, and Crimcon enlargements

#20.    elimination prints of Bryant McEwen

#21.    inked 10-prints of Bonnie Lacy

#22.    photographs taken by Kenneth Martin

#23.    report of Robert Silva

#24.    report of Robert Foilb

#25.    two "crib sheets" prepared by Dennis LeBlanc

#26.    assorted miscellaneous photographs, enlargements, photocopies, and other documents

**EXAMINATION REQUESTED:**

Latent Prints

PAT WERTHEIM, #4257
Criminalist
Southern Regional Crime Laboratory
(520) 746-4575

CUSTODY OF EVIDENCE

RECEIVED    Lt. Frank Matthews #1794

DISPOSITION    Lt. Frank Matthews #1794

*Accredited by the ASCLD Laboratory Accreditation Board*

*Any notes, photographs, charts, or graphs generated during the examination are retained in the laboratory.*

2322

ATTACHMENT # 4

# Ron Smith & Associates, Inc.
## P.O. Box 4436
## Meridian, Mississippi  39304
## Office:  601-485-7606
## Fax:  601-485-7622
## Email: ron@ronsmithandassociates.com

EXHIBIT

O'Toole

5

6|14|06   KmS

March 8, 2004

William Casey
Deputy Superintendent
Information Technology Division
Boston Police Department
1 Schroeder Plaza
Boston, Massachusetts  02120

Reference:  Request for Latent Print Consultation Services

Superintendent Casey,

On January 23, 2004 you contacted our office to inquire as to the ability and availability of "Ron Smith & Associates, Inc." to assist the Boston Police Department in a thorough and complete technical and administrative assessment of the Latent Print Unit. This request resulted, in part, from the discovery of an erroneous identification of a latent fingerprint in 1997 on a case involving a Boston Police officer who received non-fatal gun shot wounds during a physical confrontation while on duty.

Our conversation continued on January 26, 2004, and at that time you requested that I travel to Boston to further discuss how we might assist your department in fully assessing the current status of the Latent Print Unit. This would involve the identification of the strengths as well as any technical and/or administrative procedural weaknesses and the preliminary development of a proposal to address any weaknesses identified.

Boston Police Department                                      March 8, 2004

Subsequent to that request, I arrived at the headquarters of Boston Police Department on Monday morning, February 9, 2004. The majority of that day was spent meeting with the agency administrative command staff as well as the line supervisory staff of the Latent Print Unit. These meetings were required to develop a mutually agreed upon action plan for the initial assessment of the Latent Print Unit.

This trip was not designed to evaluate the actual case involving the erroneous identification, hereafter referred to as the "Gallagher" case. The determination that an error in the original identification had indeed occurred had already been made by the Boston Police Department and confirmed by I.A.I. Certified Latent Print Examiners from at least two outside governmental agencies. My primary responsibility was to examine the operation of the Latent Print Unit to determine, if possible, how an error of this magnitude could have been made, verified internally by a second examiner in the unit and testified to in a court of law.

To answer these questions would require access to employee training records, case files, procedure manuals and all other pertinent documentation regarding past and present operating guidelines of the Latent Print Unit. I must say at this point that you, other members of the command staff and the line supervisors of the Latent Print Unit were exceptionally open with information and very helpful in this phase of the process and your cooperation was very much appreciated.

Near the close of the first day, February 9th, your staff offered me access to the actual "Gallagher" Latent Print Unit case file along with the items of evidence which had been returned from the District Attorney's Office as part of the initial post-conviction case review. I conducted an initial examination of photographs of the latent fingerprint in question, along with the identification charts which Officer Dennis LeBlanc used to illustrate the identification as part of his sworn testimony in the trial which occurred in 1998.

I first determined that the "identification" illustrated in the charted enlargements was indeed erroneous. (Of this fact, there is absolutely no doubt.) My examination of the charts also caused me great concern due to the manner in which the latent fingerprint from the glass mug was illustrated in the enlargements. The clear glass mug had been processed with cyanoacrylate ester fuming, which is a perfectly acceptable and recommended method for processing glass items. This process results in the development of friction ridge detail of the latent fingerprint in a white color on the surface. Since the friction ridge detail of a known inked fingerprint, such as that found on the defendant's fingerprint card, is reproduced in a black color, it is common practice to reverse the color of the white latent fingerprint photographically, prior to the enlargements being made. This is done so that the friction ridge details of the latent fingerprint will be the same color in the enlargements as the friction ridge details of the known inked fingerprint and the jury members can see the correlation of matching characteristics when they are pointed out by the expert witness. This in no way alters the uniqueness of the friction ridge information, but simply makes it much easier to see and comprehend and is a very common practice in the latent fingerprint community. Upon

2

Boston Police Department

March-8, 2004

inquiry of the current and past supervisory staff of the Latent Print Unit, the photographic reversal of color, prior to making enlargements, is commonly practiced in the Boston Police Department as well. To not reverse the color of the latent fingerprint prior to making the enlargements seems to defeat the primary purpose of preparing charts for the jury to see and this was indeed worthy of further review. Along with this observation, I noticed that on the back of the "identification" charts there were a set of hand written step by step instructions on how to explain the ten matching "points of identification" between the latent fingerprint developed on the glass mug and the left thumb print of "Stephan Cowans". This may not be unusual for this officer to do but would be considered unusual in the general latent fingerprint community because normally when identification charts are explained to a jury the witness is looking at the front of the charts and simply directs the attention of the jury to the points of identification and counts across the intervening ridges between each subsequent point. This does not require written "scripted" instructions because the witness is looking directly at the enlargements as they testify. Upon inquiry of the current and past supervisory staff of the Latent Print Unit, this also seemed odd to them and they couldn't recall another case of Officer LeBlanc's where they observed this practice. The overall uniqueness of this practice can only be determined after other identification charts from other cases are requested from the Superior Court or the District Attorney's Office and compared with the "Stephan Cowans" latent fingerprint identification chart.

Although this level of research should certainly be conducted and is highly recommended, there is one other set of identification charts which are part of the official record of the "Gallagher" case which do lend themselves to an immediate comparison of charting methods. These were also initially examined on that first afternoon, February 9th, 2004, along with the case file.

There was a second latent fingerprint developed on the glass mug. This was subsequently identified by Officer Dennis LeBlanc as the left ring fingerprint of "Bonnie Lacy", a lady whose home was broken into by the perpetrator as he fled from the scene of the shooting of Officer Gallagher. According to the information provided, the glass mug belonged to "Bonnie Lacy" and was reported to have been handled by the perpetrator during the time he held her captive in her home. An examination of the photograph of this latent fingerprint and the known fingerprints of "Bonnie Lacy" revealed that it indeed was a correct identification.

This second latent fingerprint, which was also developed with cyanoacrylate ester fuming, appeared as a latent fingerprint with white colored ridges. When this "white ridge" latent fingerprint was photographed as part of the identification chart making process, Officer LeBlanc reversed the color of the ridges prior to making the enlargements. The result of this process being that the ridges of the latent fingerprint on this charted enlargement appear black, just as the ridges of the known inked fingerprint of "Bonnie Lacy". Of course, this makes the corresponding fingerprint ridge detail between the latent fingerprint and the known inked fingerprint much easier for the jury to see and comprehend during the testimony of the expert witness. This is an example of how the process normally proceeds when making charted enlargements of latent prints developed

3

March 8, 2004

Boston Police Department

with cyanoacrylate ester fuming. This color reversal process was not employed in the making of the identification chart illustrating the identification of the left thumb print of "Stephan Cowans".

The preliminary review of the "Gallagher" case file required the remainder of the first day. I was provided a copy of the official transcript of the sworn testimony of Officer Dennis LeBlanc, Detective William Hussey and Officer Rosemary McLaughlin, which they provided during the trial of the defendant, "Stephan Cowans". I studied my notes that night, compared them with the transcripts from the trial and prepared for meetings with the command staff the next day to discuss my areas of concern with the latent print examinations and testimony in the case. Although this was not why I was requested to come to Boston, I felt that my preliminary observations justified the re-direction of my efforts at that time. Of course, something in the analytical process went desperately wrong in this case and there were reasons for that error in the original examination, verification and subsequent testimonies. This review of the case file, evidence and transcript, lead me to at least consider the following options regarding the latent print examinations and testimony concerning the "Gallagher" case. At this point these were only possibilities but the evidence strongly supported that these options be considered and further investigated. They were as follows:

1.      The initial examiner, Officer Dennis LeBlanc, was not competent to properly examine a latent fingerprint of this level of difficulty and the reviewing examiner, Officer Rosemary McLaughlin was not competent enough to properly serve in the capacity of "verifier" on this case.

2.      The initial examiner, Officer Dennis LeBlanc was not competent to properly examine a latent fingerprint of this level of difficulty and the reviewer, Officer Rosemary McLaughlin, did not take the time to evaluate the latent fingerprint "identification" adequately.

3.      The initial examiner, Officer Dennis LeBlanc, allowed possible outside case information; real or imagined pressure and/or unknown influences to affect his judgment, resulting in the erroneous identification and the error was not discovered by Officer Rosemary McLaughlin because of lack of competency or lack of effort in the verification process.

4.      Because of the unusual method of preparing the "Stephan Cowans" court chart of the latent fingerprint, along with selected sworn statements which were made during the testimony of Officer Dennis LeBlanc, two (2) other options must be considered:

        A.      Option #1, Option #2 or Option #3 existed and Officer Dennis LeBlanc used a very poor method of illustrating the identification of the left thumb print of "Stephan Cowans", even though he used the proper method of illustrating the identification of the elimination fingerprint of "Bonnie Lacy".

4

Boston Police Department

March 8, 2004

B.    Officer Dennis LeBlanc made the erroneous identification because of
Option #1, Option #2 or Option #3, but discovered his mistake prior to, or
during, the making of the identification charts and decided to utilize this
method of charting to keep his mistake from being discovered during
his testimony.

5.    It must be clearly understood that there may be another option which simply can't
be determined from the evidence and the transcripts, but since the erroneous
identification did in fact occur, then this additional option, by default, would be
required to include some combination of competency issues or possible
wrongdoing.

On the second day, February 10th, I continued my review of the case file and determined
that I needed to report my initial findings to the Latent Print Unit line staff supervisors,
and the agency command administrative staff. I met with Sergeant Silva, Sergeant Foilb,
and Lt. Hutchinson and asked several procedural questions of them that had developed
during my review of notes and transcripts. I explained to them my concerns and they
agreed that at that point my concerns needed to be passed up the chain of command
within the department. During the remainder of the morning and early afternoon, I made
similar presentations to you (Deputy Superintendent Casey), Deputy Superintendent
James Driscoll, Superintendent John Gallagher, and Commissioner James Hussey.

As a part of the presentation to the command staff members, I made the following
recommendations prior to my departure that afternoon:

1.    Assign one of the Latent Print Unit Sergeants to the special task of locating
case files of Officer Dennis LeBlanc's cases from 1995 through 1999 to
determine if Officer LeBlanc ordinarily used "reversed color" or "same color"
enlargements when making charts during that time period, when the latent
print had been developed with the cyanoacrylate ester fuming technique.

2.    Continue with their extensive review of all identifications reported by Officer
Dennis LeBlanc and Officer Rosemary McLaughlin to insure that no other
erroneous identifications exist.

3.    Have all cases from that the time period of 1995 through 1999 re-examined by
I.A.I. Certified Latent Print Examiners specifically for quality assurance
purposes and to determine if patterns of competency, or lack thereof,
appeared.

4.    Locate latent print identification charts within the court system that Officer
Dennis LeBlanc had prepared, and examine them to determine if they had
"scripted" instructions on the back, and non-reversed color photographs of the
latent print, such as were found on the "Stephan Cowans" chart.

5

Boston Police Department                                            March 6, 2004

After my presentation to the command staff and prior to my departure, I was informed by Sergeant Robert Foilb, that as part of his assigned duties to organize the "Gallagher" latent print case file he had observed similarities between the latent fingerprint from the glass mug, which had erroneously been identified as "Stephan Cowans" left thumb print, and the left thumb print of "Bryant McEwen" whose elimination prints were a part of the original submissions to the Latent Print Unit. He continued his examination and determined that the latent fingerprint did indeed match the left thumb print of "Bryant McEwen". I compared the enlarged reverse color photograph of the latent fingerprint from the glass mug that Sergeant Foilb had available, with the enlarged photograph of the known inked left thumb print of "Bryant McEwen" and agreed with the identification.

Upon completion of my presentation, I returned to Mississippi with the intention of beginning to work on the original project, which was to prepare a proposal for the Boston Police Department for the continued assessment of their Latent Print Unit and development of a plan of action to address the technical and administrative problems they are currently experiencing. Superintendent Gallagher also requested that I develop an additional proposal specifically related to reducing the backlog of un-worked cases existing within the Latent Print Unit by utilizing the staff experts of Ron Smith & Associates, Incorporated.

On the morning of February 11th, 2004 I was again contacted by your office and requested to return to Boston to review the cases from 1995 to 1999 to determine, if possible, if the erroneous identification, verification, and subsequent testimony was an issue of competency, careless error, some combination of these issues, or something else entirely. I advised you that this case file research would be conducted with no pre-conceived ideas as to what might be found and that it would require the efforts of at least three additional experts from the RS & A, Inc. staff. We agreed during that conversation that my team would be ready to begin work in Boston on Monday morning, the 16th of February, 2004.

During the next two days I conducted an inquiry of our staff members across the United States and selected three I.A.I. Certified Latent Print Examiners who all possessed credentials commensurate with the nature of this project. They all, including myself, have over twenty-five years in the field of forensic identification, are certified, have management or supervisory background and have all served, or continue to serve on the Latent Print Certification Board of the International Association for Identification. The members of the case review team were:

Bush, James E. (Jamie) — Mississippi Crime Laboratory — Meridian, Mississippi
Mullins, Hilbern J. (Jay) — Palm Beach County S.O. — West Palm Beach, Florida
Richardson, Charles (Chuck) — D.E.A. (Retired) — Hughesville, Maryland
Smith, Edgar R. (Ron) — Ron Smith & Associates, Inc. — Meridian, Mississippi

6

On Monday morning, February 16th, 2004 the four above members met with you and received an update as to the developments since I left the previous week. We discussed the scope of the project which was to include the following phases:

Phase I:    Thorough inventory of the latent print evidence and the Latent Print Unit case file on the "Gallagher" case, which had been placed in the custody of Superintendent John Gallagher. (To determine if the actual latent print evidence returned from the District Attorney's Office was inclusive of all the evidence described in the transcripts of Officer Dennis LeBlanc and Officer Rosemary McLaughlin. Also to determine if the contents of the case file included the supporting technical data and/or photographs of the evidence which was used to prepare the official latent print reports and provide details necessary for the testimony found in the official transcripts.)

Phase II:    Technical review of the comparisons which were conducted in the "Gallagher" case as part of the original latent print examinations reported by Officer Dennis LeBlanc. (These comparisons were reflected in the two official latent print reports from Officer LeBlanc dated 6-24-97 and 6-20-98 but will also include the comparisons of the other elimination inked fingerprints which could have been compared based on the dates these known fingerprints were taken in relation to the dates of the reports issued by Officer Dennis LeBlanc.)

Phase III:    Review of any latent print identification charts that were believed to have been made by Officer Dennis LeBlanc on other cases. (To determine, if possible, his usual and customary method of preparing identification charts for court testimonies, particularly in cases involving latent prints developed with the cyanoacrylate ester fuming process.)

Phase IV:    Technical and Administrative review of all the cases which were examined by Officer Dennis LeBlanc for a period of five years from 1995 through 1999. (To determine, if possible, the technical competency level and administrative practices displayed by Officer Dennis LeBlanc before and after he examined the latent print evidence in the "Gallagher" case.)

Phase V:    Administrative review (not Technical) of a sampling of cases examined by Officer Rosemary McLaughlin between 1995 and 1999 to determine her level of consistency in analytical documentation. (This review was limited to an administrative review due to the projected time constraints and the fact that the technical review of her reported identifications was already being conducted by supervisory members of the Boston Police Department.)

Phase VI:    Detailed review of official transcripts of the testimony of Officer Dennis Leblanc and Officer Rosemary McLaughlin in the trial of "Stephan

7

Boston Police Department

Cowans". (To determine consistency with evidence in the case file and assist in the development of a time line for the Latent Print Unit related events during the case examination.)

Phase VII:    Utilizing all documented items at our disposal, prepare a time line for the Latent Print Unit related activities related to the "Gallagher" case.

Phase VIII:    Document the work and findings of the RS & A, Inc. review team in such a manner that they could be used to prepare a formal report.

Phase IX:    Prepare a "Synopsis of Conclusions Reached"

After this initial planning meeting, the team members of RS & A, Inc. were provided a conference room near Superintendent Gallagher's office in which to work and at that time we were provided the official "Gallagher" latent print case file along with the evidence which had been returned to the Boston Police Department as part of the recent post-conviction review request from the District Attorney's Office.

Phase I:    The inventory was initiated, with all four members of the review team conducting a preliminary visual examination of the items to familiarize themselves with the case. At this point the case was assigned the RS & A, Inc. case identifier "BPD-01" which is a unique case number which will be used in any future correspondence between Ron Smith and Associates, Inc. and your agency. (The majority of these items were briefly described in an internal Boston Police Department Memorandum, dated February 11, 2004 from Lieutenant Detective Rachael Hutchinson, Identification Unit to Superintendent John Gallagher, Chief of the Bureau of Investigative Services.) The items were contained in a single cardboard box used for case storage and transport purposes. The items contained in the outer cardboard box were assigned sequential RS & A, Inc. Exhibit numbers and labeled accordingly during the inventory process. The items included the following:

Exhibit #1:    One (1) taped sealed brown cardboard box containing one (1) clear plastic Ziploc type plastic bag containing one (1) broken clear glass mug. (The glass mug appeared to have previously been processed for latent prints using the cyanoacrylate ester fuming method and the visible ridge details were in a white color.)

Exhibit #2:    One (1) manila envelope containing one (1) latent fingerprint identification court chart. This chart includes a photographic enlargement of one (1) of the two (2) latent fingerprints developed on the glass mug in Exhibit #1 mounted next to a photographic enlargement of an inked fingerprint. The photographic enlargement of the latent fingerprint illustrated the latent fingerprint ridge details in the original white color associated with the cyanoacrylate ester fuming process. The photographic enlargement of the known inked fingerprint illustrated the ridge detail of

8

the known inked fingerprint in the original black color associated with the standard fingerprinting process. The back of the chart had a court exhibit label indicating that it was assigned the court exhibit #89 on 6/24/98. (This coincides with the date of testimony of Officer Dennis LeBlanc and according to the official court transcript, is the chart which depicted the identification of the left thumb of "Stephan Cowans".) This chart has a handwritten "point by point" description of how to explain the position of the identifying characteristics taped to the back side of the chart.

Exhibit #3:    One (1) manila envelope containing one (1) latent fingerprint identification court chart. This chart includes a photographic enlargement of one (1) of the two (2) latent fingerprints developed on the glass mug in Exhibit #1 mounted next to a photographic enlargement of an inked fingerprint. The photographic enlargement of the latent fingerprint illustrated the latent fingerprint ridge details in a black color, which required that the original photograph of the white ridge latent fingerprint be color reversed prior to the court chart enlargements being prepared. This is the most common and recommended method for displaying an identification involving a latent fingerprint which was developed with the cyanoacrylate ester fuming process. The back of the chart had a court exhibit label indicating that it was assigned the court exhibit #90 on 6/24/98. (This coincides with the date of testimony of Officer Dennis LeBlanc and according to the official transcript, is the chart which depicted the identification of the left ring finger of "Bonnie Lacy".) This chart has no handwritten "point by point" description on the back.

Exhibit #4:    One (1) manila envelope containing two (2) photographs of the glass mug in Exhibit #1 and three (3) photocopies of the photograph.

Exhibit #5:    One (1) manila envelope containing the elimination fingerprints of the Boston Police Department employees who had legitimate access to the crime scene areas.

Exhibit #6:    One manila envelope containing a "Scratchpad" reproduction of the known inked fingerprints of "Matthew Vickers". "Scratchpad" is a form of software utilized by the Boston Police Department to print a fingerprint card from electronically stored images in the Identification Unit. (No further mention of "Matthew Vickers" was found in the Latent Print Unit case file.)

Exhibit #7:    One (1) manila envelope containing separate heat sealed plastic sleeves containing elimination inked fingerprints of:

A. "Bonnie Lacy". One (1) set of known inked fingerprints, dated 6-3-97. These elimination fingerprints were taken by "Detective John Callahan". (These known inked fingerprints were eventually used

9

Boston Police Department

to make the enlargement for the latent fingerprint identification chart contained in Exhibit #3. See Exhibit #8-B)

B. "Jackie McEwen". One (1) set of known inked fingerprints, dated 6/1/98.

C. "Jackie McEwen". Two (2) sets of known inked fingerprints, dated 6/3/98.

D. "Carl B. Lacy". Two (2) sets of known inked fingerprints, dated 6/2/97.

E. "Tony Behrendt". One (1) set of known inked fingerprints, dated 5-3-98.

Exhibit #8:    One (1) manila envelope containing:

A. Four (4) copies of the Identification Unit Latent Print Report for CC# 70275294, dated 06-24-97, signed "Dennis E. LeBlanc". This report included the statement "On June 13, 1997, I was given a name of a possible suspect. Upon my comparison of the latent prints to the suspects prints, I was to conclude that one of the latents was identical to the inked impression of one; Stephan Cowans, B/M, BR#121053-93 number six (6) finger."

B. Two (2) copies of the Identification Unit Latent Print Report for CC# 970-275-294, dated 06-20-98, signed "Dennis E. LeBlanc". This report included the statement "I respectfully report that on June 17, 1998, as a result of receiving a new set of inked impression from Bonnie Lacy, I was able to identified the second print found on the glass mug as belonging to her number nine (9) finger." (This was the actual spelling found in the report)

C. One (1) subpoena number 97-11231, issued 6-10-98, for Police Officer Dennis LeBlanc to appear on Monday, June 22, 1998 in Superior Court for the County of Suffolk in the case of "Commonwealth VS: Stephan Cowen".

D. Four (4) legal size sheets of white paper containing copy machine reproductions of the latent fingerprint identification chart contained in Exhibit #2.

E. One (1) AFIS printout dated 06/23/98 of "Finger No. 06, Key No. 009-016-031. (This appears to be a printout of the left thumb print of "Stephan Cowans" on file with the Massachusetts State Police AFIS system that was made by Officer Dennis LeBlanc upon the request of

10

Boston Police Department

the prosecutor's office one day before the testimony of Officer
LeBlanc. Although this item was never introduced as evidence in the
trial, it was discussed on Page 3-246 of the direct testimony of Officer
Dennis LeBlanc and again on Page 3-251 of the cross examination
testimony of Officer LeBlanc.)

**Exhibit #9:**   One (1) manila file folder labeled "970-275-294" containing the latent
print report of "Officer Sharon Wong, dated 6-2-97, in which she reported
the negative results of examining Officer Gallagher's handgun for latent
prints.

**Exhibit #10:**   One (1) manila envelope containing:

A.  One (1) copy of the Identification Unit Latent Print Report for CC#
970-275-294, dated 06-20-98, signed "Dennis E. LeBlanc". (Same as
Exhibit # 8-B)

B.  One (1) photocopy of a full size inked fingerprint card bearing rolled
and plain impression inked fingerprints and the name "Bonnie Lacy".
(This is a copy machine reproduction of the original inked fingerprint
card which is contained in Exhibit #21.)

C.  Three (3) letter size sheets of white paper bearing photocopy
reproductions of known fingerprints marked "Bonnie Lacy" at the top
of the page.

**Exhibit #11:**   One (1) white paper Boston Police Department envelope marked "Blue
mask on tracing done by Sgt. Foilb, 2/10/04, 9:10 PM in presence of Lt.
Hutchinson" containing:

A.  One (1) AFIS tracing paper bearing a ridge tracing of the latent
fingerprint depicted in the photograph in Exhibit #11-B.

B.  One (1) Polaroid photograph of a latent fingerprint depicted with
ridge details in black color. (This photograph is a corrected color
version of the latent fingerprint which had been erroneously identified
as the left thumb print of "Stephan Cowans". Upon discussion with
Sergeant Foilb, it was determined that this new reverse color
photograph and attached AFIS tracing were made by Officer Dennis
LeBlanc after the erroneous identification was discovered in January
of 2004. Although Ex. #11-A and Exhibit #11-B were not part of the
original case examination in 1997 and 1998, they are important in that
they represent the manner in which the original AFIS search should
have been conducted. The court transcript reflects, on Page 3-241, that
Officer LeBlanc agreed under cross examination that he conducted an
AFIS search of the latent fingerprint (the one which was later

11

identified as Stephan Cowans) on May 31st, 1997 but doesn't mention as to how he deals with the white colored ridges prior to tracing the ridge formations. Officer LeBlanc testified under re-direct examination that he conducted an AFIS search of both of the latent fingerprints from the glass mug. This is reflected on Page 3-241 of the trial transcript. There were no reverse "corrected" color photographs or AFIS ridge tracings from either of those AFIS searches present in the Latent Print Unit case file. There is no physical evidence to prove or disprove if, or how, these original AFIS searches were conducted.

Exhibit #12:  One (1) manila envelope containing:

A.  Three (3) photographs and four (4) copy machine enlarged reproductions of the latent fingerprint identified as "Stephan Cowans" developed on the glass mug.

B.  One (1) photocopy enlargement of the left thumb print of "Stephan Cowans".

C.  One (1) photographic negative of the latent fingerprint on the glass mug identified as the left thumb print of "Stephan Cowans".

Exhibit #13:  One (1) manila envelope containing one (1) photographic enlargement with individual ridge details (minutia) marked in red and two (2) photocopy reproductions of the left thumb print of "Stephan Cowans". (There are no notations on these documents to indicate when, by whom or for what reason they were made.)

Exhibit #14:  One (1) tape sealed manila envelope containing:

A.  One (1) tape sealed manila envelope containing broken pieces of glass with a bubble wrap protector enclosed. It appears from the notations on this item that it has been recently examined by and initialed by "BAR on 1-21-04". (There is no record in the file to indicate who "BAR" is or what was done on 1-21-04.)

B.  One (1) manila envelope containing numerous small pieces of glass. (It appears that both Exhibit #14-A and Exhibit #14-B contain the pieces of broken glass from the mug in Exhibit #1.

Exhibit #15:  One (1) manila envelope containing one (1) Latent Print Section Evidence Receipt with carbon copy attached to one (1) white paper Boston P.D. envelope containing six (6) Polaroid photographs, five (5) of which are labeled "DEL" and two (2) clear 1 ½ x 2 inch latent hinge lifters.

12

Boston Police Department

**Exhibit #16:**   One (1) sealed white envelope containing:

    A. One (1) photographic enlargement of the latent fingerprint developed on the glass mug which was subsequently identified as the left thumb print of "Stephan Cowans". (This item was assigned the court Exhibit #87 and was referred to during the direct testimony of Officer Dennis LeBlanc on Page 3-219 of the trial transcript.)

    B. Polaroid photograph of left thumb print of "Stephan Cowans". (This item was labeled as court Exhibit #88 and was referred to during the direct testimony of Officer Dennis LeBlanc on Page 3-219 of the trial transcript.)

**Exhibit #17:**   One (1) taped sealed manila envelope containing:

    A. Three (3) Polaroid photographs of the latent fingerprint on the glass mug with the ridge detail printed in the "correct" color (black ridges). (There are no notations on these photographs to indicate when, or by whom they were made, although they do not appear to be very old and are consistent with the type of Polaroid film being used in the Latent Print Unit in 2004.

    B. One (1) Polaroid photograph of the glass mug, Exhibit #1.

    C. One (1) photographic negative of the photograph represented in Ex. 17-B.

    D. One (1) photographic negative of the left thumb print of "Stephan Cowans".

**Exhibit #18:**   One (1) manila envelope containing three (3) 10-Print fingerprint cards dated 9-8-89, 2-11-93 and 6-19-97, one (1) set of major case prints dated 6-19-97, and five (5) photocopy reproductions of the know prints of "Stephan Cowans". (The set of known fingerprints of "Stephan Cowans" dated 9-8-89, was used for charting the identification as represented on the court chart in Exhibit #2.)

**Exhibit #19:**   One (1) heat sealed clear plastic bag containing:

    A. One (1) piece of broken glass taped to a black-backed lift card reported to have been part of the glass mug in Exhibit #1.

    B. Three (3) photographic enlargements of inked fingerprints reported to be the left ring fingerprints of "Bonnie Lacy". ( Enlargements are of the same fingerprints contained in Exhibit #7-A.)

Boston Police Department                                                    March 2004

C. One (1) elimination fingerprint sheet bearing what is reported to be the right hand fingerprints of "Bonnie Lacy".

D. Three (3) photographic enlargements of the latent fingerprint on the piece of glass from the mug (Exhibit #19-A) with the ridge detail printed in the correct color. (black ridges)

E. One (1) Polaroid photograph of the latent fingerprint on the piece of glass from the mug (Exhibit #19-A) as it was observed on the glass—ridge detail is in reverse color. (white ridges)

Exhibit #20:    One (1) manila envelope containing three (3) heat sealed clear plastic sleeves containing elimination fingerprint sheets (one each), labeled to be:

A. "Bonnie Lacy", dated 6-1-97 (later correctly identified as being the known prints of "Bryant McEwen". This was a clerical error made by Det. Callahan when collecting the know elimination fingerprints of the victims, etc.)

B. "Bryant McEwen", dated 6-1-97.

C. "Bryant McEwen", dated 6-3-97.

Exhibit #21:    One (1) heat sealed clear plastic bag containing one (1) 10-Print fingerprint card of "Bonnie Lacy". (These known inked fingerprints are dated as having been taken on 6-15-98 by Officer Rosemary McLaughlin at the Boston Police Department I.D. Unit. Although these known inked fingerprints were never admitted as evidence during the trial of "Stephan Cowans", they were referred to in both the testimony of Officer Dennis LeBlanc and Officer Rosemary McLaughlin. On Page 3-226 through Page 3-229 of the trial transcript, Officer LeBlanc testifies about this fingerprint card being the one he used to identify the second fingerprint on the glass mug. This coincides with Exhibit #8-B, his second identification report dated 6-20-98. Special attention should be given to the quote from this report as noted in the description of Exhibit #8-B. Officer McLaughlin also testifies that she took these inked fingerprints of "Bonnie Lacy" and used them to verify the identification of the second print on the glass mug. This testimony can be found on Page 4-24 of the trial transcript.)

Exhibit #22:    One (1) manila envelope containing one (1) enlarged photograph of the first latent fingerprint on the glass mug with ridge detail in reversed (black) color. (This photograph was reported to have been made by Lt. Ken Martin of the Massachusetts State Police as part of their evaluation of the suspected erroneous identification.)

14

Exhibit #23:   One (1) manila envelope containing Sgt. Robert Silva's two page report dated January 26, 2004. (This report contains details of what duties he performed in relation to the recent post-conviction evaluation of the initial latent fingerprint identifications.)

Exhibit #24:   One (1) manila envelope containing Sgt. Robert Foilb's three page report dated February 10, 2004. (This report contains details of what duties he performed in relation to the recent post-conviction evaluation of the initial latent fingerprint identification.

Note: The following items were not recorded on the "Transfer of Case File" memorandum dated February 11, 2004 from Lt. Hutchinson to Superintendent John Gallagher but were found in the same box with those items which had been itemized on that memorandum.

Exhibit #25:   One (1) manila envelope containing the following sheets of paper found in the file box (these were placed in the manila envelope by RS & A, Inc. for evidence security purposes):

A.  One (1) approximately 4 x 5 inch piece of white paper bearing a reduced copy of the "point to point" instructions found on the back of the identification chart contained in Exhibit #2.

B.  One (1) approximately 4 x 5 inch piece of white paper bearing a separate, and different, set of "point to point" instructions than that found in Exhibit #25-A. (These instructions, although different, appeared to have been prepared as a second option of how to illustrate the points of identification on the chart in Exhibit #2.)

Exhibit #26:   One (1) manila envelope containing multiple copies of photographic sheets, enlargements, photocopies and other documents. (A review of these documents did not reveal any new information and therefore they were not itemized as part of this official inventory.)

Note:   Upon review of all of the evidence and the related documents made available to RS & A, Inc. it appears that many of the documents noted in the Exhibits list were not part of the original examination but became part of the Latent Print Unit Case file on the "Gallagher" case as a part of the post-conviction review process. Since very few of these "new" items were properly initialed or dated, they were included in the official inventory. Every attempt was made to differentiate the "new" documents from the ones which were pertinent to the evaluation of the original latent print case examinations conducted by Officer LeBlanc and Officer McLaughlin.

It was also noticed that the AFIS tracings which were mentioned by Officer LeBlanc during his testimony at the trial of "Stephan Cowans", were not found in the official case file. This testimony can be found on Page 3-241 and Page 3-242 of the transcript. This is

15

Boston Police Department                                          March 8, 2004

no suggestion of wrongdoing, but just an observation by the review team as part of the formal inventory process. From an administrative viewpoint, the analytical documentation was very haphazard and almost non-existent in some areas. Worksheets detailing what, how or when different examinations were performed were not a part of the file in this case, but as was discovered later, this was more the norm than the exception in cases where Officer Leblanc was the primary examiner in the case. More on that issue will be forthcoming in this report.

Phase II:    The comparison phase of the review was began by reviewing the two identifications reported by Officer LeBlanc. The first identification reported was the identification of the first latent fingerprint on the glass mug as the left thumb print of "Stephan Cowans". The original latent fingerprint on the glass mug, the multiple photographs of this latent fingerprint, both in its original ridge color (white) and its reversed ridge color (black) were examined. It was determined that this latent fingerprint was sufficient for comparison and identification purposes. This latent fingerprint was then compared with the known inked left thumb print of "Stephan Cowans", whose known inked prints were found throughout the inventoried evidence.

In addition to this examination, the identification charts prepared by Officer Dennis LeBlanc, illustrating the "identification" were thoroughly examined. There are multiple discrepancies between the ridge detail information on the latent fingerprint from the glass mug and the known inked left thumb print of "Stephan Cowans". Although there are a few friction ridge details on the latent fingerprint which have a similar appearance on the inked fingerprint, there are multiple "Points of Identification" marked on the enlargement of the known inked fingerprint that in no way coincide with the same area of the latent fingerprint. For a trained latent print expert, these differences are not difficult to see, even when the ridges of the latent fingerprint are white and the ridges of the known inked fingerprint are black, but for an untrained person these differences would not be easily recognized.

Based on these examinations, it is the opinion of all four of the RS & A, Inc. review team members that this is indeed an erroneous identification. The latent fingerprint reported on by Officer Dennis LeBlanc on 6-24-97 was not made by the left thumb of "Stephan Cowans" as represented on the known inked fingerprint cards bearing that name.

As mentioned earlier in this report, this same latent fingerprint was subsequently identified by Sergeant Robert Foilb as the left thumb print of "Bryant McEwen", a resident or visitor of the home from which the glass mug was recovered. This identification statement can be found in Exhibit #24, the report issued by Sergeant Robert Foilb to Lt. Rachael Hutchinson on February 10, 2004. This identification was reviewed by all four members of the RS & A, Inc. review team and was confirmed as a valid identification. According to the date that the known elimination fingerprints of "Bryant McEwen" were taken by Detective John Callahan (6-1-97 & 6-3-97), these known elimination fingerprints should have been available to Officer LeBlanc prior to the "identification" of "Stephan Cowans", which according to his testimony (Page 3-230)

16

60

occurred on June 13, 1997. (Since no written record of when these known elimination fingerprints were delivered to the Latent Print Unit could be found in the "Gallagher" case file, their presence in the unit prior to the "Stephan Cowans" identification cannot be confirmed.) If the known inked fingerprints of "Bryant McEwen", Exhibit #20-B and Exhibit #20-C, were available to Officer LeBlanc prior to the identification of "Stephan Cowans", and they were compared and not identified, then this would be categorized as a "missed identification". A "missed identification" is defined as an identification which was not made during the comparison process but should have been, based on the evidence available at the time of the comparison.

The second latent print identification on the glass mug, Exhibit #1, was reported on June 20, 1998, by Officer LeBlanc. This Latent Print Unit Report, Exhibit #10-A, was issued almost a full year from the date of the first report, dated June 24, 1997. In this report, Officer LeBlanc made the following statement "I respectfully report that on June 17, 1998, as a result of receiving a new set of inked impressions from Bonnie Lacy, I was able to identified the second print found on the glass mug as belonging to her number nine (9) finger. This was verified by Latent Print Examiner Rosemary McLaughlin." (The improper grammar was part of the actual report.) Based on the testimony of Officer LeBlanc and Officer McLaughlin, the set of fingerprints which are referred to in this statement were those taken by Officer McLaughlin personally at the I.D. Unit of the Boston Police Department on June 15, 1998. These have been marked as Exhibit #21 in the inventory list.

This second latent fingerprint was examined by all four members of the RS & A, Inc. review team. The original latent fingerprint on the broken piece of glass mug and numerous photographs of this latent fingerprint were examined and it was determined that this second latent fingerprint was sufficient for comparison and identification purposes. This latent fingerprint was then compared with the known inked fingerprints of "Bonnie Lacy" which were contained in Exhibit # 7-A, taken on 6-3-97 by Detective John Callahan and Exhibit #21, the inked fingerprints taken by Officer Rosemary Mclaughlin on June 15, 1998. This identification was confirmed as a valid identification by all four members of the review team.

During this examination and review process, the photographic enlargements used during the trial by Officer LeBlanc to illustrate this identification of the second latent fingerprint as belonging to the victim, "Bonnie Lacy" were carefully examined. During this process two (2) significant observations were made.

1.     The first thing that was noticed is that the color of the ridge details of this latent fingerprint had been reversed prior to the enlargements being made for the court charts. In earlier portions of this report it was noted that the clear glass mug was processed with the cyanoacrylate ester fuming process, which develops the latent fingerprint ridge detail in a white color. This is a perfectly acceptable method of processing this type of evidential item. Since the ridge details of a known inked fingerprint are black in color, it is recommended to reverse the color of the latent fingerprint ridge details photographically so that when the enlargements are made and mounted side by side, the

17

fingerprint ridge details are of the same color and they are much easier for the jury members to see and understand. This set of court charts were made in that recommended manner.

Conversely, the set of charts made to illustrate the "Stephan Cowans" identification were not made in this same manner, even though this process would have it much easier for the jury members to see and understand the "Point by Point" testimony of Officer LeBlanc.

The understanding of the proper court charting methodology exhibited by Officer LeBlanc in the example of the "Bonnie Lacy" fingerprint identification caused the review team to wonder why this same proper methodology was not utilized in the obviously much more important suspect identification of the "Stephan Cowans" fingerprint.

2.     The second observation is of equal importance. One of the elements of the chart review process is to locate within the items of evidence, the exact same known inked fingerprint that was used to make the enlargement for the court identification chart. This was conducted and we discovered that the known inked left ring fingerprint of "Bonnie Lacy" which was specifically selected by Officer Leblanc to be enlarged for the court identification chart did not come from the set of known inked fingerprints taken by Officer Rosemary McLaughlin on June 15, 1998, (Exhibit #21) as would have been expected, but instead came from the set of inked elimination fingerprints taken by Detective John Callahan on June 3, 1997 (Exhibit #7-A).

This is in conflict with the statement in Exhibit #8-B. Officer LeBlanc's report of the identification of this latent fingerprint being "as a result of receiving a new set of inked impression from Bonnie Lacy".

It appears to also be in general conflict with the trial testimony of Officer Leblanc when he describes the process of identifying this second latent fingerprint as being the left ring fingerprint of "Bonnie Lacy", while inferring that he used the set of inked fingerprints taken by Officer McLaughlin to make the identification and to prepare the enlarged latent fingerprint identification court chart. This part of Officer LeBlanc's sworn testimony can be found on Pages 3-226 through 3-229. Based on our examination, this testimony appears to be in conflict with the evidence that was actually presented.

There is no record in the case file of why, when or by whom an additional set of inked elimination fingerprints of "Bonnie Lacy" was requested.

Regarding these issues, the RS & A, Inc. review team is in unanimous agreement on four (4) additional points. They are as follows:

A.     The additional set of inked elimination fingerprints of "Bonnie Lacy" were never needed to identify the second latent fingerprint on the glass mug.

B.     The inked left ring fingerprint appearing on the fingerprint card taken by Officer McLaughlin in 1998, was not as legible as the inked left ring fingerprint taken by

18

Boston Police Department                                          March 8, 2004

Detective John Callahan in 1997 and would not have been as good for making court enlargements.

C.    If the known inked fingerprints of "Bonnie Lacy", Exhibit #7-A, were available to Officer Dennis LeBlanc at the time of the initial examinations and were compared by him, and not identified, prior to his first report issued on June 24, 1997, then this would be categorized as a "missed identification", as previously defined.

D.    Since there is no record of why, when or by whom an additional set of elimination fingerprints were requested, this needs to be further investigated to determine if the request came from Officer LeBlanc and through what channels the request was made. (Why was Officer Rosemary McLaughlin the one who took the prints of "Bonnie Lacy" and not Officer LeBlanc?)

Phase III:    We requested to see any and all charts which could be attributed to Officer Dennis LeBlanc to determine, if possible, his usual and customary method of preparing identification charts for court testimonies, particularly in cases involving latent prints developed with the cyanoacrylate ester fuming process.

Lt. Rachael Hutchinson of the Identification Unit gathered the identification charts which were found in the desk area of Officer LeBlanc for inspection by the review team but none of these had markings which indicated by whom they were made and under what circumstances. They also did not appear to have been utilized in a trial proceeding since they did not have any court exhibit markings on them.

It is highly recommended that a thorough technical review of any latent print identification charts which can be attributed to Officer Dennis LeBlanc, particularly from the period of 1995 through 1999, which may be in the possession of the court system or District Attorney's Office, be examined to determine the following:

A.    In cases where the latent print was developed with the cyanoacrylate ester fuming process did Officer LeBlanc normally reverse the color of the ridge details before the enlargements were produced for the identification charts.

B.    Did Officer LeBlanc normally place written "Point by Point" instructions on the back of identification charts, and if it was an occasional occurrence, was there a correlation between their presence and the images on the front of the charts, such as reversed color, distortion, faint ridge details etc.

Based on the lack of information at our disposal, Phase III of our inquiry remains incomplete at this time.

Phase IV:    The Administrative and Technical review of cases which had been assigned to Officer Dennis LeBlanc from the period between 1995 and 1999 required a joint effort of all four (4) of the RS & A, Inc. members, working in two (2) teams, of two

Boston Police Department                                                    March X, 2004

(2) members each. Boxes reported to contain all the cases which would have been worked by Officer Dennis LeBlanc for that five year time period were delivered to the conference room for examination. A total of one thousand, two hundred and fifty-six (1256) individual cases were examined during this phase. Of those cases, a total of sixty-seven (67) cases resulted in identifications which appeared to involve a suspect. Of the sixty-seven (67) "Suspect Identified" cases during this time period, fifty-four (54), or 80% of these identifications were as a direct result of AFIS searches launched and reviewed by Officer LeBlanc.

The Administrative review of the cases from this five year time period revealed an almost total disregard for quality documentation of evidence received, work performed, comparisons conducted and verifications conducted. In those cases resulting in an identification, there was at most times a copy of the report to the investigator in the case file, but in cases not resulting in an identification, a report was very seldom found. Interestingly enough, in some limited instances the documentation was indeed better, and was almost always associated with cases in which he was having his identifications verified by an Officer Ken Shaw, who we were advised was another Officer assigned to the Latent Print Unit during that time period. In the majority of his cases, in which his identifications were reviewed by Officer Rosemary McLaughlin, there was an obvious difference in how well he documented his work and prepared his case file. Very little effort was made in these cases to properly document the work he performed.

We also had the opportunity to review sixty-seven (67) cases from the four year period of 2000 through 2003 in which Officer LeBlanc had identified suspects. Because of time constraints we were not able to review any of his non-identification cases from 2000 through 2003. Of these sixty-seven (67) "Suspect Identified" cases, thirty-six (36), or 53% were made as a direct result of AFIS searches launched and reviewed by Officer LeBlanc. There appeared to be some noticeable improvement in his administrative case documentation on "Suspect Identified" cases as time progressed.

The Technical review of the cases was limited to the examination of the identifications reported by Officer Dennis LeBlanc during the period between 1995 and 2003, which were provided to the RS & A, Inc. team by the Boston Police Department. Based on our records, we examined a total of one hundred and thirty-four (134) cases involving "Suspect Identifications". In those cases we did not find any identifications which were erroneous. We did locate one (1) identification on a case in 1996 in which the wrong finger, of the correct person, was listed in the report, but based upon our examination, we believe that to have been the result of a clerical error, when preparing the report.

During this technical review process we each had numerous opportunities to see the level of technical ability of Officer Dennis LeBlanc displayed in his casework. We focused our attention primarily on his abilities in the five year span surrounding the year the "Gallagher" case was examined, which was 1997.

Based upon this review, it is the unanimous opinion of the RS & A, Inc. review team that Officer Dennis LeBlanc possessed the technical ability to have examined the evidence in

20

the "Gallagher" case properly, if he had applied his considerable skills as demonstrated in the numerous other cases we examined. He consistently identified latent fingerprints which were as difficult as the "Stephan Cowans" latent fingerprint.

The only significant difference we could determine is that in the majority of these other "difficult latent fingerprint" cases he had acquired his suspect from his search of the latent fingerprint through the state AFIS system and in the "Gallagher" case he had been provided the name of the suspect by the Detective Division. This could indicate a developed dependence on AFIS results as part of his identification process. As noted above, from 1995 to 1999, the percentage of his total "Suspect Identification" cases resulting from AFIS was 80%, while the percentage of his total "Suspect Identifications" using AFIS during the next four years was 53%, which is significantly lower. We fully realize that there may be another explanation for this significant percentage change, other than a lessening dependence upon AFIS as his experience level grew, but we agreed that these statistics were significant enough to note as an official part of this report.

**Phase V:**    The Administrative review of a sampling of cases examined by Officer Rosemary McLaughlin between 1995 and 1999 was conducted to determine if there was a pattern of poor documentation which had become the accepted "norm" within the Latent Print Unit during this time period.

This review revealed that Officer Rosemary McLaughlin was very skilled in casework documentation and consistently completed her case files properly, including a copy of finished reports on almost every case, regardless of results. Her case documentation also appeared to consistently improve as the years progressed.

Based upon the Administrative review of the case files of both Officer LeBlanc and Officer McLaughlin, it appears that, during this period, the level of documentation completed by each examiner was their decision to make without any structured supervisory review. This environment could not insure that at least a minimum amount of information was placed in each case file.

**Phase VI:**    The review process of the transcripts of Officer Dennis LeBlanc and Officer Rosemary McLaughlin was extensive. They were first reviewed to determine consistency between the testimonies and the actual evidence in the case. Some of these discrepancies have already been pointed out in other sections of this report.

The following pages indicate additional "Testimony of Interest" topics which we consider pertinent to our overall evaluation of this case:

A.    Page 3-198 through Page 3-201: In these pages Officer LeBlanc testifies as to the general process used to compare latent fingerprints with known inked fingerprints. He describes the characteristics that are used to compare fingerprints and how the individual ridge details must relate to each other in the correct position for the identification to be made. He also points out on

Boston Police Department                                                  March 8, 2004

Page 3-201 that if the points of reference are not present then "It would not be a match". This clearly shows that he fully understood what the result should be when individual details do not correctly correspond on both the latent print and the known inked print.

B.     Page 3-209:  On this page Officer LeBlanc testifies that "I compared all ten fingers to this latent print". Of course, we know that he identified this latent print to the left thumb print of "Stephan Cowans" and according to his testimony on Page 3-214, he compared it with the fingers of the right hand then identified it as the number 6 finger, which means that he never compared it with the remaining four (4) fingers of the left hand. Inconsistent statement.

C.     Page 3-220 through Page 3-224:  Officer LeBlanc describes the "Point by Point" process of identifying the first latent fingerprint from the glass mug as the left thumb print of "Stephan Cowans" using the court charts he prepared for that purpose. He follows his written directions which he has taped on the back of the charts very carefully.

D.     Page 3-226 through Page 3-229:  Officer LeBlanc testifies about Officer McLaughlin taking a set of known inked elimination fingerprints of "Bonnie Lacy" and using them in the comparison of the second latent fingerprint on the mug. He also testifies about making the second identification and infers that it was made using that particular card even though his charts of this identification include an enlargement of the known inked left ring fingerprint of "Bonnie Lacy" taken by Detective Callahan back in 1997. Testimony inconsistent with the evidence.

E.     Page 3-246:  Under re-direct examination, Officer LeBlanc was asked by the prosecutor if the AFIS print of Mr. Cowan which he had been asked to retrieve was a good print or poor print. The question was "In other words, was there enough there to compare it?" Officer LeBlanc answered; "Compare it with my latent print that I had, no". When reviewing the case file we came across a one page AFIS printout dated 6/23/98, which was the day before the testimony of Officer LeBlanc. It has the Operator ID Number of DPS1298 which we were informed belonged to Officer LeBlanc. This appears in the evidence inventory list as Exhibit #8-E. It appears that this might be the printout that the prosecutor asked Officer LeBlanc to prepare and bring with him to court. We can not know for sure because it was not admitted into evidence, although it is mentioned again during cross examination on Page 3-251 when Officer LeBlanc states, "These prints were put in in 1990". The printout, Exhibit #8-E indicates that that particular AFIS fingerprint was entered in to the state AFIS system on 6-26-90. If it was, then the response of Officer LeBlanc regarding the quality of the fingerprint image would be very questionable, since the ridge detail of the fingerprint on Exhibit #8-E is very clear indeed, with no smudging or distortion of any kind.

Boston Police Department

F.  Page 3-246:  After Officer LeBlanc responded regarding the quality of the AFIS print of "Stephan Cowan", the prosecutor continued by asking "Why was that?" Officer LeBlanc's response seemed very disjointed and non-responsive.  He answered, "Because the part of my latent prints that I had was a good – the ridges were fine.  You could see the ridges.  I could see the core.  I had definitely three points in my latent print and definitely with my inked impression that I could match up no problem." This question was not one that was presented to him under cross examination but one that should have been very easy to answer if the AFIS print had indeed been of poor quality.  It appears that his answer may have been revealing much more than the question called for and could be considered as an indication of his approach to the latent print identification in this case.  "I had definitely three points in my latent print and definitely with my inked impression that I could match up no problem" had absolutely nothing to do with the question.  It certainly would not be a statement that a latent print examiner would be expected to make under normal circumstances.

G.  Page 3-251:  Under cross examination, Officer LeBlanc replies to several questions from the defense counsel about Mr. Cowans fingerprints being in the state AFIS system when the latent fingerprints from the glass mug were searched on May 31st, 1997.  Officer LeBlanc states, "The print is distorted".  If he is once again referring to the known inked left thumb print of "Stephan Cowans" whose fingerprint appears on Ex.#8-E, he is now going even further with his opinion as to the quality of the known inked left thumb print on the printout.  As was mentioned earlier, this print is certainly not distorted but actually is very clear indeed and is in direct conflict with his testimony.

H.  Page 4-24:  Officer Rosemary McLaughlin states, "As far as confirming the print, I examined the mug and examined the latent fingerprint on the mug and compared it to the inked impression." She does not mention examining any photographs of the latent fingerprint, although this seems to be the method of choice in the unit during that time period on other cases.  It is quite difficult to do a direct comparison of the white ridge latent fingerprint on a curved glass surface with the black ridges of a known inked fingerprint without the benefit of photographs.  If this comparison was done without photographs then it might be easier to understand how the erroneous verification occurred.  There is no written documentation in the case file, other than the reports prepared by Officer LeBlanc, that indicate that Officer McLaughlin looked at the latent prints in question.  She testified that she did and there is nothing in the file to contradict that testimony.

Phase VII:    A review of the documents and evidence contained in the inventory list in Phase I, along with a review of the trial transcript in Phase VI, enabled the RS & A, Inc. review team to develop a time line of "Gallagher" case related events pertaining to the activities and involvements of the members of the Boston Police Department Latent Print Unit.  Although this is not to be considered an exhaustive list, it does include the major

23

Boston Police Department                                    March 8, 2004

events along with any discrepancies which have appeared during the review process. That time line is as follows:

| Date | Event | (Dates in bold indicate a contradiction) |
|------|-------|------|
| May 30, 1997 | Officer Rosemary McLaughlin responds to crime scene at #7 School Street. Officer involved shooting. (Transcript – McLaughlin) | |
| May 31, 1997 | Officer Dennis LeBlanc relieves Officer McLaughlin at secondary crime scene at #29 School Street. Accompanied by Sergeant Robert Foilb. (Transcript – LeBlanc) | |
| May 31, 1997 | The glass mug was processed for latent prints by Officer LeBlanc and Sergeant Foilb. (Transcript – LeBlanc) | |
| May 31, 1997 | The two (2) identifiable latent fingerprints which were developed on the clear glass mug were photographed and searched through the state AFIS. (Transcript –LeBlanc) | |
| June 2, 1997 | Officer Sharon Wong issues a report on the negative results in processing "Officer Gallagher's" firearm. (Case report in file) | |
| June 10, 1997 | A Detective provides the ID Unit with the name of "Stephan Cowans" as a possible suspect. (Verbally provided to review team from Superintendent John Gallagher after we made the inquiry) | |
| June 12, 1997 | The name of "Stephan Cowans" was provided to the ID Unit. (Transcript – McLaughlin) | |
| June 13, 1997 | The first latent fingerprint on the glass mug was identified as the left thumb print of "Stephan Cowans" by Officer Dennis LeBlanc. (Transcript –LeBlanc) | |
| June 15, 1997 | Officer LeBlanc's identification of the left thumb print of "Stephan Cowans" verified by Officer Rosemary McLaughlin. (Transcript – Leblanc / McLaughlin) | |
| June 24, 1997 | Officer Dennis LeBlanc issues a Latent Print Unit report on the "Stephan Cowans" identification. (Case report in file) | |
| June 10, 1998 | Officer Dennis LeBlanc is issued a subpoena to appear on 6-22-98 in Superior Court for the County of Suffolk in the case of State of Massachusetts VS "Stephan Cowans". (Subpoena in case file) | |

Boston Police Department                                    March 8, 2004

June 15, 1998      Officer Rosemary McLaughlin takes an additional set of inked
                   fingerprints of "Bonnie Lacy". (Exhibit #21)

June 17, 1998      Officer Dennis LeBlanc identifies the second latent fingerprint on
                   the glass mug as the left ring fingerprint of "Bonnie Lacy" (Report
                   in case file)

June 20, 1998      Officer Dennis Leblanc issues a Latent Print Unit report on the
                   "Bonnie Lacy" identification. (Case report in file)

June 23, 1998      Officer Dennis LeBlanc retrieves an AFIS printout of the left
                   thumb print of "Stephan Cowans" upon request of prosecutor.
                   (Transcript – LeBlanc)

June 24, 1998      Officer Dennis LeBlanc testifies as to the identification of
                   "Stephan Cowans" and "Bonnie Lacy" fingerprints and the
                   identification charts are admitted along with photos and the glass
                   mug. (Transcript – LeBlanc)

January 26, 2004:  Sergeant Robert Silva issues a report regarding his involvement in
                   the post-conviction examination of the "Gallagher" case up to that
                   date. (Exhibit #23)

February 10, 2004  Sergeant Robert Foilb correctly identifies the first latent fingerprint
                   on the glass mug as the left thumb print of "Bryant McEwen" and
                   issues a report regarding this identification.

**Phase VIII:**   We believe that the Ron Smith & Associates, Inc. review team of latent
fingerprint expert and managers have been successful in the documentation of what our
research revealed. This report is a result of that documentation.

**Phase IX:**     Synopsis of Conclusions Reached.

As in any extensive and detailed investigation, the desire is that all technical questions
can, and will be answered. That was our wish as well, as we reviewed every latent print,
in excess of five thousand documents, and hundreds upon hundreds of evidence items.
Many questions were answered but some were not. Based upon our extensive research,
and very careful consideration of the information we examined, we are able to make the
following statements:

1.     The identification of "Stephan Cowans" by Officer Dennis LeBlanc was
       erroneous.

2.     The verification of this "Stephan Cowans" identification by Officer Rosemary
       McLaughlin was erroneous. The review of this case did not reveal any evidence

Boston Police Department

March 8, 2004

that she knew of, or participated in other actions, related to concealment of this erroneous identification.

3.  If the known inked fingerprints of "Bonnie Lacy" which were taken by Detective John Callahan, dated 6-3-97, were available to Officer Dennis LeBlanc at the time of the initial examinations and were compared by him prior to his first report issued on June 24, 1997, and not identified, then this would be categorized as a "missed identification" by Officer LeBlanc.

4.  If the known inked fingerprints of "Bryant McEwen", which were taken on 6-1-97 and 6-3-97, were available to Officer Dennis LeBlanc at the time of the initial examinations and were compared by him prior to the identification of "Stephan Cowans", and not identified, then this would be categorized as a "missed identification". (Had this comparison been conducted properly, the entire erroneous identification would have been averted.)

5.  Officer Dennis LeBlanc possessed the technical ability to have examined the evidence in the "Gallagher" case properly, if he had applied his considerable skills as demonstrated in numerous other cases we examined. Indeed, he identified several latent fingerprints, prior to and after 1997, which would be considered more difficult than the latent fingerprints in the "Gallagher" case.

6.  Officer Dennis LeBlanc fully understood the process of making a latent fingerprint identification and what the analytical results should be when ridge details do not appear in the same relative position on both the latent fingerprint and the known inked fingerprint.

7.  Officer Dennis LeBlanc fully understood how to prepare court latent fingerprint identification charts in a manner that would make them more easily seen and understood by the members of the jury, as evidenced by his chart of the "Bonnie Lacy" fingerprint identification. However, he chose for some reason, to not reverse the color of the fingerprint ridge details of the "Stephan Cowans" fingerprint identification prior to making the enlargements for that court chart.

8.  The review of the evidence in this case does not provide the definitive answer as to why this erroneous identification was made by Officer Dennis LeBlanc and verified by Officer Rosemary McLaughlin.

9.  Based upon the extensive review of the "Gallagher" case, it is the unanimous opinion of the Ron Smith & Associates, Inc. review team that at some point, after the erroneous identification was made, but prior to his testimony in the "Stephan Cowans" trial, Officer Dennis LeBlanc discovered his mistake and concealed it all the way through the trial. This opinion is derived from the review of numerous documents, the charted enlargements presented in this case, the apparent attempt to conceal errors regarding the "Bonnie Lacy" missed identification in 1997, the

26

Boston Police Department                                    March 8, 2004

numerous inconsistencies in the trial testimony of Officer Dennis LeBlanc
himself, and the wealth of data collected during this entire review process.

This concludes the official report on the review of this case by "Ron Smith & Associates,
Incorporated. If you wish for us to examine additional material related to case, please
feel free to contact us at your convenience. If testimony regarding our findings is
required, we would require that we be allowed to once again gain access to the evidence
in this case so that all the necessary photographic images could be captured. Because of
the technical nature of our testimony regarding the findings in this case, it would be
necessary for us to have an additional thirty days to prepare the court exhibits.

As you have requested, an invoice for the services rendered will be forwarded to your
office under separate cover.

Respectfully submitted,

*Ron Smith*

Ron Smith, President
Certified Latent Print Examiner

27



EXHIBIT
O'Toole
6
6/14/06   KMS



# Ron Smith & Associates, Inc.

P.O. Box 4436 · Meridian· Mississippi · 39304·
Toll Free: 1-866-TEAM RSA (832-6772) · Office (601) 485-7606 · Fax (601) 485-7622 ·
www.ronsmithandassociates.com

September 5, 2004

Captain Thomas Dowd, Supervisor
Identification Division
Boston Police Department
1 Schroeder Plaza
Boston, Massachusetts   02120

Reference:   Latent Print Unit Evaluation

Captain Dowd,

Pursuant to our previous contractual agreement, several senior staff members of Ron
Smith & Associates, Inc. conducted interviews, administered written tests, and practical
exercises to several members of the Boston Police Department Latent Print Unit. The
members of the RS & A, Inc. unit/examiner evaluation team were as follows:

| | | |
|---|---|---|
| Team Leader: | Ron Smith, President of RS & A, Inc. | Meridian, MS |
| Team Member: | Charles Richardson, Senior Consultant | Hughesville, MD |
| Team Member: | Bob Garrett, Senior Consultant | Metuchen, NJ |

The general purpose of the on site testing and evaluation was to answer, if possible, the
following questions:

1.     What is the individual general knowledge level of each examiner in the field of
latent print examination?

2.     How does their level of knowledge compare to the expected level of knowledge
commensurate with the requirements of experts in the field today, particularly as
it relates to the level of knowledge required for certification by the International
Association for Identification?

3.     What appears to be the level of "collective knowledge" within the Latent Print
Unit?

1

4.    Is their level of knowledge displayed consistent with the level of training they have been provided from internal and external sources throughout their career within the Latent Print Unit?

5.    What is the individual skill level of each latent print examiner as it pertains to "analysis of latent prints" to determine sufficiency for further review? (This exercise was designed to determine what level of expertise each examiner displayed in determining if partial latent prints were of value for comparison purposes.)

6.    What is the individual skill level of each latent print examiner as it pertains to "comparison and evaluation" of latent prints with known inked prints of possible suspects? (These practical exercises were designed to provide the evaluation team with sufficient information to determine the probability of each examiner successfully completing the comparison portion of the I.A.I. Latent Print Examiner Certification test.)

7.    How do the results of these individual and collective evaluations compare to the initial unit assessment previously reported under the sections "III. Training Deficiencies of Existing Personnel: Latent Print Unit" and "VI. Absence of Continuing Education Program of members of the Latent Print Unit."? (These two items can be found in the previous report entitled "Request for Proposal: Latent Print Services" which was dated, June 22, 2004.

## The Evaluation Process:

Every attempt was made to fairly and honestly determine the knowledge, skills and abilities of each staff member of the B.P.D. Latent Print Unit. Although these assessments were certainly not exhaustive, they were designed to elicit sufficient information to answer the questions noted above. It is the opinion of the assessment team that this was accomplished. It should be noted at the outset that these individuals did not know what was going to be expected of them prior to the actual on site assessment; therefore they had no time to conduct any special preparations for the evaluations. All they had been instructed to do was to have a current resume prepared for inspection during the interview portion of the assessment. The results and comments are a compilation of the findings of the on site evaluation team and a thorough review of the assessment results.

It should be noted that the following members of the B.P.D. Latent Print Unit participated in the evaluation process, as noted below:

2

| Name | Participated in: |
|---|---|
| ▮▮▮▮ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I. (Was not requested to participate in Latent Print Comparison Exercise Level II due to assistance he had to provide to members of the RS & A, Inc. assessment team. He therefore, did not have time to complete this Level II exercise) |
| ▮▮▮▮ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ▮▮▮▮ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ▮▮▮▮ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ▮▮▮▮ | Written Knowledge Assessment, Interview Assessment, Friction Ridge Evaluation and Orientation Exercise, Latent Print Comparison Exercise Level I, Latent Print Comparison Exercise Level II. |
| ▮▮▮▮ | Was not present and did not participate. |

## Results:

The individual results will be reported for each element of the on site assessment. The results will be reported in three different manners to assist in the complete comprehension of the information. First, the raw data for each assessment or exercise will be noted for each individual participating in the assessment. This will be referred to in this report as RESULTS: RAW DATA.

Second, the data will be reviewed and discussed in a fuller context to discuss any individual patterns which might have been recognized by the assessment team and displayed in the exercises. The data will also be discussed in comparison to what the expected level of performance would be on these exercises for subject matter experts in other functional latent print units. This section will be referred to as INDIVIDUAL RESULTS: OBSERVATIONS.

Third, the data will be reviewed and discussed in combination with the training and experience level of each examiner, which was determined through the interviews, to fully evaluate the data in the proper context. This will be referred to as INDIVIDUAL RESULTS: FINAL ASSESSMENT.

Once all of the individual results have been addressed, the final review of the results will be discussed from a collective knowledge, skills and abilities perspective to determine what capabilities, and/or limitations within the Boston Police Department Latent Print Unit currently exist. This is a vital part of the evaluative process because it is this collective knowledge, skill and ability that represents the absolute best the B.P.D. Latent Print Unit currently has to offer. This will indicate the highest level of expertise currently available within the section when all the resources are combined together and will not be indicative of the collective abilities of each working shift. This section will be referred to as the LATENT PRINT UNIT COLLECTIVE ASSESSMENT.

## RESULTS: RAW DATA

I.    Written Knowledge Assessment:

Note: This written assessment consisted of a two hundred (200) question latent print general knowledge examination. The examination was designed to determine the working knowledge level of the Boston Police Department employees who currently represent the department as subject matter experts in the field of latent print examination. The primary topic areas which were included in this written assessment included the following:

A.    History of the science of friction ridge comparison and identification.

B.    The fundamentals of fingerprint classification methods and systems.

C.    Biological aspects of the friction ridge science.

D.    Finger, palm and foot latent print orientation principles.

E.    The principles of the latent print comparison & identification process.

F.    Chemical & non-chemical latent processing techniques.

The cumulative individual results on the Written Assessment were as follows:

| Name | Percentage of Correct Answers (Entire Test) |
|------|---------------------------------------------|
| ███████ | 65% |
| ███████ | 54% |



50%

62%

47%

The breakdown of correct/incorrect answers for each participant as it is related to each primary topic area is as follows: (Note: The numbers under each name reflect the total number of correct answers each participant received followed by a slash mark and the number of incorrect answers for each topic. The total number of questions for each topic is noted in parentheses next to the topic name.)

| Name: | ▮ | ▮ | ▮ | ▮ | ▮ |
|---|---|---|---|---|---|
| (Correct/Incorrect) | C/I | C/I | C/I | C/I | C/I |
| Topics | | | | | |
| History (45) | 26/19 | 12/33 | 16/29 | 21/24 | 11/34 |
| Classification (36) | 29/7 | 29/7 | 27/9 | 28/8 | 29/7 |
| Biology (23) | 15/8 | 16/7 | 13/10 | 18/5 | 15/8 |
| Position Orientation (14) | 9/5 | 12/2 | 10/4 | 12/2 | 8/6 |
| Principles of Comparison (27) | 26/1 | 22/5 | 12/15 | 21/6 | 20/7 |
| Processing Techniques (55) | 25/30 | 16/39 | 22/33 | 25/30 | 11/44 |
| Totals (200) | 130/70 | 107/93 | 100/100 | 125/75 | 94/106 |

## II.    Friction Ridge Evaluation and Orientation Exercise

Note:   This practical exercise was composed of fifty (50) latent impressions. The latent impressions were originally developed with black latent fingerprint powder, lifted with clear lifting tape, and mounted on white latent lift cards. The impressions were digitally scanned as TIFF images using a resolution of 1000 dpi and printed on high quality photographic paper. The impressions within this exercise consisted of impressions from fingers, tips of fingers, second and third joints of fingers, palms, feet, non-friction ridge human skin and lightly textured non-human surfaces. Of the fifty (50) impressions, a total of twelve (12) of them have been deemed to be of no value for comparison purposes by I.A.I. Certified Latent Print Examiner senior team members of RS & A, Incorporated.

The purpose of this exercise is to determine the skill of each participant in making the initial determination of "value versus no value" on their latent prints. This is a very critical part of the ACE-V process. (Analysis, Comparison, Evaluation – Verification). Examiners who continually deem latent prints to be of value, which do not possess sufficient friction ridge area information to be used for comparison purposes, reduce the unit efficiency over a period of time by a significant margin. Likewise, examiners who do not retain difficult latent prints which are indeed identifiable, eliminate entirely the possibility of that latent print being identified.

This exercise is also designed to determine the knowledge of the participant in recognizing the friction ridge origin area of the latent prints. This knowledge is a very critical element of the comparison process and one that has a major impact on the overall efficiency of the examiner during the comparison phase of the examination process.

The results were as follows:

| Name | Correct/Incorrect Answers |
|------|---------------------------|
|  | 1.  Correctly located all twelve (12) of the latent impressions which were not of value for comparison purposes. |
| | 2.  Incorrectly marked two (2) latent impressions as being of no value when they were of value for comparison purposes. |
| | 3.  Of the remaining thirty-six (36) latent impressions he deemed to be of value, he accurately determined the correct friction ridge origin area of twenty-nine (29) of the latent impressions. |



1.  Correctly located ten (10) of the twelve (12) latent impressions which were not of value for comparison purposes.

2.  Incorrectly marked five (5) latent impressions as being of no value when they were of value for comparison purposes.

3.  Of the remaining thirty-five (35) latent impressions he deemed of value, he accurately determined the correct friction ridge origin area of twenty-nine (29) of the latent impressions.

1.  Correctly located all twelve (12) of the latent impressions which were not of value for comparison purposes.

2.  Incorrectly marked eight (8) latent impressions as being of no value when they were of value for comparison purposes.

3.  Of the remaining thirty (30) latent impressions she deemed of value, she accurately determined the correct friction ridge origin area of twenty (20) of the latent impressions.

1.  Correctly located six (6) of the twelve (12) latent impressions which were of no value for comparison purposes.

2.  Incorrectly marked one (1) latent impression as being of no value when it was of value for comparison purposes.

3.  Of the remaining forty-three (43) latent impressions he deemed of value, he accurately determined the correct friction ridge origin area of thirty-two (32) of the latent impressions.

1.  Correctly located all twelve (12) of the latent impressions which were of no value for comparison purposes.

2.     Incorrectly marked four (4) latent impressions as being of no value when they were of value for comparison purposes.

3.     Of the remaining thirty-four (34) latent impressions he deemed of value, he accurately determined the correct friction ridge area of origin of twenty-four (24) of the latent impressions.

## III.    Latent Print Comparison Exercise Level I:

Note:  This exercise was composed of fifteen (15) latent prints of medium levels of difficulty. All fifteen (15) of these latent impressions were made by one of the individuals whose known inked prints are contained in the exercise and all fifteen (15) contain sufficient legible friction ridge detail information to be identified. The corresponding "match area" of the known inked prints is of sufficient clarity to be used to correctly locate and identify all fifteen of the latent impressions in this exercise. All latent impressions were developed on items with cyanoacrylate ester fuming and further developed with black latent fingerprint powder. Each latent impression was lifted with clear lifting tape and mounted on white latent lift cards. The latent impressions were then digitally scanned as TIFF images at a resolution of 1000 dpi. The five (5) sets of known inked fingerprints and palm prints, A through E, were recorded with black printer's ink and scanned as TIFF images at a resolution of 1000 dpi. Both the latent impressions and the known inked prints were printed on high quality photographic paper on a Kodak color printer set at an output resolution of 1000 dpi.

| Name | Correct/Incorrect Answers |
|------|---------------------------|
| ▮▮▮▮▮▮ | 1.  Correctly identified eight (8) of the fifteen (15) latent prints in this comparison exercise. |
|  | 2.  Did not identify the seven (7) remaining latent prints in this comparison exercise. |
|  | 3.  Incorrectly marked one (1) of the latent impressions as being of no value when it was of value for comparison purposes and sufficient for identification with one (1) of the suspect known prints provided. |
| ▮▮▮▮▮▮ | 1.  Correctly identified nine (9) of the fifteen (15) latent prints in this comparison exercise. |

8

2. Did not identify the six (6) remaining latent prints in this comparison exercise.

3. Incorrectly marked two (2) of the latent impressions as being of no value when they were of value for comparison purposes, and sufficient for identification with the suspect known prints provided.

1. Correctly identified nine (9) of the fifteen (15) latent prints in this comparison exercise.

2. <u>Incorrectly identified one (1) latent impression.</u> (This could have been an administrative error since the correct finger was the finger next to the one she marked. She said that one of the latent prints (Latent # 11) matched the left middle finger of suspect E when it actually matched the left ring finger of that same subject.)

3. Did not identify the five (5) remaining latent prints in this comparison exercise.

4. Incorrectly marked three (3) of the latent impressions as being of no value when they were of value for comparison purposes, and sufficient for identification with the suspect known prints provided.

1. Correctly identified three (3) of the fifteen (15) latent prints in this comparison exercise.

2. Did not identify the remaining twelve (12) latent prints in this comparison exercise.

3. Incorrectly marked five (5) of the latent impressions as being of no value for comparison purposes when they were of value for comparison purposes, and sufficient for identification with the suspect known prints provided.

1. Correctly identified nine (9) of the fifteen (15) latent prints in this comparison exercise.

2. Did not identify the remaining six (6) latent prints in this comparison exercise.

## IV. Latent Print Comparison Exercise Level II:

Note: This exercise was composed of fifteen (15) latent prints of more advanced levels of difficulty. Fourteen (14) of the fifteen (15) of these latent impressions were made by the individuals whose known inked prints are contained in the exercise and all fifteen (15) contained sufficient legible friction ridge detail information to be identified or excluded. The corresponding "match area" of the known inked prints is of sufficient clarity to be used to correctly locate and identify all of the matching latent impressions in this exercise. All latent impressions were developed on items with cyanoacrylate ester fuming and further developed with black latent fingerprint powder. Each latent impression was lifted with clear lifting tape and mounted on white latent lift cards. The latent impressions were then digitally scanned as TIFF images at a resolution of 1000 dpi. The five (5) sets of known inked fingerprints and palm prints, A through E, were recorded with black printer's ink and scanned as TIFF images at a resolution of 1000 dpi. Both the latent impressions and the known inked prints were printed on high quality photographic paper on a Kodak color printer set at an output resolution of 1000 dpi.

| Name | Correct/Incorrect Answers |
|---|---|
|  | 1. Did not participate in the Level II Comparison Exercise. |
|  | 1. Correctly identified one (1) of the latent prints in this comparison exercise. |
| | 2. <u>Incorrectly identified one (1) latent impression.</u> Erroneous identification of wrong individual. |
| | 3. Did not identify or exclude any of the remaining thirteen (13) latent prints in this comparison exercise. |
| ▬▬▬▬ | 1. Correctly identified five (5) of the latent prints in this comparison exercise. |
| | 2. Incorrectly identified one (1) latent impression. Erroneous identification of wrong individual. (This latent impression did not match any of the known inked fingerprints provided.) |
| | 3. Did not identify the remaining nine (9) latent prints in this comparison exercise. |

1.  Did not identify any of the fifteen (15) latent prints in this comparison exercise.

2.  Incorrectly marked thirteen (13) of the latent impressions as being insufficient for "verification", when they were all sufficient for comparison and identification or exclusion with the known inked prints provided.

1.  Correctly identified five (5) of the latent prints in this comparison exercise.

2.  Did not identify the remaining ten (10) latent prints in this comparison exercise.

3.  Incorrectly marked four (4) of the latent impressions as being insufficient for comparison purposes, when they were sufficient for comparison and identification with the known inked prints provided.

## INDIVIDUAL RESULTS: OBSERVATIONS

**Note:** It is very important to understand that any comments made in this section of the report entitled "Individual Results: Observations" are based upon what would be the expected level of knowledge and performance for any examiner who is being offered to the court system as a subject matter expert in the field of latent print examination and are not based upon their individual background, training and experience.

**Name**                **Written Assessment**

1.  In the Written Assessment it became clear that _____ general knowledge of the science of friction ridge identification is significantly greater than his subordinate employees but is significantly less than what it could be, or should be, considering his current assignment as a supervisor of the latent print unit.

11

2. His primary strengths appear to be in the critically important area of "Principles of Latent Print Comparison and Identification Process" and "Fingerprint Classification".

3. He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

4. He demonstrates average knowledge in the area of "Finger, Palm and Foot Latent Print Orientation Principles".

### Friction Ridge Skin Evaluation and Orientation Exercise

1. ████████ appears to have developed a high level of discernment related to making the value/no value decision in latent print examinations. Appears to be very experienced and skilled in making this initial analytical decision.

2. Demonstrates average ability in his knowledge of position clues related to finger and palm print areas of origin.

3. Demonstrated no significant knowledge of position clues related to footprint impressions.

### Latent Print Comparison Exercise Level I

1. ████████ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints. He seems to be slightly less proficient in comparing latent palm prints than fingerprints.

2. He seems to be very careful in making his identification decisions, which is a very desirable analytical trait.

### Latent Print Comparison Exercise Level II

████████ did not participate in this Level II exercise due to lack of time.

| <u>Name</u> | <u>Written Assessment</u> |
|---|---|

▉▉▉▉▉▉

1.  In the Written Assessment it became clear that ▉▉▉▉▉▉ ▉▉▉▉▉▉ general knowledge of the science of friction ridge identification is slightly above the average of the non-supervisory employees within the B.P.D. Latent Print Unit, but is significantly less than what it could be, or should be, considering his current assignment as a testifying latent print subject matter expert.

2.  His primary strengths appear to be in the areas of "Principles of Latent Print Comparison and Identification Process", "Finger and Palm Print Orientation Principles", and "Fingerprint Classification".

3.  He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

<u>Friction Ridge Skin Evaluation and Orientation Exercise</u>

1.  ▉▉▉▉▉▉ appears to have a slightly below expected average level of discernment related to making the value/no value decision in latent print examinations. Appears to be less skilled and lacks training in making this initial decision.

2.  Demonstrates expected average ability in his knowledge of position clues related to finger and palm print areas of origin.

3.  Demonstrated no significant knowledge of position clues related to footprint impressions.

<u>Latent Print Comparison Exercise Level I</u>

1.  ▉▉▉▉▉▉ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints.

2..     In this exercise, he seemed to be very careful in making his identification decisions, which is a very desirable analytical trait.

## Latent Print Comparison Exercise Level II

1.     ▓▓▓▓▓▓▓▓ did not exhibit any significant skill level in comparing difficult latent prints. He identified one latent impression in this exercise correctly and erroneously identified a second latent fingerprint. A thorough review of this major error was conducted and the review team cannot understand how this particular error could have occurred. The reported matching fingerprint in no way resembles the latent fingerprint.

## Name

▓▓▓▓

## Written Assessment

1.     In the Written Assessment it became clear that ▓▓▓▓ general knowledge of the science of friction ridge identification is well below the average of the non-supervisory employees within the B.P.D. Latent Print Unit and is significantly less than what it could be, or should be, considering her current assignment as a testifying latent print subject matter expert.

2.     Her primary knowledge strengths appear to be in the areas of "Finger and Palm Print Orientation Principles", and "Fingerprint Classification".

3.·     She shows very significant weaknesses in her knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

4.     Worthy of special notice is her significant weakness in her knowledge of the very critical area of "Principles of Latent Print Comparison and the Identification Process". Her number of incorrect answers in this topic area was in excess of double of any of the other B.P.D. examiners evaluated.

14

## Friction Ridge Skin Evaluation and Orientation Exercise

1.     ▓▓▓▓▓▓▓ appears to have a significantly below expected average level of discernment related to making the value/no value decision in latent print examinations.  Appears to be less skilled, or for some other reason, very hesitant to retain latent prints which might be difficult to compare with suspect known prints.

2.     Demonstrates less than expected average ability in her knowledge of position clues related to finger and palm print areas of origin.

3.   · Demonstrated no significant knowledge of position clues related to footprint impressions.

## Latent Print Comparison Exercise Level I

1.     Based upon the correct identifications only, ▓▓▓▓▓▓ appears to possess a slightly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints.

2.     In this exercise, she identified ten (10) of the latent impressions, which was at least one (1) more than any other participant. However, when recording her identifications on the examination results worksheet, she appears to have inadvertently recorded the wrong matching finger of the correct known prints.  This is normally referred to as a "clerical erroneous identification", if indeed this is what actually occurred.  It is the opinion of the review team that this was indeed a serious clerical error, but not one of a technical nature.

## Latent Print Comparison Exercise Level II

1.     ▓▓▓▓▓▓ appears to possess an average expected ability to compare difficult latent prints and was able to identify five (5) of these more difficult latent prints correctly. This was based upon the identifications reported correctly and not the erroneous identification.

2.   She did, however, incorrectly identify one (1) latent impression.  After a thorough review of the latent print and the known inked prints, it is the opinion of the review team that this "identification" qualifies as a

"technical erroneous identification", which is the most serious of all technical errors. The latent impression was of the same pattern type as the known inked fingerprint but was not made by this person.

Name    Written Assessment

1.  In the Written Assessment it became clear that ▮▮▮▮ ▮▮▮▮ general knowledge of the science of friction ridge identification is above the average of the non-supervisory employees within the B.P.D. Latent Print Unit but is significantly less than what it could be, or should be, considering his current assignment as a testifying latent print subject matter expert.

2.  His primary knowledge strengths appear to be in the areas of "Principles of Latent Print Comparison and Identification Process", "Finger and Palm Print Orientation Principles", "Biological Aspects of the Friction Ridge Science" and "Fingerprint Classification".

3.  He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", and the "History of the Science of Friction Ridge Identification".

Friction Ridge Skin Evaluation and Orientation Exercise

1.  ▮▮▮▮▮▮ appears to have a slightly below expected average level of discernment related to making the value/no value decision in latent print examinations. Appears to be less skilled and lacks training in making this initial decision. He lacks the willingness to eliminate the "no value" impressions when they occur.

2.  Demonstrates below expected average ability in his knowledge of position clues related to finger and palm print areas of origin.

3.  Demonstrated no significant knowledge of position clues related to footprint impressions.

### Latent Print Comparison Exercise Level I

1.    ████████ appears to possess significantly below expected average skill level when conducting latent print comparisons of medium difficulty latent prints. He seemed to be hesitant to "make the call" on his own, even in this non-case testing environment.

2.    In this exercise, he identified less than half as many latent prints as the other B.P.D. participants.

### Latent Print Comparison Exercise Level II

1.    ████████ did not exhibit any significant skill level in comparing difficult latent prints. He did not identify any of the latent prints in this exercise. His worksheet notes indicated that he had probably found the most likely candidate for some of the latent prints but he was not willing to make a commitment as to the identification.

### Name

████████

### Written Assessment

1.    In the Written Assessment it became clear that ████ general knowledge of the science of friction ridge identification is significantly below the average of the non-supervisory employees within the B.P.D. Latent Print Unit and is significantly less than what it could be, or should be, considering his current assignment as a testifying latent print subject matter expert.

2.    His primary strengths appear to be in the areas of "Principles of Latent Print Comparison and Identification Process", "Finger and Palm Print Orientation Principles", and "Fingerprint Classification".

3.    He shows very significant weaknesses in his knowledge of "Chemical & Non-Chemical Latent Processing Techniques", the "History of the Science of Friction Ridge Identification", and the "Biological Aspects of the Friction Ridge Science".

Friction Ridge Skin Evaluation and Orientation Exercise

1.  ████████████ appears to have a slightly below expected
    average level of discernment related to making the value/no
    value decision in latent print examinations. Appears to be
    less skilled and lacks advanced training in making this
    initial decision.

2.  Demonstrates less than expected average ability in his
    knowledge of position clues related to finger and palm
    print areas of origin.

3.  Demonstrated no significant knowledge of position clues
    related to footprint impressions.

Latent Print Comparison Exercise Level I

1.  ████████████ appears to possess a slightly below
    expected average skill level when conducting latent print
    comparisons of medium difficulty latent prints.

2.  In this exercise, he seemed to be very careful in making his
    identification decisions, which is a very desirable analytical
    trait.

3.  Seems to display a lack of confidence in searching for
    latent palm prints.

Latent Print Comparison Exercise Level II

1.  ████████████ appears to possess an average expected
    ability to compare difficult latent prints and was able to
    identify five (5) of these more difficult latent prints
    correctly.

2.  Appears to be a very cautious examiner.

INDIVIDUAL RESULTS: FINAL ASSESSMENT

Note: It should be fully understood that the comments made in this section entitled
"Individual Results: Final Assessment" are based upon not only the results of their
written and practical exercises but also upon a thorough interview with each of the
participants and a careful review of their individual resume and training history.

Name                    Final Assessment

████████ is a dedicated career B.P.D. employee who has been
employed as either a civilian or sworn officer with the department
since 1968. He has been assigned to the Identification Unit since
1985 and was assigned to the Latent Print Unit for a period of five
(5) years between 1990 and 1995. His primary function for the last
several years, since 1995, has been as a supervisor in the
Identification Unit with direct daily supervision of the 10 Print
operation and very limited supervision of the Latent Print Unit. He
has not been functioning as a latent print examiner on a regular
basis since 1995.

Based upon a review of his resume which he provided, and a
thorough interview, it appears that his original technical training
was not formal and was very restricted in scope. It appeared to
have been primarily internship type training with very little
organized material or other instructional methods being employed
internally. Much of what he now knows he learned on his own
through other sources throughout his career. He was provided the
opportunity to participate in limited external training, primarily
when it was made available to the department without tuition or at
a reduced cost. Based upon his written assessment, he seems very
proficient in discussing the latent print science, from the
perspective of how it was being practiced by the Boston Police
Department during his assignment to the Latent Print Unit.

Surprisingly, and in spite of the fact that he has not been an active
latent print examiner since 1995, his overall knowledge level of the
friction ridge science was higher than any of the latent print
examiners currently assigned to the Latent Print Unit and he scored
the highest in four (4) of the six (6) topic areas. Although, this
certainly can be considered a positive when examining the
credentials of ████████, it most assuredly should be considered as
a negative when examining the expected level of knowledge
displayed by the current latent print staff members who are
representing the department in court as their subject matter experts.

It is the opinion of the RS & A, Inc. assessment team that even
though his lack of knowledge of current technology and scientific
methodology could certainly be used against him in a court of law
by an informed defense attorney, his vast years of experience in the
field will probably keep that from happening. It is doubtful that
the counselor would be versed enough themselves in the science to

be able to convince the judge to disallow his testimony. Even though he would probably be able to qualify as an expert witness in the Boston courts, his lack of knowledge could greatly affect his level of credibility in the eyes of the jury members as the cross examination proceeds. If he will continue to be offered as an expert witness, his training deficiencies would need to be addressed as soon as reasonably possible.

His technical ability to properly evaluate latent prints for sufficiency and determine the friction ridge origin area and proper orientation should be considered as acceptable, <u>considering his absence from active latent print casework for approximately nine (9) years</u>. Based upon the expected level of proficiency, in this required area, for a supervisor of a fully functional Latent Print Unit, his current technical ability is significantly below the desired level.

▮▮▮▮▮▮ technical ability to compare and correctly identify latent prints should also be considered acceptable, <u>considering his absence from active latent print casework for approximately nine (9) years</u>. Based upon this very critical responsibility area of a Latent Print Unit supervisor, his technical ability would currently be below the desired level.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the RS & A, Inc. assessment team that ▮▮▮▮ is a very cautious and conscientious employee and is fully capable of arriving at the correct ident/non-ident conclusion on the vast majority of latent prints he encounters.

It is also the opinion of the assessment team that on some difficult "ident" latent prints he currently does not possess the skills and experience necessary to arrive at the "ident" conclusion and would choose to arrive at an "inconclusive" decision rather than take a chance and make an erroneous identification. This is a very commendable trait and one that all examiners should possess; but for a Latent Print Unit to effectively function, the senior technical supervisor(s) who serve as the final word on difficult examinations, must be able to make the correct decision on the difficult latent print comparisons. As a result, a significant number of suspect latent prints will not be identified, thereby reducing the effectiveness of the entire Latent Print Unit.

It is the opinion of RS & A, Inc. that ▮▮▮▮▮▮ current level of knowledge, skill and ability as a latent print examiner is indeed

consistent with his level of internal and external training and experience. There appears to be a direct correlation between his lack of technical training and his lack of scientific knowledge in the field.

████████ has not had the opportunity during his career to receive sufficient training in numerous areas of importance to a current day functioning Latent Print Unit. Some of these deficient areas would include Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, Expert Witness Testimony Techniques in a Post-Daubert Environment and Latent Print Section Management. Although B.P.D. supervisory personnel may not be required to perform all of these additional duties on a daily basis, for them to maintain a proper Quality Assurance / Quality Control program for the Latent Print Unit, they need to fully understand the procedures and underlying scientific principles of each of these functions.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ████████ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ████████ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ████████ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

████████ certainly appears to be capable of improving himself in his technical areas of deficiency, if he has the desire to do so at this point in his career. He is certainly trainable and should be able to excel in a formal training environment. He has continually displayed a very positive attitude throughout the assessment process. It is the opinion of RS & A, Inc. that ████████ could be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination.

████████████ has been an employee of the Boston Police Department since 1986. He was assigned to the Identification Unit in July of 2000 and was officially assigned to the Latent Print Unit in January of 2004 although he was physically moved to the Latent Print Unit in September of 2003.

While being assigned to the Identification Unit he received external training in fingerprint classification, law enforcement photography, latent print recovery techniques and crime scene investigation. Since being appointed to the Latent Print Unit he has attended a twenty-four (24) hour palm print identification seminar.

Upon entering the Identification Unit he did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print functions. Upon his assignment to the Latent Print Unit he was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of his training in latent prints has come from spending time with the previously employed latent print examiners ██████████ and ████████████ and the current examiners ██████████ and ████ No documentation of his internal training in latent prints seems to exist.

Based upon his written assessment, ██████████████ has a general understanding of the very basic principles of friction ridge area identification as it applies to latent print examinations but is very limited in his knowledge of several advanced topics of importance. To his credit, much of what he does know was learned from his own reading and his own individual efforts, which is very commendable. His has a very significant lack of technical knowledge regarding the subjects of Biological Uniqueness, Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, and Expert Witness Testimony Techniques in a Post-Daubert Environment.

It is consensus opinion of the RS & A, Inc. assessment team that he will not be able to succeed as an subject matter expert witness if he is challenged to any significant degree by a defense attorney who has prepared their cross examination utilizing any form of Daubert style issues. Since he cannot testify to having completed any formal latent print examiner training program and he does not possess any significant amount of actual experience, it would not

22

be surprising to see him disallowed to testify due to his lack of expert credentials. This is particularly true in light of the public exposure gained from recent events within the Boston Police Department Latent Print Unit. He may not get challenged in court, but if he does, then there is a likelihood that his testimonial career would be damaged. If the court does not allow him to qualify as an expert witness, then he will forever have to admit that a court in his past disallowed him to testify as an expert in the science of friction ridge identification. This bit of history will hang around his neck like an albatross forever and can, and probably would, be used by defense attorney's to attack the credentials of the entire Latent Print Unit.

███████████ technical ability to properly evaluate latent prints for sufficiency and to determine the friction ridge origin area and proper orientation should be considered as more than acceptable considering the very limited amount of practical experience he has gained in the short time he has been assigned to the Latent Print Unit.

To be authorized to conduct independent case work without having completed a formal latent print examiner training program is far from acceptable in itself, but he did not know this was improper and simply did the best he could with the situation he was presented. During the sufficiency and origin determination exercises he performed at a level higher that would be expected for someone with his limited training and experience, which indicates to the assessment team that he possesses some natural talents that lend themselves well to this type of examination.

███████████ technical ability to compare and correctly identify most medium difficulty latent prints should also be considered acceptable considering his lack of training, if indeed his reported identifications were based upon his application of fundamental scientific principles of the identification process. Considering the fact that he has not undergone a formal training program, his ability to locate and identify medium difficulty latent prints was quite impressive. However, his lack of formal training became very obvious when he was faced with difficult latent impressions resulting in a far less than acceptable performance. This exercise included one (1) erroneous identification, which by itself is sufficient to ruin an entire career if it were to happen on an actual case and became public knowledge.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the

23

RS & A, Inc. assessment team that ████████████ is capable of arriving at the correct ident/non-ident conclusion on the vast majority of medium difficulty latent prints he encounters.

It is also the opinion of the assessment team that on the majority of the more difficult "ident and non-ident" latent prints, he currently does not possess the skills and experience necessary to arrive at the correct conclusion and is certainly capable of making an erroneous identification due to his lack of formal training in this area.

It is the opinion of RS & A, Inc. that ████████████ current level of knowledge, skill and ability as a latent print examiner is indeed consistent with his level of internal and external training and experience. There appears to be a direct correlation between his lack of technical training and his lack of scientific knowledge in the field.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ████████████ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ████████████ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ████████████ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

████████████ certainly appears to be capable of improving himself in his technical areas of deficiency, if he has the desire to do so. He is trainable and should be able to excel in a formal training environment. He displayed a reasonably positive attitude throughout the assessment process, once he became familiar with the assessment process and the members of the assessment team. It is the opinion of RS & A, Inc. that ████████████ could be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination. Although an accurate time line for this training process cannot be established with the available information, it would be reasonable to assume that it could be accomplished

within a period of two years, if training became his primary responsibility.

█████████ has been employed as a Police Officer with the Boston Police Department since 1979 and has been assigned to the Identification Unit since 1998.

While being assigned to the Identification Unit, first in the tenprint operation and later in the Latent Print Unit she received external training in fingerprint classification, law enforcement photography, latent print recovery techniques, crime scene investigation, advanced latent print procedures, palm print identification and courtroom testimony techniques.

Upon entering the Identification Unit she did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print agency functions. Upon her assignment to the Latent Print Unit she was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of her training in latent prints has come from spending time with the previously employed latent print examiners. No documentation of her internal training in latent prints seems to exist.

Based upon a review of her resume which she provided and a thorough interview, it appears that her original technical training was not formal and was very restricted in scope. It appeared to have been primarily internship type training with very little organized material or other instructional methods being employed internally. She was provided the opportunity to participate in a significant amount of external training. Based upon her written assessment, she seems proficient in discussing the latent print science, strictly from the perspective of how it has been practiced by the Boston Police Department during her assignment to the Latent Print Unit.

Surprisingly, and in spite of the fact that she has had the opportunity to participate in a fairly significant amount of external training during her career, her ability to demonstrate that knowledge was certainly not displayed in the written assessment. Of the five individuals evaluated, she scored near the bottom of the list when all topic areas were considered.

She has a very significant lack of technical knowledge regarding the subjects of Biological Uniqueness, Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print

Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, and Expert Witness Testimony Techniques in a Post-Daubert Environment. There appears to be a possible correlation between her lack of performance in the written assessment, particularly in the area of Latent Print Comparison Principles, and her performance in the Latent Print Comparison Exercises.

It is the opinion of the RS & A, Inc. assessment team that her lack of knowledge of current technology and scientific methodology could certainly be used against her in a court of law by an informed defense attorney. It may be doubtful that an attorney could convince a judge to disallow her testimony since she has already qualified as an expert witness in the Boston courts on several previous occasions, but her lack of knowledge could greatly affect her level of credibility in the eyes of the jury members as the cross examination proceeds. If she continues to be offered as an expert witness, her training deficiencies would need to be addressed as soon as reasonably possible.

Her technical ability to properly evaluate latent prints for sufficiency and to determine the correct friction ridge origin area and proper orientation cannot be considered acceptable, in light of her years of experience. Although she correctly located the twelve (12) latent impressions which were not of value for comparison purposes, she eliminated an additional eight (8) latent impressions which were indeed identifiable. The result of this in casework is that cases with very difficult latent impressions would not likely be kept and be compared with possible suspects. This would then result in potential identifications not being made which should have been made. It is felt that this could primarily be as a result of her lack of formal training in this aspect of her duties.

████████ technical ability to compare and correctly identify latent prints is still in question. Although she was able to correctly locate and identify an acceptable number of medium and difficult level latent impressions in Latent Print Comparison Exercises I and II, she made what is believed to be a "clerical erroneous identification" in Comparison Exercise I and a "technical erroneous identification" in Comparison Exercise II. Technical erroneous identifications are the most serious of all errors in the field of latent print examination and it is not unusual at all for agencies to immediately remove an employee from this job responsibility when this type of error is committed in an actual case. This type of error cannot be allowed in a professional, fully efficient and effective Latent Print Unit. As experienced by the

Boston Police Department already in recent months, an incorrect analysis can create havoc within the department and the entire criminal justice community.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ▮▮▮▮▮▮ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ▮▮▮▮▮▮ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ▮▮▮▮▮▮ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

▮▮▮▮▮▮ certainly should be capable of improving herself in her technical areas of deficiency, if she has the desire to do so at this stage of her career. She could be re-trained but it will require significant effort to go back and start over in her formal training to eliminate the obvious problems which exist based upon her written and practical exercise assessments. Typically it takes longer to correct ingrained bad habits than it takes to start from scratch with a new examiner trainee. She displayed a reasonably positive attitude throughout the assessment process, once she became familiar with the assessment process and the members of the assessment team. It is the opinion of RS & A, Inc. that ▮▮▮▮▮▮ could possibly be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination. It would take a tremendous effort on her part along with her instructors. An accurate time line for this training process cannot be established with the available information and the success of this re-training program would depend primarily on her attitude toward the process.

▮▮▮▮▮▮ has been an employee of the Boston Police Department since 1982. He was assigned to the Identification Unit in August of 1998 and was transferred to the Latent Print Unit in January of 2001.

While being assigned to the Identification Unit he received external training in fingerprint classification, law enforcement

photography, latent print recovery techniques and crime scene investigation. Since being appointed to the Latent Print Unit he has attended a twenty-four (24) hour palm print identification seminar.

Upon entering the Identification Unit he did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print functions. Upon his assignment to the Latent Print Unit he was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of his training in latent prints has come from spending time with the previously employed latent print examiners. No documentation of his internal training in latent prints seems to exist.

Based upon his written assessment, ████████ has a general understanding of the very basic principles of friction ridge area identification as it applies to latent print examinations, but is very limited in his knowledge of several advanced topics of importance. To his credit, much of what he does know was learned from his own reading and his own individual efforts, which is very commendable. He did score higher in the written assessment than all of the other non-supervisory latent print examiners although it was certainly less than it should have been for someone with his level of experience. He has a significant lack of technical knowledge regarding the "new technology" subjects, including Chemical Processing, Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology and Procedures, Digital Imaging, and Expert Witness Testimony Techniques in a Post-Daubert Environment.

████████ is very articulate and presented himself in a very professional manner during the interview portion of the assessment. He is capable of explaining the concepts with which he is familiar. It is the opinion of the RS & A, Inc. assessment team that he would be able to withstand the rigors of cross examination on the Daubert style issue questions, if he were to learn the material. His advanced level of formal education appears to have benefited him greatly in the area of oral communication. His ability to effectively communicate will be of great value if he is able to correct his considerable knowledge deficiencies. This certainly seems to be his "strong suit".

████████ did not fair nearly as well in the practical exercise portions of the assessment. His technical ability to properly

evaluate latent prints for sufficiency and to determine the friction ridge area of origin fell far short of what would be expected for someone who has worked in latent prints since 2001. It is quite obvious that he has never received any significant training in how to determine sufficiency and how to determine origin areas of latent impressions. This lack of training clearly manifests itself in all aspects of his practical exercises.

His technical ability to compare and correctly identify most medium difficulty latent prints should also be considered far less than acceptable under any circumstances. He only identified three (3) of the medium difficulty latent prints in Comparison Exercise Level I, which represented less than one half of the identifications reported by each of the other examiners evaluated. His failure to produce at a level even near to that of the other examiners indicates a serious issue regarding his training and ability to perform this vitally important aspect of his duties. Considering the fact that he has not undergone a formal training program, his ability to locate and identify medium difficulty latent prints was somewhat understandable. This is also quite troublesome since these results could represent his current level of performance in Boston P.D. casework, and without having had a QA/QC program in place, there is no way to know what this impact might have been on the effectiveness of the Latent Print Unit.

███████ was not able to identify even one of the more difficult latent impressions in the Latent Print Comparison Exercise Level II. This inability to locate, identify and commit on difficult latent impressions will certainly decrease his effectiveness and that of the entire unit when he is faced in casework with latent impressions of this quality.

Of course, RS & A, Inc. encourages and appreciates appropriate caution in all latent print comparison and identification work but a quality Latent Print Unit must be capable of identifying the difficult latent impressions when they possess sufficient legible friction ridge information to arrive at a conclusion of identification. Several of the latent impressions contained in the Level II exercise are of a similar quality level as that of the IAI Latent Print Certification examination.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the RS & A, Inc. assessment team that ███████ is capable of arriving at the correct ident/non-ident conclusion on a minority of the medium difficulty latent prints he encounters.

It is also the opinion of the assessment team that on the majority of difficult "ident and non-ident" latent prints he currently does not possess the skills and experience necessary to arrive at the correct conclusion.

It is the opinion of RS & A, Inc. that ████████ current level of knowledge, skill and ability as a latent print examiner is indeed consistent with his level of internal and external training and experience. There appears to be a direct correlation between his lack of technical training and his inability to perform the required technical tasks.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ████████ does not currently possess the necessary knowledge to successfully complete the written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS & A, Inc. that ████████ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I.

It is the opinion of RS & A, Inc. that ████████ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

████████ appears to be capable of improving himself in his technical areas of knowledge deficiency, if he has the desire to do so at this stage of his career. He is intelligent and trainable and should be able to succeed in a formal training environment. He displayed a hesitant, but reasonably positive, attitude throughout the assessment process, once he became familiar with the assessment process and the members of the assessment team.

Regarding his inability to perform at an acceptable level in the practical exercises, it is much too soon to offer any opinion as to his ability to be retrained in this topic area. He needs to have his vision checked, as do all of the examiners, and he needs further evaluation on his visual acuity. Physical impairments need to be eliminated as a possible contributing factor prior to any additional evaluations being conducted.

30



has been an employee of the Boston Police Department since 1983. He was assigned to the Identification Unit from 1992 through 1994, returned to street assignments from 1994 through 1997 and returned to the Identification Unit in 1997. He was assigned to the Latent Print Unit in 1999.

While being assigned to the Identification Unit he received external training in fingerprint classification, law enforcement videography, latent print recovery techniques, crime scene investigation, advanced photography and digital imaging, palm print identification and advanced latent fingerprint procedures.

Upon entering the Identification Unit he did receive some individual internal training in the fundamentals of fingerprint identification as they apply to the ten print functions. Upon his assignment to the Latent Print Unit he was not placed in any formal latent print examiner training program because none existed in the department. It appears that the vast majority of his training in latent prints has come from spending time with the previously employed latent print examiners. No documentation of his internal training in latent prints seems to exist.

Based upon his written assessment, [redacted] has a general understanding of the very basic principles of friction ridge area identification as it applies to latent print examinations, but is very limited in his knowledge of several advanced topics of importance. Although he has had the opportunity to participate in as much, if not more, external training opportunities over his career in the Identification Unit than anyone else assigned to the unit, he scored the lowest of all the personnel on the written evaluation. During his interview he made the comment that he did not do well on written tests in the past, although we did not discuss his performance on the written test and had not even graded them at the time of the interview. He seems to have a significant deficiency in his knowledge of the friction ridge science and it seems to be concentrated on the more technical topics such as processing techniques. It seems as if he has never received any formal training in chemical development methods past what they commonly used in the Latent Print Unit and he scored significantly lower on this topic area than any other personnel in the unit. His interview also revealed that he has a significant lack of technical knowledge regarding Alternate Light Source Techniques, Advanced Latent Print Photography, ACE-V Methodology, AFIS/IAFIS Technology, Digital Imaging and Expert Witness Testimony Techniques in a Post-Daubert Environment.

It is the opinion of the RS & A, Inc. assessment team that his lack of knowledge of current technology and scientific methodology could certainly be used against him in a court of law by an informed defense attorney. It may be doubtful that an attorney could convince a judge to disallow his testimony since he has already qualified as an expert witness in the Boston courts on several previous occasions, but his lack of knowledge could greatly affect his level of credibility in the eyes of the jury members as the cross examination proceeds. If he will continue to be offered as an expert witness, his training deficiencies would need to be addressed as soon as reasonably possible.

██████████ technical ability to properly evaluate latent prints for sufficiency and to determine the friction ridge origin area and proper orientation should be considered as acceptable considering the amount of time he has been assigned to the Latent Print Unit. He did quite well on the Friction Ridge Evaluation and Orientation Exercise and was a close second behind ████████ in this exercise. He performed significantly better than the other non-supervisory employees on this practical exercise.

██████████ technical ability to compare and correctly identify most medium difficulty latent prints and some of the more difficult latent prints should also be considered acceptable considering his lack of formal training in this subject area. It appears that he is indeed very cautious in his decisions and possesses some significant ability in this area. He did not commit any major errors in his practical exercises and identified as many latent prints as anyone in the unit.

Based upon his technical performance during all phases of the assessment process in which he participated, it is the opinion of the RS & A, Inc. assessment team that ████████ is capable of arriving at the correct ident/non-ident conclusion on the vast majority of medium difficulty latent prints he encounters.

It is the opinion of RS & A, Inc. that ████████ current level of knowledge, skill and ability as a latent print examiner is not completely consistent with his level of internal and external training and experience. His level of knowledge displayed in the written assessment should have been higher, based upon his exposure to external training opportunities.

Regarding I.A.I. certification as a latent print examiner, it is the opinion of RS & A, Inc. that ████████ does not currently possess the necessary knowledge to successfully complete the

written test phase of the Latent Print Certification examination of the International Association for Identification.

It is the opinion of RS. & A, Inc. that ▮▮▮▮▮▮ does not currently possess the skills and ability to successfully complete the latent print comparison phase of the Latent Print Examiner Certification examination of the I.A.I. Although he did display considerable talent in this phase of the assessment, it does not appear that he performed at a level necessary for the successful completion the I.A.I. latent comparison test.

It is the opinion of RS & A, Inc. that ▮▮▮▮▮▮ does currently possess the necessary knowledge, skill and ability to successfully complete the pattern interpretation phase of the Latent Print Examiner Certification examination of the I.A.I.

▮▮▮▮▮▮ appears to be capable of improving himself in his technical areas of deficiency, if he has the desire to do so at this stage in his career. Although initially quite hesitant, he displayed a fairly positive attitude throughout the assessment process, once he became familiar with the assessment process and the members of the assessment team. It is the opinion of RS & A, Inc. that Fred Fontaine could be trained to a level commensurate with the successful completion of all phases of the I.A.I. Latent Print Examiner Certification examination. His comparison skills need to be improved with detailed exercises and he would need to undergo extensive training to increase his general knowledge of the science of friction ridge examination and identification. Although an accurate time line for this training process cannot be established with the available information, it would be reasonable to assume that it could be accomplished within a period of one year, if training became his primary responsibility.

## LATENT PRINT UNIT: COLLECTIVE ASSESSMENT

As can be seen from the data collected through the written and practical assessments, along with the personal interviews, the Latent Print Unit of the Boston Police Department contains members with a wide variety of knowledge and expertise levels. Collectively, the level of knowledge and expertise found within the unit appears to be relatively consistent in most respects with the level of training received by its members over the last few years. Considering the size of the agency, the current level of experience found within the non-supervisory latent print examiners is quite low, although this experience level has significantly been reduced by the recent departure of two of the most experienced employees.

Generally speaking, it appears that over the last several years the Latent Print Unit has developed into a unit that has been satisfied with survival instead of success. The absence of involvement and administrative supervision from upper management, coupled with the lack of on site technical leadership have contributed to an environment in which excellence is not expected, therefore not achieved. Maintaining the status quo became Job #1, regardless of what the rest of the forensic identification world was doing.

This situation was further complicated by a never ending stream of analytical work that exceeded the perceived abilities of the examiners. Survival became acceptable and new employees assigned to the unit quickly became accustomed to this philosophy.

Although these comments appear to all be negative, there were certainly some positives discovered during the assessment process. We received the impression that the majority of the Latent Print Unit employees enjoyed their work as latent print examiners, which is very important indeed. Collectively, they possess a significant amount of knowledge in several topic areas that certainly are of importance to the daily function of a Latent Print Unit. Eagerness to learn new techniques was noted and it is believed that the majority of the examiners within the unit are certainly capable of learning new skills, <u>if they so desire at this stage of their careers.</u> Although varying levels of oral communication skills were displayed, it is the opinion of the RS & A, Inc. assessment team that all current Boston Police Department Latent Print Unit staff members possess the necessary communication skills to testify successfully as an expert witness if they are able to increase their knowledge levels and receive specialized expert witness training.

Regarding the very critical area of "latent print sufficiency" determination, it is our opinion that there currently exists a very significant difference between the volume of latent impressions which are currently being deemed to be "of value" and the actual number being submitted. Although it always best to err on the side of caution, it is strongly felt that currently "many" suspect identifications are not being made which could, and should, be made because the identifiable latent impressions are being deemed of "no value" by members of the unit during the initial assessment. This is certainly compounded by the existing unwritten policy that only identifications are to be reviewed by additional examiners. In other words, the decision to deem a latent impression as being of "no value" is not currently subject to review.

Regarding the very critical area of "latent print position orientation", it is our opinion that collectively there currently exists a significant difference between the number of latent prints which are currently being identified and the actual number of latent prints which should be identified due to a lack of expertise in correctly positioning the latent print prior to the search be conducted. It is said in this profession that "you cannot identify what you cannot find" and "you cannot find what you cannot position (orient)". This is certainly true in that if you cannot properly determine what area of friction ridge skin made the latent impression along with the correct up and down position, then you will not conduct the minutia search in the correct area and the search will not result in an identification.

34

Regarding the very critical area of latent print comparison and identification, it is our opinion that currently the most widely accepted scientific methodology, ACE-V, is not being followed by the Boston P.D. Latent Print Unit. ACE-V stands for Analysis, Comparison, Evaluation and Verification and it is a methodology that, when followed, results in a much higher quality of examination being produced. It is a methodology that has become an industry-standard and one that the Boston Police Department needs desperately to institute as soon as reasonably possible. Although not full proof, it is an accepted methodology which will enable a latent print unit to significantly increase their effectiveness over time. It would require some significant re-training for the existing staff but would certainly be worth every hour of training required. Coupled with an aggressive QA/QC program, it would enable the Latent Print Unit to become the efficient and effective forensic operation that is needed in the Boston Police Department. As demonstrated throughout the practical exercises, the level of comparison and identification expertise within the Latent Print Unit is woefully inadequate. Although, it is our opinion that the current policy of having three examiners within the unit agree on all identifications made by the unit will for all practical purposes eliminate the possibility of an erroneous identification, it is the consensus opinion of our team of RS & A, Inc. experts that numerous identifications are being overlooked or not agreed upon due to the difficulty of the comparison. The results of the comparison exercises would clearly substantiate and validate this opinion.

Finally, one of the purposes of this assessment was to determine if the results correlate with the initial assessments entitled "III. Training Deficiencies of Existing Personnel: Latent Print Unit" and "VI. Absence of Continuing Education Program for members of the Latent Print Unit", which was reported on June 22, 2004 as a segment of the "Request for Proposal: Latent Print Services". It is clear to the entire team that the results of this assessment are certainly closely aligned with statements in that previous document. The problems noted in that initial evaluation were clearly defined throughout this assessment process and remain unchanged at this time.

This completes our assessment report. All the assessment documents are available for inspection if you so desire. As agreed upon in our original discussion, the comments regarding individual personnel are designed for your information purposes only and not intended for distribution to anyone other than management personnel. If you have any questions regarding any aspect of this report feel free to contact me for clarification.

We thank you for the opportunity to serve you in this very important endeavor and sincerely appreciate the hospitality your department showed us while we were on site during the assessment process.

Sincerely,

Ron Smith

Ron Smith, President
Ron Smith & Associates, Inc.



35

**EXHIBIT**
O'Toole
7
6/14/06 1525

# Ron Smith & Associates, Inc.
## P.O. Box 4436
## Meridian, Mississippi   39304
## Office:  601-485-7606
## Fax:  601-485-7622
## Email: ron@ronsmithandassociates.com

May 27, 2004

William Casey, Superintendent
Bureau of Administration and Technology
Boston Police Department
1 Schroeder Plaza
Boston, Massachusetts  02120

Reference:       Request for Fingerprint Classification Training and Latent
                 Print Examiner Evaluation Services

Superintendent Casey,

Pursuant to our conversation on May 20, 2004, I have prepared this formal proposal for
your consideration.  This proposal has been specifically designed for the Boston Police
Department and addresses the immediate needs in three (3) particular areas.  Those areas
are as follows:

I.     Fingerprint Classification and 10 Print Identification

       It is our understanding that the Boston Police Department needs training in
       this area for several new employees assigned to the section in order for
       them to be fully functional within the section.  Boston Police Department
       also needs this specific training for existing employees in the section in
       order for them to meet part of the formal training requirements to qualify
       for the "10-Print Examiner Certification" program soon to be offered by
       the International Association for Identification.

Boston Police Department                                    *May 27, 2004*

Latent Print Examiner Evaluations:

It is our understanding that the Boston Police Department seeks a full and formal evaluation of the existing levels of technical knowledge, skills, and abilities of all of their employees, including supervisory personnel, who may be responsible for the examination, comparison, identification and documentation of latent print evidence within the department. This would also include preliminary evaluation of testimonial skills related to the aforementioned duties, particularly in light of recent court challenges and decisions affecting the science of friction ridge identification.

III.    Latent Print Section Functionality Evaluation

It is our understanding that the Boston Police Department seeks a full and formal evaluation of the current status of the Latent Print Unit specifically in the areas of operational guidelines, policies and procedures, along with a full facility and equipment assessment. As we discussed in our subsequent telephone conversation on May 25th, 2004, this evaluation would be done under this proposal in order to take advantage of the physical presence of several members of the RS & A senior consulting staff in Boston at the same time. The information obtained from this on-site evaluation will be used to formulate and implement the long term plan of action. This action will be outlined in the long term proposal, which will soon be submitted for your consideration. This information will also be extremely valuable in developing a plan of action for the reduction of the existing backlog within the Latent Print Unit, once the funding for that project is acquired. The inclusion of this phase under this proposal will serve as a significant cost saving measure for the Boston Police Department.

As a result of this project's approval and after discussions with Lt. Tom Dowd, the following implementation schedule has been established:

June 21- 25, 2004:

First session of training in Fingerprint Classification and 10 Print Identification will be conducted. This would include approximately one half of the non-latent print personnel currently assigned to the Identification Section.

NOTE: If the Latent Print Unit personnel are to be included in the classification training program for formal credentialing purposes, it is imperative that they attend this first week of training. They will be not be available the second week due to the Latent Print Examiner Evaluation program which will commence the following week.

2

NOTE: It is fully understood by RS & A, Inc. that the business of the Boston Police Department must continue while this training is being conducted; however in order for the members of the department to receive formal credentialing for the hours of training provided by RS & A, Inc. they must attend a minimum of 90% of the course hours being offered.

**June 28 – July 2, 2004:**

Second session of training in Fingerprint Classification and 10 Print Identification will commence. It will be a repeat of the first session and will include the second half of the non-latent print personnel assigned to the identification Section. This class should not include any Latent Print Unit personnel.

**June 28 – July 1, 2004:**

The Latent Print Examiner evaluations will be conducted. These evaluations will involve three or four full days of written and practical exercises, and individual interviews with each of the employees who have duties within the Latent Print Unit, including supervisory personnel. It will be designed specifically to determine the knowledge, skills and abilities which exist both individually and collectively within the Boston Police Department. This data will be used to identify any technical deficiencies which may exist within the Latent Print Unit, and will be vital in the development of any training which might be required to achieve expertise commensurate with Latent Print Examiner Certification testing by the International Association for Identification. These individual evaluations will be formally prepared and submitted to you in writing by the end of July, 2004.

NOTE: As part of this evaluation process, it will be imperative that each member of the Latent Print Unit have a complete and current Curriculum Vitae prepared and ready for inspection by the RS & A team no later than June 21, 2004. These CV's should be faxed or emailed directly to Ron Smith & Associates, Incorporated. The fax number is 601-485-7622 (Attention: Ron Smith) and the email address is ron@ronsmithandassociates.com. These will be extensively reviewed prior to the week of evaluations commencing on June 28, 2004. Copies of any and all training certificates should be ready and available for inspection during the on-site evaluation process.

Boston Police Department

May 27, 2004

**June 28 – June 30, 2004:**

The Latent Print Section Functionality Evaluation will be initiated. During this process it will be imperative that the members of the RS & A team be provided examples of any and all documents currently in use by members of the Latent Print Unit. These would include evidence chain of custody documents or forms, case examination worksheets, photo log worksheets, AFIS entry worksheets or log books, and examples of written analytical reports. The reports and documentation should include cases in which there were no latent prints of value developed, cases in which there were latent prints of value developed and no suspects submitted and an AFIS search was initiated, cases in which AFIS searches resulted in an identification being effected, and cases in which named suspects were identified without the aid of an AFIS search being conducted.

It is imperative that all written policies, procedures, guidelines, etc. that currently exist within the Boston Police Department Latent Print Unit be provided to RS & A, Inc. as part of this evaluative process. If no such formal written policy or operation manuals exist, then a copy of the existing policies and procedures manuals for the Boston Police Department Crime Laboratory should be provided. These documents can be used to formulate new operational manuals for the Latent Print Unit so that continuity is developed within the forensic services offered throughout the Boston Police Department.

NOTE:  These documents should be collected by Boston Police Department and ready for release to RS & A on the morning of June 28, 2004.

During this Latent Print Unit evaluation process, a survey of existing equipment and commodities will be conducted to determine what will be needed to maximize the efficiency of the unit. This is needed especially if members of the RS & A consulting staff will be working within the section on a long term basis as part of the backlog reduction project, which would be implemented subsequent to the acquisition of funding.

4

Boston Police Department                                                    May 27, 2004

Completion of all of the elements of this proposal will require the on site services of four (4) members of the Ron Smith & Associates, Incorporated team of experts. They are as follows:

**Mike Campbell, Training Project Coordinator for RS & A, Inc. (Milwaukee, WI)**

Project Assignment:   Trainer for both of the Fingerprint Classification and 10 Print Identification classes. ( On site: June 21 - 25, June 28 - July 2, 2004)

**Ron Smith, President of RS & A, Inc.                    (Meridian, MS)**

Project Assignment:   Latent Print Examiner Evaluation and assist with Latent Print Unit Evaluation. Coordinate results of all projects and issue formal reports. (On site: June 28 - July 1, 2004)

**Jamie Bush, Senior Consultant for RS & A, Inc.            (Meridian, MS)**

Project Assignment:   Latent Print Examiner Evaluation and assist with Latent Print Unit Evaluation. (On site: June 28 - July 1, 2004)

**Bob Garrett, Senior Consultant for RS & A, Inc.          ( Metuchen, NJ)**

Project Assignment:   Latent Print Unit Evaluation (On site: June 28 - July 1, 2004) If the funding for the long term project is acquired, Bob Garrett will be assigned as Project Coordinator for the case backlog reduction phase of the project, along with additional training duties as needed.

The cost projection for the completion of this project is based upon the following factors:

1.   A minimum of 176 total hours of on-site training and evaluation services performed by members of the RS & A, Inc. staff at an hourly rate of $85.00 per hour.

2.   A minimum of 40 additional hours of off-site preparation for training and evaluation, along with approximately 20 hours of documentation and review of training and latent examiner testing results upon completion of the on-site evaluation and testing. These off-site hours are at a rate of $60.00 per hour.

3.   Coach air fare or standard mileage for all four members of the RS & A, Inc. staff from the city or residence and return. Estimated to be approximately $500.00 for airfare for each of two staff members (Smith & Bush), $700.00

Boston Police Department                                    May 27, 2004

Completion of all of the elements of this proposal will require the on site services of four (4) members of the Ron Smith & Associates, Incorporated team of experts. They are as follows:

**Mike Campbell, Training Project Coordinator for RS & A, Inc. (Milwaukee, WI)**

Project Assignment:    Trainer for both of the Fingerprint Classification and 10 Print Identification classes. ( On site: June 21 – 25, June 28 – July 2, 2004)

**Ron Smith, President of RS & A, Inc.                    (Meridian, MS)**

Project Assignment:    Latent Print Examiner Evaluation and assist with Latent Print Unit Evaluation. Coordinate results of all projects and issue formal reports. (On site: June 28 – July 1, 2004)

**Jamie Bush, Senior Consultant for RS & A, Inc.            (Meridian, MS)**

Project Assignment:    Latent Print Examiner Evaluation and assist with Latent Print Unit Evaluation. (On site: June 28 – July 1, 2004)

**Bob Garrett, Senior Consultant for RS & A, Inc.        ( Metuchen, NJ)**

Project Assignment:    Latent Print Unit Evaluation (On site: June 28 – July 1, 2004) If the funding for the long term project is acquired, Bob Garrett will be assigned as Project Coordinator for the case backlog reduction phase of the project, along with additional training duties as needed.

The cost projection for the completion of this project is based upon the following factors:

1.    A minimum of 176 total hours of on-site training and evaluation services performed by members of the RS & A, Inc. staff at an hourly rate of $85.00 per hour.

2.    A minimum of 40 additional hours of off-site preparation for training and evaluation, along with approximately 20 hours of documentation and review of training and latent examiner testing results upon completion of the on-site evaluation and testing. These off-site hours are at a rate of $60.00 per hour.

3.    Coach air fare or standard mileage for all four members of the RS & A, Inc. staff from the city or residence and return. Estimated to be approximately $500.00 for airfare for each of two staff members (Smith & Bush), $700.00

Boston Police Department                                                    May 27, 2004

for one staff member (Campbell-includes two trips) and standard mileage
(estimate at $250.00) for the fourth member (Garrett), who will be driving.

4.    Hotel accommodations for all four members of the RS & A, Inc. staff. (After
      review of the hotel information provided it is has been decided that the
      RS & A, Inc. staff members would be able to acquire suitable lodging outside
      of the city center for a much reduced price ($100-$125 per night) and use the
      savings to rent a vehicle for the entire length of the project, which would
      preclude the use of daily taxis or transport being provided by members of the
      Boston Police Department each morning and evening. This would also make
      evening travel for dinner, supplies, etc. much more accessible for the staff
      members.) Based upon our research, the savings in daily hotel room charges
      would more than offset the cost of the rental vehicle.

5.    Meals at a rate of $40.00 per day / per staff member, plus applicable tips of
      15%.

6.    Rental Vehicle at a projected rate of $60.00 per day, including insurance and
      gasoline.

7.    Cost of reproducing training and testing materials and training certificates of
      completion, including shipping, is estimated to be $700.00.

---

Total Cost of this project to the Boston Police Department:              $25,872.00

Upon satisfactory completion of the two week project, Ron Smith & Associates, Inc.
would submit a formal invoice for the amount of $25,872.00. This invoice would include
all of the services covered under this proposal and would be due within 30 days of receipt
by the Boston Police Department.

This completes the proposal as you have requested. If you have any specific questions
regarding any particular element please feel free to contact me for explanation or
clarification. I appreciate the opportunity to submit this proposal for your consideration
and I look forward to hearing from you soon.

Respectfully Submitted,


Ron Smith, President
Ron Smith & Associates, Incorporated



EXHIBIT
O'Toole
8
6/14/06 KmS

## Ron Smith & Associates, Inc.

P.O. Box 4436
Meridian, Mississippi  39304
Office:  601-485-7606
Fax:  601-485-7622
Email: ron@ronsmithandassociates.com

June 22, 2004

William Casey, Superintendent
Bureau of Administration and Technology
Boston Police Department
1 Schroeder Plaza
Boston, Massachusetts  02120

Reference:    Request for Proposal: Latent Print Services

Superintendent Casey,

Pursuant to our conversation on May 20, 2004, I have prepared this formal proposal for
your consideration.  This proposal has been specifically designed for the Boston Police
Department, (hereinafter referred to as BPD) and addresses the Existing Status:
**Primary Problem Areas** of both the Identification Unit (Tenprint) and Latent Print Unit.
This proposal will also address **Recommended Solutions** to these problems.

<u>Existing Status: Primary Problem Areas</u>

I.    Backlog of un-worked 2003 and 2004 cases. (Latent Print Unit)

    A.    According to the figures provided by your staff at the May 20th meeting,
the current backlog of un-worked cases within the Latent Print Unit has
more than tripled in the last two months and continues to rise at an
alarming rate.  At the current rate of incoming cases, it is anticipated that,
unchecked, the backlog will easily surpass 1000 felony cases prior to the
end of the 2004 calendar year, and continue to increase at a similar rate in
2005.

    B.    This increase in backlog can be attributed largely due to the lack of trained
and experienced personnel. This situation is magnified due to the
administrative suspension of two of the latent print examiners assigned to
the Latent Print Unit.  This suspension comes as a result of alleged
infractions on a case which is currently being investigated by the
Massachusetts Attorney General's Office.  These two examiners represent

3248

approximately 40% of the pre-suspension case production within the Latent Print Unit and their production cannot be replaced by realignment of existing personnel within the BPD. These developments have contributed to a "crisis" situation for the BPD which can not be dealt with internally. These latent print cases require examinations conducted by fully trained and experienced latent print examiners.

II. In-efficient use of technology, data and supervisory skills within the Identification Unit

A. Based upon our personal observation of activities within the Identification Unit, and preliminary discussions with the non-supervisory and supervisory personnel, it appears that some significant changes must be considered to maximize the technical efficiency of the operation. As part of the long term project to be addressed at a later point in this proposal, this operation needs to be studied in much greater detail, particularly in the area of general technological capabilities such as AFIS or task specific software.

B. The supervisory structure does not appear to be conducive to efficient Quality Assurance or Quality Control within the Identification Unit.

C. Based upon information acquired during the "Cowans" case review, it appears that the current supervisory responsibilities of senior examiners for both the Identification Unit and the Latent Print Unit contributed, in part, to the problem which developed within that case. This condition needs to be further evaluated in much greater detail as part of the long term project and will be addressed at a later point in this proposal. It also appears from the preliminary evaluation, that there may be several operational changes necessary within the Latent Print Unit. These operational changes could significantly impact the efficiency of the Latent Print Unit.

III. Training Deficiencies of Existing Personnel: Identification Unit & Latent Print Unit

A. The investigation of the case resulting in the suspension of two officers, uncovered numerous technical and training related deficiencies within the Identification Unit (Tenprint) and Latent Print Unit of the BPD, which have apparently developed over a period of many years.

B. Several of the newly assigned officers within the Identification Unit (Tenprint) need basic fingerprint science training, because there appears to be no formal modular training program for new officers assigned to this unit. The remaining officers assigned to the unit need additional standardized training which can be used to meet part of the formal

2

3249

training requirements needed for the "Tenprint Examiner Certification" program soon to be offered by the International Association for Identification. This certification program, which heretofore has not existed, needs to become an agency standard for personnel working within the Identification Unit. (Note: The first two week phase of this training is being implemented in June of 2004 under an agreement approved May 28th, 2004 and funded through the existing budget of the BPD.)

C.  Based upon earlier on-site observations and discussions with BPD Latent Print Unit personnel and supervisory staff, there appears to be a significant void in formal and consistent technical training in the science of latent print examination and identification. This was further confirmed by a review of the written training documentation provided during the initial inspection. Formal training in the past appears to have been disorganized and based primarily upon what was available for a minimal cost, instead of being based upon the ongoing needs of the officers assigned to the Latent Print Unit. A formal modular "Latent Print Examiner Training Program" for newly assigned officers to the Latent Print Unit does not exist within the BPD. (Note: The remaining staff members of the Latent Print Unit will be fully evaluated during the second week of the training period to be conducted under an agreement approved May 28th and funded through the existing budget of the BPD. This evaluation will include written testing of the scientific principles and methodologies of the science of friction ridge identification. It will also include a series of visual analytical tests specifically designed to determine the skill and ability of each officer currently assigned to the Latent Print Unit as it relates to the "Analysis, Comparison & Evaluation" elements the examination process. These evaluations will result in a formal recommendation regarding the future training needs of the existing personnel and newly assigned personnel to the Unit.)

IV.  Lack of Written Operational Polices and Procedures

A.  Subsequent to a review of more than 1,500 latent print cases as part of the "Cowans" case review, it became readily apparent that the BPD Latent Print Unit did not operate under any specific formal written guidelines relating to case examination during that time period.

B.  Further inquiries and interviews revealed that such formal written guidelines did not exist during that time frame for most functions of the Latent Print Unit and still do not exist today.

C.  Although not yet fully determined, it is suspected that a lack of written polices and procedures exist within the Identification Unit as well.

3250

D.   This lack of written policies and procedures perpetuates a lack of individual accountability regarding functional areas of both the Identification Unit and the Latent Print Unit. This is particularly evident in the examiner's responsibilities in the Latent Print Unit and in the supervisor's responsibilities, as it relates to functions of the latent print examiners.

V.   Absence of Quality Assurance / Quality Control Program (Latent Print Unit)

A.   There is no written existing QA/QC program in place within the Latent Print Unit.

B.   Employees do not participate in external proficiency testing.

C.   There appears to be no internal proficiency testing program within the Latent Print Unit.

D.   The BPD has not required or encouraged their examiners within the Latent Print Unit to undergo testing for "Latent Print Examiner Certification" through the International Association for Identification.

VI.  Absence of Continuing Education Program for members of the Identification Unit or the Latent Print Unit.

A.   The BPD has not sufficiently, nor consistently, encouraged or supported their employees to participate in regional, national and international forensic organizations which provide training opportunities through seminars, conferences and periodical publications.

B.   The BPD has not consistently pursued specialized training opportunities for members of the Latent Print Unit from third party providers.

C.   No individual, long term, "Continuing Education Plan" exists for the employees of the Latent Print Unit. These individuals are expected to stay current on recent developments within the latent print field in order to perform their examinations properly and defend their actions, as an expert witness, in a court of law.

D.   There appears to be no designated method of disseminating technical information throughout the Identification Unit and the Latent Print Unit utilizing periodical subscriptions to forensic journals.

VII. Absence of any "Skills Based" Formal Selection Process for entering into the Identification Unit or Latent Print Unit.

4

3251

A.    The Identification Unit staff is comprised of sworn police officers; however, the selection process is not currently based upon educational credentials related to the forensic sciences, or professional knowledge, skills or abilities applicable to the work being performed.

B.    It appears that entry into the Latent Print Unit comes as a transfer from the Identification Unit, and is not based upon a particular educational background, knowledge, skill or ability level related to the work being performed.

Synopsis of Existing Status of Identification Unit and Latent Print Unit:

Although several very significant problem areas exist and need to be addressed, there are several positive attributes present in the BPD which will have a major impact on the long term project. First, and foremost, the executive management staff fully understands the critical nature of the situation, and exhibits a very positive attitude toward solving these problems. Second, the line supervisors and their staff members seem to be quite supportive of the department's attempt to address the unit's deficiencies and their individual professional needs.

In addition, the BPD seems to possess the facility and the majority of the equipment necessary for the Identification Unit and Latent Print Unit to become fully functional at a more than acceptable level.

These positives will prove to be vital given the many critical situations which need to be addressed in order for the BPD to provide the level of forensic friction ridge identification services commensurate with an agency of the same size of the BPD.

As seen from the previously noted comments, there exist major voids between where the BPD is and where they should be, given the size of the agency. It appears from our preliminary observations, that these voids have developed slowly over the last twenty to thirty years, and were not purposefully created, but instead were a result of non-attention or non-concern from the upper management staff. This seems to have been aggravated by the assignment, in some instances, of less than desirable employees from other sworn divisions to the Identification Unit. Although certainly unwarranted, this is not uncommon in police departments in which Identification Units and Latent Print Units have been staffed over the years with sworn police officers instead of specially chosen civilian employees. Many of the very best latent print examiners in the United States are indeed sworn police officers, so it is not necessarily an issue of sworn versus non-sworn, but instead an issue of who has the best individual knowledge, skill and ability to perform the elements of the particular job of latent print examiner. Candidates for civilian or sworn latent print examiner positions can be screened for their skills and knowledge in the field prior to being selected for employment.

3252

Recommended Solutions:

Obviously, there is no quick fix for the situation which exists within both the Identification and Latent Print Units of the BPD. Our recommendations will address each of the Primary Problem Areas individually. The implementation of each recommendation would require significant coordination between the staff members of Ron Smith & Associates, Incorporated, (hereafter referred to as RSA) and the staff members of the Identification Unit and Latent Print Unit. It would also require the full and continued support of the upper management of the BPD throughout the entire process.

I.      Backlog of un-worked 2003 and 2004 cases (Latent Print Unit) and ongoing analytical support within the Latent Print Unit due to employee shortages and reduction in production due to anticipated training program being implemented.

Proposal:

RSA proposes to provide the full time analytical support services of two (2) I.A.I. Certified Latent Print Examiners on-site on a rotating, weekly or bi-weekly basis for a period not to exceed two years, unless further requested. Exceptions to this schedule would be on an "as required" basis. These RSA examiners would work in tandem with the Latent Print Examiners of the BPD.

RSA proposes to provide a part-time on-site project manager on a rotating weekly or bi-weekly basis. This person would serve as the primary on-site contact person for RSA and would work under the direct administrative supervision of the management staff of the BPD and RSA. This person would meet regularly with the police department management staff and provide periodic casework backlog reduction reports.

Note: The logistics of providing on-site analytical casework from an outside contractor are significant. Mission goals can, however, be accomplished, if RSA and their analytical staff along with the BPD analytical staff can set clearly defined goals and establish mutually agreed upon guidelines for the casework project. Under this proposal the casework responsibilities of RSA would be conducted under the following guidelines:

A.      Casework conducted by members of the RSA analytical staff would normally be performed during day shift hours. This would be necessary in the event that if procedural or administrative issues develop, supervisory staff of the police department would be available for consultation. Exceptions will be considered on an individual basis.

B.      Technical staff of RSA would remain under the technical supervision of the RSA management and would not perform any analytical procedures

6

not authorized by the management of RSA, but would, while on-site, report to the designated supervisory staff of the BPD for administrative questions or issues.

C.    Casework related duties performed by members of the RSA analytical staff would include:

- Processing of evidence for the presence of latent prints utilizing the most appropriate methodology available.

- Preparation of chemical reagents necessary for the processing of items of evidence for the presence of latent prints.

- Comparison of latent prints with the known prints of named suspects and/or elimination prints submitted, using ACE-V methodology. (Verifications of all latent print identifications effected by members of the RSA staff would be conducted by a second RSA staff member and a member of the BPD Latent Print Unit.)

- Photographic or electronic documentation of all latent prints deemed to be of value for comparison purposes.

- Preparation and submission of all latent fingerprints suitable for AFIS/IAFIS search, as well as, the evaluation of automated search results.

- Documentation of all evidence received, analytical procedures performed, and results obtained sufficient to support official reports issued by staff members of the BPD Latent Print Unit. This documentation would be on any official document appropriate for this purpose and provided by the BPD. If none exists, an appropriate form can be designed by RSA and approved by the BPD for that specific purpose.

- Provide a second, independent examination, if requested, on any latent print identifications effected by staff members of the BPD Latent Print Unit.

- Provide additional technical assistance specifically related to Tenprint or latent print functions, as needed, to the staff members of the BPD upon request.

- Note:  If a difference of opinion regarding the identification of a latent print arises between RSA and any staff member of the BPD Latent Print Unit, this situation should immediately be brought to

7

Boston Police Department                                    June 22, 2004

the attention of both the supervisory staff members of the BPD and the management staff of RSA. No official opinion, written or oral, should be issued by anyone prior to this difference of opinion being completely resolved.

II.  **Inefficient use of Technology, Data, and Supervisory Skills within the Identification Unit and the Latent Print Unit.**

Proposal (Identification Unit):

Based upon our preliminary observations of activities within the Identification Unit and our initial interviews with both unit personnel and supervisory personnel with the Identification Unit and Latent Print Unit, it appears that significant changes should be considered to maximize the technical efficiency of the overall operation. This 24 hour a day operation needs to be studied extensively and specific necessary tasks should be identified, evaluated and prioritized based upon both the current and projected level of need, as well as, the current and projected availability of resources.

Under this proposal RSA would do a complete analysis of the Identification Unit operation to determine what specific services have been required of this unit and how they have provided those services in the past. Each task within the section would be identified and examined to determine the following:

A.  What level of priority should be assigned to each task?

B.  What level of skill, knowledge and ability is necessary, for staff members to accomplish each task?

C.  How frequently will each task be performed and should it be performed on each shift?

D.  What level of on-site supervision should be present when each task is being completed?

E.  What technology is available to maximize efficiency while each task is being accomplished?

F.  Are there ways to utilize additional technology, to reduce human intervention, in any of the tasks being performed?

G.  Is each task needed as an integral part of the mission of the Identification Unit or is it just part of "how we have always done it."

H.  What will be the immediate and long term ramifications of an error being committed for each task?

8

3255

Boston Police Department                                    June 22, 2004

I.      Are there individuals within the Identification Unit who possess the necessary skills and desire to be trained as Latent Print Examiners, if that option were to become available?

J.      Are there individuals within the Identification Unit who can be trained to assist with the daily functions of the Latent Print Unit?

For this particular phase of the project, RSA intends to utilize the skills of team members who have supervised large scale Identification Units in similar sized police departments or state agencies. These team members would be brought in specifically to assess the functions of the Identification Unit, analyze the data collected and attempt to answer the questions noted above. More than likely, this analysis will generate many more questions which will need to be answered during this process. It would then be the task of RSA to prepare recommendations in written form and present them to the management and unit staff of the BPD for consideration. The project would include the development of a new and more efficient work flow through the unit, which would maximize the efficiency of the section. Together, RSA and the BPD would then be able to develop a cohesive plan of action to bring the Identification Unit to a level of service that can handle the demands of the present and the future. Subsequent to approval, implementation of the plan of action would require the cooperative efforts of both RSA and BPD through each step of the process.

**Proposal (Latent Print Unit —"On-site Functions"):**

Under this proposal RSA would conduct a similar audit of the Latent Print Unit operation to determine the essential functions and individual tasks of the section. Once these tasks have been determined, each task would be examined to determine the following:

A.      What level of priority should be assigned to each task?

B.      What level of skill, knowledge and ability is necessary, for staff members to accomplish each task?

C.      Based upon the technical evaluations performed under the short term contract, which current employees are most proficient and least proficient in each primary task?

D.      How frequently will each task be performed and should it be performed on each shift?

E.      What level of on-site supervision should be present when each task is being completed?

3256

Boston Police Department                                                June 22, 2004

F.   What technology is available to maximize efficiency and accuracy while each task is being accomplished?

G.   Are there ways to utilize additional technology, to reduce human intervention, in any of the tasks being performed?

H.   Is each task needed as an integral part of the mission of the Latent Print Unit or is it just part of "how we have always done it."

I.   Does each task arrive at the most complete and accurate result, and if so, is this result reproducible?

J.   What will be the immediate and long term ramifications of an error being committed for each task?

K.   Are there task(s) within the Latent Print Unit which could be performed successfully by staff members not trained as Latent Print Examiners?

L.   What level of supervision exists currently within the Latent Print Unit?

M.   What level of supervision should be available for each shift and where should that supervisor be physically located to perform these supervisory duties?

For this phase of the project RSA plans to utilize the advanced technical and administrative skills of several members of the RSA team. Each of these team members will be IAI Certified Latent Print Examiners with considerable latent print unit management experience. These team members will be brought in specifically to assess the functions of the Latent Print Unit, analyze the data collected and attempt to answer the questions noted above. It is our expectation that this process will generate many more questions than those noted above. Upon completion of this evaluative process, it would be the task of RSA to prepare recommendations in written form and to present them to the management and unit staff of the BPD for consideration. The project would include the development of a new and more efficient work flow process through the unit which would maximize the efficiency of the section. Together, RSA and the Boston Police Department would then be able to develop a cohesive plan of action to bring the Latent Print Unit to a new level of excellence. The Latent Print Unit should be expected to conduct latent print examinations in a manner consistent with the quantity and quality levels that can handle the demands of both the present and the future. This RSA proposal would be designed to accomplish the long term desired result. Implementation of the plan of action would require the cooperative efforts of both the RSA and BPD staff members and management through each step of the process.

10

Boston Police Department                                             June 22, 2004

III.    Training Deficiencies of Existing Personnel (Identification Unit and Latent Print Unit):

Proposal (Identification Unit):

RSA proposes that a formal, long term "Identification Unit Training Plan" be developed and maintained within the Identification Unit. This modular training plan would be designed around the specific needs and particular tasks associated with the BPD operation. Its design would also coincide with the training requirements of the International Association for Identification Tenprint Certification Program, which has recently been established. Upon completion of the "Identification Unit Training Plan", individuals within the section would have completed all of the training requirements of the certification program. These individuals would still be required to meet the experience and/or educational requirements of the I.A.I. Tenprint Certification Program prior to being accepted for certification testing.

RSA proposes to develop a long term training plan for BPD utilizing RSA staff members who have experience in the supervision of Identification Units and who have a proven record of establishing various elements of training programs within their own agency. This program would be designed in such a manner that it could be maintained long term, by trained staff members of the BPD, after RSA has completed our contractual agreements. The program would also provide continuing education requirements needed to maintain the high level of excellence desired of an Identification Unit.

The long term modular training plan would include on-site training provided by members of the BPD staff, along with selected third party training providers. The plan would be designed to document the initial and long term training status and training record of each member of the Identification Unit throughout their career within the section. This formal documentation will be compiled in such a manner that it can be used for training budget preparation and promotional considerations by BPD if desired.

Proposal (Latent Print Unit):

As noted earlier, on-site observations, discussions with BPD personnel, and a review of a significant number of BPD Latent Print Case Files, strongly indicates that there is a substantial void between the current knowledge level of the BPD Latent Print Examiners and the expected knowledge level of latent print examiners in the field. Regardless of the reasons this has happened, it is the intention of RSA to remedy this situation as soon as reasonably possible. It will require significant effort on the part of the existing Latent Print Examiners, and the total support of the BPD management staff. When training is in session it involves a full time commitment of both the instructor and the student, and the BPD management staff must be able to continue providing the off-site (crime

11

3258

June 22, 2004

scene) services of the Latent Print Unit without interrupting the formal training sessions while they are in session. This will require a major effort in time management and employee assignments, but is vital to the success of any training program implemented.

RSA proposes that this training situation be approached from four separate, but equally important, directions. First, the training and expertise void which exist within the BPD Latent Print Unit must be identified on an individual examiner basis. Each examiner must be thoroughly tested, interviewed, and evaluated while performing multiple tasks within the section. It is anticipated that the majority of this evaluation will be completed under the contractual agreement already approved, which will be conducted on June 27th through July 1st, 2004.

Second, these individual evaluations will be examined from the perspective of what the collective knowledge level is of the total group of examiners and supervisors within the Latent Print Unit, and how that knowledge is distributed among the two shifts.

Third, once the evaluations are fully completed, a specific training plan needs to be designed for each individual within the Latent Print Unit. In many instances the training will be the same for multiple individuals, but particular strengths and weaknesses need to be accounted for in the training process. RSA would design each individual training plan around the knowledge, skills, and abilities expected of any examiner who could successfully complete the Latent Print Examiner Certification Test administered by the International Association for Identification. Each training plan would also be configured to include all aspects of the "Training to Competency" plan developed by the Federal Bureau of Investigation's Scientific Working Group on Friction Ridge Analysis, Study, and Technology.

Finally, RSA proposes that a formal "Latent Print Unit Training Plan" be developed and maintained long term within the Latent Print Unit. This plan would be designed for implementation any time a new person is assigned to the Latent Print Unit. This modular training plan would be designed around the specific needs and particular tasks of the BPD operation. Its design would also coincide with the training requirements of the International Association for Identification Latent Print Examiner Certification Program, which has been in existence for over twenty-five years. They would still be required to meet the experience and/or educational requirements of the I.A.I. Latent Print Examiner Certification Program prior to being accepted for certification testing.

RSA proposes to develop a long term training plan for BPD utilizing those RSA staff members who have experience in the supervision of Latent Print Units. These individuals have a proven record of establishing various elements of

12

Boston Police Department                                      June 22, 2004

training programs within their own agencies. This program would be designed in such a manner that it could be carried on long term by trained staff members of the BPD after RSA has completed our contractual agreements. This program would also provide for the development of a continuing education plan to maintain professional certification and the high level of excellence desired of a Latent Print Unit.

The long term modular training plan would include on-site training provided by members of the BPD staff and RSA staff, along with selected third party training providers. It would also be designed to document the initial and long term training status and training record of each member of the Latent Print Unit throughout their career within the section. This formal documentation will be compiled in such a manner that it can be used for long term training budget preparation.

IV.     Lack of Written Operational Policies and Procedures.

Based upon multiple case reviews, inquiries, and interviews conducted as part of this initial process, it became readily apparent that the lack of formal written operational guidelines within the Latent Print Unit has had a significant impact on the quality of latent print examinations conducted in the past and the present. The lack of formal written policies and procedures have contributed to a lack of personal accountability within the Latent Print Unit, including the supervisory staff. The lack of agency and unit policies and procedures directing the examination of latent print evidence became a major contributing factor in the "Stephan Cowans" case. It is impossible for a Latent Print Unit or Identification Unit to function in a professional manner, in today's environment, without formal guidelines which are clearly understood and followed by members of the analytical staff. This lack of formal directives is painfully obvious at BPD, as is the importance of correcting this situation.

RSA proposes to utilize the information gained in other aspects of this project to begin the development of a "Standard Operations Manual" and "Technical Bench Manual" for the Latent Print Unit. This is a massive undertaking and one that will require many months to complete. After each task has been identified, examined and prioritized, a policy statement regarding each function will be developed in draft form. The draft will be submitted to the BPD for review and comment, and upon completion of this review the task will be prepared for inclusion in the appropriate manual.

It is anticipated that the format for these manuals will be the same as that being used by the Boston Police Department Crime Laboratory, which is accredited by ASCLD-LAB, an accrediting institution working under the auspices of the American Society of Crime Lab Directors. Although, it has not been indicated to RSA that the supervision of the Latent Print Unit will be transferred to the Crime Laboratory, the design of the operational manuals consistent with the BPD

13

3260

Boston Police Department                                      June 22, 2004

laboratory would make that transition much easier if that option was considered in the future

It is the intention of RSA that operational manuals would also be designed for the Identification Unit simultaneously with the Latent Print Unit. Although, the operation of these two units differ significantly, its operation could also become much more efficient under new and more modern guidelines and procedures which could be easily passed on to new staff members within the unit. It is anticipated that the development of the manuals for the Identification Unit would require approximately six months to complete. The same process of policy and procedure development would be required. RSA would identify a task, design a policy statement regarding this task, and then submit it to BPD for review and comment. Upon completion of this process the task will be prepared for inclusion in the appropriate manual.

**V.     Absence of Quality Assurance / Quality Control Program (Latent Print Unit)**

As noted in the "Primary Problem Areas" of this proposal, there is no formal Quality Assurance or Quality Control program existing within the BPD Latent Print Unit. Although the presence of a working QA/QC program would not have guaranteed that the "Stephan Cowans" erroneous identification would not have occurred, the likelihood of it happening would have been greatly diminished. Well designed, management supported, quality assurance and quality control programs are the standard required in today's forensic environment. The volume, intensity and critical nature of physical evidence requests received by the Latent Print Unit are constantly increasing, and the pressures associated with this work are increasing proportionately. Under these levels of physical and mental demands, the BPD cannot adequately protect itself and the citizens it serves without having a formal QA/QC system in place. It is the QA/QC system itself that takes over when the employees themselves drop their guard inadvertently, lose concentration momentarily or for whatever other reason, fail to render the correct opinion in their initial examination. No agency is immune to analytical problems; therefore, no agency should be without a formal QA/QC program in place.

RSA proposes that the development of a formal written QA/QC program be part of the contractual elements of the project. This would include the development of a standard technical and administrative review system for all casework being conducted by the BPD Latent Print Unit. Although the BPD has an unwritten policy at this time that requires that all identifications be verified by a second Latent Print Examiner, this current policy fell desperately short in the "Stephan Cowans" case. The lack of supervisory involvement has created a major void in the current technical review case review process which must be filled before the BPD can be assured of a long term, quality, analytical product being generated by the Latent Print Unit on a daily basis.

14

June 22, 2004

RSA proposes to initiate a formal, periodic internal and external proficiency testing program within the BPD Latent Print Unit. Any agency which professes to have a professional latent print unit participates in proficiency testing programs on a regular basis, and maintains documentation of the results for further reference.

During the initial evaluations which have been conducted, it has been determined that the BPD currently has no latent print examiners who have achieved professional certification as a "Certified Latent Print Examiner" through the International Association for Identification, even though this certification program has been in existence since 1978. RSA proposes that the existing staff members be evaluated, as soon as possible, to determine if they qualify for application and testing for the I.A.I. latent print certification program. If any of the existing employees qualify for testing then their individual training programs would be designed around achieving certification as soon as reasonably possible.

VI.    Absence of Continuing Education Program for Members of the Identification Unit and Latent Print Unit.

From information gathered it appears that the BPD has not designed any formal continuing education program for members of the Identification Unit or Latent Print Unit. Members of these units were not encouraged to participate in professional organizations or to attend state, regional or national training conferences to learn new skills or maintain expertise in existing skills. As noted earlier, even when employees of the BPD were fortunate enough to attend external training seminars, there was no method in place at BPD to disseminate that information to others within the department. Continuing education is a vital element of any modern forensic identification operation and is a mandatory requirement to meet the challenges of today's legal environment.

RSA proposes the development of a long term "Continuing Education Plan" for each staff member assigned to the Identification Unit and Latent Print Unit. These plans will include internal information dissemination methods along with external seminars, conferences and workshops as they are needed or as they become available. Some of the information can be gained from assigned readings and internet sources which will not require agency travel funds, although travel funds will be necessary for attendance at selected regional or national conferences.

VII.    Absence of any "Skills Based" Formal Selection Process for Entering into the Identification Unit or Latent Print Unit.

It appears that some of the long term problems, which have confronted the Identification Unit and the Latent Print Unit, have been a result of mistaken personnel actions of the BPD. From public reports and information received it appears that the Identification Unit has sometime been used as a sort of "unit of

3262

last resort" for officers who have had problems elsewhere within the BPD. Although this is certainly not the case for many of the current employees, it still points to the fact that there seems to be no formal selection process for entry into the Identification Unit or advancement into the Latent Print Unit.

RSA proposes to assist the BPD in the development of a screening process to be used prior to the selection of staff members being assigned to the Identification Unit and the Latent Print Unit. The screening process to be used for selection of personnel for the Latent Print Unit would include a knowledge and skills based series of tests to insure that the most qualified candidates were selected for these advanced forensic positions.

## Implementation Issues:

As can be seen from this proposal, much can be done to improve the Identification and Latent Print Units of the Boston Police Department. This proposal has been designed to address what we believe to be the most critical needs within each of these units. If RSA is selected for this project, it will be imperative that the entire project be included, since each of these areas of concentration is directly dependent on another. RSA would make every effort to proceed with as many of the specific projects simultaneously as possible. While casework was being conducted on-site by RSA staff members, many other parts of the project would be underway off-site by other members of RSA at the headquarters office in Meridian, Mississippi. Some off-site elements of the project, such as training plans, manuals, etc., might be assigned to staff members located in other parts of the United States as needed. Training of BPD staff members would be scheduled based on agency work schedules as much as possible, but in some instances it would require that BPD make significant changes to accommodate training opportunities. These schedules would be coordinated through a cooperative effort between BPD management staff and RSA management staff.

Obviously, a project of this magnitude will require an exceptional amount of pre-planning, along with an unusually large commitment to regular monitoring to insure the quality of the work being performed. It is the intention of RSA to include in this proposal the services of an on-site project manager, who will be directly responsible for the staff assigned to the on-site segments of the project. This person would be traveling to Boston for at least one or two days per trip on a weekly or bi-weekly basis as needed. In addition to this on-site supervision, it is intention of RSA to have selected members of the RSA management team on-site for inspection and project review at least once a month to review the progress of the project and provide status reports to the management staff of the BPD.

## Project Time Line:

It is impossible to develop an accurate time line for this entire project without knowing more about the knowledge, skills and abilities of the individual BPD staff members. It will also be dependent on the level of existing backlogged casework and rate of incoming

3263

Boston Police Department                                    June 22, 2004

casework once the project is initiated. Certain parts of the project, such as manual development, etc. should be accomplished within a one year time frame, whereas others might take up to two years to complete. It would be unreasonable to submit a practical timeline without additional information being obtained. As further information becomes available, a time line for certain elements of the project can be developed, which would in turn result in a time line for the entire project being constructed. It is the full intention of RSA to develop an accurate time line as soon as reasonably possible.

**Performance Period:**

Based upon information supplied during our meetings, and telephone conversations regarding this project, it would be the intention of RSA to provide these services for such a period of time as defined by the Boston Police Department. It is fully understood that the performance period may be adjusted by the BPD based upon budgetary considerations and staffing changes. Based upon the services requested as part of this proposal, it is the considered opinion of RSA that the performance period required for the implementation of all of the services would be approximately two years.

**Project Costs:**

RSA proposes to provide the services included in this proposal under the following categories and applicable rates:

1.    Hourly Rate for General On-Site Services Performed:   $85.00 per hour/ per RSA analyst: (Projected # of RSA hours per month = 400 - 425)

   a.    Includes all on-site services such as casework, personnel evaluations and testing, etc.

   b.    Does not include third party training.

   c.    Does not include providing expert witness testimony services.

2.    Hourly Rate for General Off-Site Service Performed:   $65.00 per hour / per RSA analyst:  (Projected # of RSA hours per month = 50 - 75)

   a.    Includes all off-site services such as development of Standard Operating Procedures Manuals, project status reports, etc.

   b.    Does not include third party training.

   c.    Does not include providing expert witness testimony services.

   Note:  Each hour of on-site or off-site service will be fully documented and will be included in the monthly invoice submitted by RSA.

3264

June 22, 2004

3. Travel Expenses: (For any purpose related to the proposal)

   a. Coach airfare or mileage at the current Federal rate of reimbursement. (Estimated: 10 - 12 round trip tickets per month)

   b. Meals at a rate of $40.00 per day per staff member, plus tips not to exceed 15%. (Estimated: 65 - 75 meal days per month)

   c. Lodging estimated to be $100 - $125 per night per night per staff member. (Estimated: 55 - 60 room nights per month. Not utilizing downtown hotels to avoid higher rooming cost)

   d. Rental vehicle at a projected rate of $85.00 per day, including insurance and gasoline. (Estimated: 20 - 25 days per month)

   e. Cost of reproducing training materials, manual drafts, and other larger documents. (Estimated at $200.00 per month)

4. Expert Witness Testimony Services:

   a. $1000.00 per day for each day spent in court.

   b. $500.00 per day for each day of travel associated with court appearances.

   c. Travel expenses as noted above.

5. On-Site Third Party Training:

Depending upon the specific training needed, the services of non-RSA instructors may be required. The charges for their services will be negotiated separately by RSA and would be invoiced to BPD as a separate line item on the applicable monthly invoice. The amount of these charges will vary depending on the topic, the instructor, the length of the training and whether or not this training is available to BPD through other sources. Every attempt would be made to assist BPD in receiving this training at the lowest cost possible.

Project Cost Synopsis and Invoicing for Services Rendered:

Based upon the above noted estimates, the anticipated monthly expenditures for this entire project would fall in the range of $49,000 to $55,000 per month for the entire performance period.

As noted earlier in this document, a monthly invoice from Ron Smith & Associates, Inc. would be submitted with supporting documentation as requested by the Boston Police Department. Arrangements could be made for direct deposit or in any other reasonable manner preferred by the BPD. Due to the large amount of out-of-pocket expenses

3265

incurred by RSA each month, payment within 30 days of receipt of invoice would be
expected and appreciated.

This completes the formal proposal requested by the Boston Police Department. If you
have any specific questions regarding any particular item within this proposal please feel
free to contact me for explanation or clarification. Ron Smith & Associates, Inc.
appreciates the opportunity to submit this proposal for your consideration and we look
forward to hearing from you soon.

Respectfully Submitted,

Ron Smith, President
Ron Smith & Associates, Incorporated

19